## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DUBOIS COUNTRY CLUB, LTD and JUNIATA LAKE PROPERTIES, LLC,** | ) ) ) | **Case No. 3:19-cv-190** |
| Plaintiffs, | ) ) | **JUDGE KIM R. GIBSON** |
| v. | ) ) | |
| **DEPOSITORS INSURANCE COMPANY, ALLIED PROPERTY & CASUALTY INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, and AFFILIATED COMPANIES,** | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendants Depositors Insurance Company ("Depositors"), Allied Property & Casualty Insurance Company ("Allied"), and Nationwide Mutual Insurance Company and Affiliated Companies' ("Nationwide") (collectively the "Insurers") "Motion for Partial Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(a)—Bad Faith Claims" (ECF No. 45) and brief in support. (ECF No. 45-6). Plaintiffs Dubois Country Club, LTD ("Dubois Country Club") and Juniata Lake Properties, LLC's ("Juniata") (collectively the "Policyholders") Complaint contains the following two claims against the Insurers: Breach of Contract (Count I) and Bad Faith (Count II). (*See* ECF No. 1-2). The Insurers ask this Court to grant summary judgment with respect to the Policyholders' bad faith claims (Count II) alone. (ECF No. 45 at 1).

The Insurers' Motion is fully briefed (ECF Nos. 45-6, 46, 49) and is ripe for disposition. For the following reasons, the Court **GRANTS** the Insurers' Motion for Partial Summary Judgment.

I.      **Jurisdiction and Venue**

The Court has subject-matter jurisdiction over this dispute under 28 U.S.C. § 1332. On the one hand, Depositors is a citizen of Iowa, Allied is a citizen of Iowa, and Nationwide is a citizen of Ohio. (ECF No. 1 at ¶ 5). *See GBForefront, L.P. v. Forefront Management Group, LLC*, 888 F.3d 29, 34 (3d Cir. 2018) (noting that the "citizenship of a corporation is both its state of incorporation and its principal place of business."). On the other hand, Dubois Country Club is a citizen of Pennsylvania, and the Court lacks any information indicating that Juniata is a citizen of either Iowa or Ohio. (ECF No. 1-2 at ¶¶ 1–2). *See GBForefront, L.P.,* 888 F.3d at 34 (explaining that a limited liability company is a citizen of all the states of its members).[1] Thus, there is complete diversity among the parties. Additionally, the amount in controversy exceeds $75,000. (ECF No. 1-2 at 9).

Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to this suit occurred in the Western District of Pennsylvania.

---

[1] The Court notes that it may raise the issue of subject-matter jurisdiction on its own initiative at any stage in the litigation. *Arbaugh v. Y&H Corp.,* 546 U.S. 500, 506 (2006) (explaining that the "objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment. Rule 12(h)(3) instructs: 'Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'"). Here, the parties have not provided the Court with any indication that any member of Juniata is a citizen of Iowa or Ohio, and the Court is not aware of any information that would indicate the same. Therefore, the Court will proceed with the understanding that Juniata, which is based in Pennsylvania (ECF No. 1-2 at ¶ 2), is neither a citizen of Iowa nor Ohio. Accordingly, the Court will proceed to consider the merits of the Insurers' Motion for Partial Summary Judgment.

II.     **Factual Background**

    A. **The Insurance Policy and the Fire**[2]

According to the Policyholders, Juniata owns approximately 160 acres of land located in Dubois, Pennsylvania, that it leases to Dubois Country Club. (ECF No. 1-2 at ¶ 3). Dubois Country Club uses the land and buildings on the property to operate a club house, banquet center, restaurant, and golf club. (*Id* at ¶ 4).

The Policyholders state that from December 23, 2013, until December 23, 2014, they had a commercial insurance policy with Allied (the "Policy"), and Allied placed the coverage through Depositors. (*Id.* at ¶ 9).[3] The Policyholders further state that Allied and Depositors were both affiliates of Nationwide. (*Id.* at ¶¶ 8, 9). On or around February 24, 2014, while the Policy was in effect, a fire occurred at Dubois Country Club, causing the complete destruction of the upper level of the building that included the banquet hall, restaurant, and members golf building (the "country club"). (*Id.* at ¶ 14). However, the fire did not damage the building known as the pro shop. (*Id.*). Further, although the fire did not damage the lower level of the country club: (1) the Insurers directed the Policyholders to place a covering over the lower level, (2) the Policyholders could not use the lower level of the country club for a period of time after the fire, and (3) mold and other contaminants

---

[2] Because the parties disagree over some of the facts in the following subsection, the Court derives certain background information from the Policyholders' Complaint. (ECF No. 1-2). In doing so, the Court does not take these facts as established, it offers them for the purpose of providing background, and it notes that they are not highly relevant to the disposition of the Policyholders' bad faith claims.

[3] The Court notes that in their Response to the Insurers' Motion, the Policyholders state that their claims involve multiple policies issued by Depositors and Allied. (ECF No. 46 at ¶ 1). Because the specific number of policies is not relevant to the Policyholders' bad faith claim, the Court will not presently concern itself with exactly how many policies there were.

began to grow on the lower level as a result of the water that the firefighters used to stop the fire. (*Id.* at ¶ 15).

**B. The Insurers Pay the Policyholders Under the Policy**

The parties agree that, pursuant to the Policy, the Insurers paid the Policyholders a total of $2,396,082.15 for the damages caused by the fire. (ECF No. 45 at ¶ 17; ECF No. 46 at ¶ 17). The Insurers paid the Policyholders this amount of money through several checks issued between February 27, 2014, and April 5, 2016. (ECF No. 45-1, Exhibit D).

Further, from the time that the fire occurred until the present, various individuals and entities have prepared estimates outlining the costs that the Policyholders incurred and the damages that they suffered as a result of the fire. (*See* ECF Nos. 45, 46). First, with respect to the damage to the country club:

    a. Kevin Leisenring of Franjo Construction, an individual that the Policyholders hired to produce an estimate to rebuild the upper level of the country club (ECF No. 45 at ¶ 19; ECF No. 46 at ¶ 19), conducted an inspection in April of 2014. (ECF No. 46, Exhibit 6). Based on that inspection, he estimated that it would cost $2,320,717.31 to rebuild the upper level of the country club. (*Id.*). The Policyholders indicate that they submitted this report to the Insurers. (ECF No. 46 at ¶ 25).

    b. However, Leisenring stated that he told the Policyholders that the "original [estimate] was high, and it [was] going to get whittled down from there." (ECF No. 45-2, Exhibit G, at 84). Leisenring prepared a second estimate, indicating that the rebuild of the damaged structures at the country club would cost $1,384,330.51. (*Id.* at 42).

    c. On June 4, 2015, Anthony M. Komarnicki, the president of The Architrave Architecture & Design, Inc., provided Plaintiffs with an estimate for a proposed re-use of the basement at the country club. (ECF No. 46, Exhibit 8, at 1, 4). Komarnicki concluded that it would cost $229,025.00 to restructure the lower level to make it structurally sound, mold free, and ADA accessible. (*Id.* at 3). Further, after he added the

cost of finishing/building out the basement area (such as by completing plumbing work and patching the floor) to the estimate, he concluded that the total cost of a build out for the lower level would be $782,375.00. (*Id.*).

d. The Insurers contend that they prepared their own repair estimate in July of 2015, in which they concluded that it would cost $1,573,092.72 to repair the damaged portions of the country club. (ECF No. 45-1, Exhibit F). The Insurers state that they paid the Policyholders $1,537,092.72 for the damage to the building based on this estimate. (ECF No. 45 at ¶ 17). The Policyholders contend that they never received that amount of money specifically earmarked for compensating them for damage to the country club. (ECF No. 46 at ¶ 17).

e. Finally, in September of 2020, Richard T. Hughes prepared an estimate to rebuild the entire country club. (ECF No. 46, Exhibit 7). He estimated that doing so would cost $2,320,090. (*Id.*).

Second, with respect to the amount of business income the Policyholders lost as a result of the fire:

a. The Insurers state that, in July of 2015, they prepared their own estimate of the business income that the Policyholders lost, concluding that the Policyholders suffered $261,823 in lost business income as a result of the fire. (ECF No. 45-5, Exhibit N). The Insurers submit that they paid the Policyholders $261,823 for lost business income based on that estimate. (ECF No. 45 at ¶ 17).

b. In July of 2020, Tyler Hawkins from Meaden & Moore estimated that the Policyholders lost $261,823 in business income between February 24, 2014, and February 23, 2015, as a result of the fire. (ECF No. 45-4, Exhibit M).

c. Finally, in October of 2020, Shaun Henry from Advantage Golf Advisors estimated that it would have cost $782,984 to continue golf course operations and maintenance for the 8-month primary golf season at Dubois Country Club following the fire. (ECF No. 46, Exhibit 9). He further stated that the Policyholders would have incurred additional, minimal expenses during the winter months. (*Id.*).

Third, with respect to the business property that the Policyholders lost as a result of the fire, the Insurers prepared their own estimate, concluding that the actual cash value of the business personal property that the Policyholders lost as a result of the fire was $297,815.20. (ECF No. 45-5, Exhibit O). The Insurers contend that they ultimately paid the Policyholders $315,638.01 for lost business personal property based on this estimate. (ECF No. 45 at ¶ 17). The Policyholders appear to deny that they ever received that amount of money specifically earmarked for compensating them for lost business property. (ECF No. 46 at ¶ 17).

Finally, the Insurers argue that they paid the Policyholders $116,653.63 for extra expenses and $67,977.83 for temporary repairs. (ECF No. 45 ¶ 17). The Policyholders appear to deny that they ever received that amount of money specifically earmarked for compensating them for extra expenses and temporary repairs. (ECF No. 46 at ¶ 17).

### C. The Baseball Game

The Policyholders contend that, at some point between when Kevin Leisenring submitted his first and second estimates to rebuild the upper level of the country club, the Insurers attended a baseball game with him and pressured him to change his first estimate. (ECF No. 46 at ¶¶ 19, 21). For his part, Leisenring testified that someone from or associated with his company invited Mr. Tuttle, an employee of Nationwide, to a baseball game. (ECF No. 46, Exhibit 5, at 80–82). Leisenring further stated that (1) he believed the game took place "over [the] summer" he was preparing the estimates for the Policyholders; (2) he believed that his company or someone associated with it invited Mr.

Tuttle to the game for the purpose, at least in part, of discussing the estimate; and (3) he did not tell Dubois Country Club that Mr. Tuttle had been invited to the game. (*Id.* at 81–82). Finally, Leisenring stated that at the time he submitted his second estimate to the Policyholders, it was his expectation that his company, Franjo Construction, would be the ones rebuilding the country club. (ECF No. 45-2, Exhibit G, at 37–38).

### D.  Mr. Tuttle's Statements to the Policyholders

The Policyholders also argue that the Insurers, through Mr. Tuttle, authorized the Policyholders to spend a significant amount of the money that the Insurers paid out under the Policy to operate the Dubois Country Club during the summer of 2014. (ECF No. 46 at ¶¶ 15–17). On that basis, they contend that they never actually received $1,537,092.72 for the damage to the country club. (*Id.*).

As evidence, the Policyholders point to the affidavit of Dale W. Sobol, an employee of S&T-Evergreen Insurance, LLC, who sold a fire insurance policy to the Policyholders on behalf of Depositors. (ECF No. 46, Exhibit 1). According to Sobol, on February 25, 2014, Mr. Stephen L. Tuttle, an employee of the Insurers, met with the Policyholders and delivered a check to them in the amount of $500,000.00. (*Id.*). In doing so, Mr. Tuttle told the Policyholders that his company would "'make [them] whole,'" and, according to Sobol, he indicated that the Policyholders could use the money "from the check for all repairs and expenses necessary to pay the Plaintiffs' bills and to operate the business." (*Id.*).

Moreover, Sobol stated that he was present:

> [A]t later meetings with Stephen L. Tuttle and the various members of the DuBois Country Club and owners of Juniata Lake Properties, LLC wherein Mr. Tuttle reaffirmed that the monies that were being issued initially were to be used to operate the business of the golf club. I remember him saying, "You gotta do what you gotta do to get the golf course open when golf season starts." Plaintiffs interpreted this as the approval to use the proceeds from the check issued on February 25, 2014, in the amount of $500,000.00 as well as the proceeds from the check issued on March 24, 2014, in the amount of $236,947.73 and the proceeds from the check issued on August 1, 2014, in the amount of $518,660.84 to operate the business of the golf club and to maintain, repair and improve the golf course so as to keep the club in operation. For example, Plaintiffs were directed to secure a tent and restrooms.

(*Id.*).

### III.    Procedural History

On October 16, 2019, the Policyholders filed a Complaint against the Insurers in the Court of Common Pleas of Clearfield County, Pennsylvania, alleging Breach of Contract (Count I) and Bad Faith (Count II). (ECF No. 1-2 at 8, 9). On November 5, 2019, the Insurers removed the case to this Court. (ECF No. 1).

On October 21, 2020, the Insurers moved for a partial judgment on the pleadings. (ECF No. 35). The Insurers argued that the Policyholders' bad faith claims are barred by the statute of limitations. (ECF No. 36 at 1). On January 5, 2021, this Court entered a Memorandum Order denying the Insurers' motion without prejudice to their raising the same argument at summary judgment. (ECF No. 44).

On February 5, 2021, the Insurers moved for partial summary judgment with respect to the Policyholders' bad faith claims. (ECF No. 45). The Insurers contend that this Court should dismiss the Policyholders' bad faith claims on the ground that they are barred by the statute of limitations, or, alternatively, on the ground that the record cannot

support a bad faith claim. (ECF No. 45-6 at 9–15).[4] The Policyholders submitted a response on March 1, 2021. (ECF No. 46). Finally, the Insurers submitted a reply to the Policyholders' response on March 2, 2021. (ECF No. 49).

IV.      **Legal Standard**

"Summary judgment is appropriate only where . . . there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.  The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009).  "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

---

[4] As the Court explains more fully below, it concludes that the record cannot support a bad faith claim. Accordingly, the Court will not address the issue of whether the Policyholders' bad faith claims are barred by the statute of limitations.

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" (citation and internal quotation marks omitted)).

## V.    Analysis

### A.   The Parties' Arguments

The Insurers argue that they did not operate in bad faith. (*See* ECF No. 45-6). They created estimates with respect to all three of the Policyholders' insurance claims under the policy: (1) their claim for lost business property, (2) their claim for business income loss, and (3) their claim for reconstruction of the country club. (*Id.* at 12–14). The Insurers contend that because they created estimates for these claims and then paid the

Policyholders based on those estimates, the Policyholders cannot demonstrate that the Insurers acted in bad faith. (*Id.* at 12–15).

In response, the Policyholders make four arguments that they contend demonstrate that the Insurers acted in bad faith. (*See* ECF No. 46). First, they argue that the Insurers pressured Kevin Leisenring to change his estimate from $2,320,717.31 to $1,384,330.51 during their interactions at the baseball game. (*Id.* at ¶ 54). Second, the Policyholders state that because the Insurers paid the Policyholders over $800,000 during the summer and fall of 2014 to operate their business, they did not actually pay the Policyholders $1,573,092.72 for the repairs to the country club. (*Id.*). Third, the Policyholders argue that the Insurers have continued to refuse to pay the full amount of the Policyholders' claim throughout litigation. (*Id.* at ¶ 56). Finally, the Policyholders contend that the Insurers have compelled the Policyholders to respond to discovery requests regarding the cause of the fire. (*Id.* at ¶¶ 13, 52).

## B.  Section 8371: Bad Faith Claims

The Pennsylvania General Assembly enacted Section 8371 "to protect insureds from bad faith denial of coverage." *Berg v. Nationwide Mutual Ins. Co., Inc.,* 189 A.3d 1030, 1037 (Pa. Super. Ct. 2018). "Bad faith applies to 'those actions an insurer took when called upon to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract.'" *Id.* (quoting *Toy v. Metro. Life Ins. Co.,* 928 A.2d 186, 199 (Pa. 2007)).

To state a claim for bad faith insurance practices under § 8371, two elements are required: "(1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 376–77 (Pa. 2017) (adopting the two-part test articulated in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)). Ultimately, while an insured must prove a statutory bad faith claim by clear and convincing evidence, *Maronda Homes, LLC v. Motorists Mut. Ins. Co.*, 2:20-cv-01526-CCW, 2021 WL 2017337, at *3 (W.D. Pa. May 20, 2021), "'a reasonable basis is all that is required to defeat a claim of bad faith.'" *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) (quoting *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004)). That said, "'[b]ad faith claims are fact specific and depend on the conduct of the insurer'" in relation to the insured. *Berg*, 189 A.3d at 1037 (quoting *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)).

### 1. No Reasonable Jury Could Conclude that the Insurers Pressured Leisenring to Lower His Estimate

After reviewing the deposition testimony of Kevin Leisenring, the Court finds that no reasonable jury could conclude that the Insurers pressured him to lower his estimate. Leisenring made no allegation whatsoever that Tuttle, or any other agent or employee of the Insurers, influenced his estimate in any fashion. Further, because Leisenring expected his company to conduct the repairs for the Policyholders, it would be strange that he would have lowered his estimate—the very same estimate that would have influenced

how much money his company would have made—without honestly believing that his

initial submission was too high.

Therefore, because the deposition of Kevin Leisenring could not lead a reasonable

jury to conclude that the Insurers influenced his estimate, and because the Policyholders

present no other evidence of the Insurers influencing Leisenring, the Court holds that the

Insurers did not act in bad faith with respect to Leisenring's estimate. *Coolspring,* 10 F.3d at

148 (noting that the nonmovant must offer more than a scintilla of evidence in support of

its position in order to avoid summary judgment).

### 2. No Reasonable Jury Could Find that the Insurers Acted in Bad Faith with Respect to What They Paid the Policyholders for the Damage to the Country Club

The Policyholders' second argument is as follows: the Insurers could not have paid

them "the sum of $1,573,09.72 for the construction of the building when over $800,000.00

of that amount had been paid to the [Policyholders] for the purpose of financing the

continued operation of the business during the Summer and Fall of 2014." (ECF No. 46 at

¶ 54). Assuming without deciding that this argument, if established, would demonstrate

bad faith on the part of the Insurers, it still fails because the evidence that the

Policyholders rely upon—the affidavit of Dale Sobol—would not allow a reasonable jury

to conclude that the Insurers paid the Policyholders $800,000 *for the specific purpose* of

operating their business.

In Sobol's affidavit, the only actual statements Sobol alleged Tuttle made to the

Policyholders were: (1) that the Insurers would "make you whole," (2) "[t]he only asset

you have left, in reality, is the golf course and we have to keep that going," and (3) "[y]ou gotta do what you gotta do to get the golf course open when golf season starts." (ECF No. 46, Exhibit 1). None of these statements indicate that the Insurers paid the Policyholders $800,000 for the specific purpose of operating the business during the summer of 2014. In fact, contrary to the Policyholders' assertion, many of Tuttle's statements indicate that the Insurers were quite comfortable with the Policyholders spending the money on things like repairing the damaged country club. For example, with respect to Tuttle's first statement, "making [the Policyholders] whole" connotes restoring them to their pre-disaster condition, which could certainly include things like repairing the damaged country club. With respect to his second and third statements, keeping the golf course going or opening it when the season starts could easily include making repairs to the "members golf building," which the Policyholders allege was destroyed by the fire. (ECF No. 1-2 at ¶ 14). Indeed, the most that the Policyholders could reasonably take from Tuttle's statements would be that he advised them to open and run the golf course. There is no indication that the Insurers paid $800,000 for that specific purpose.

Further, Sobol stated that Tuttle authorized the Policyholders to "use the money from the (initial) check for *all repairs and expenses necessary to pay the Plaintiffs' bills* and to operate their business." (ECF No. 46, Exhibit 1) (emphasis added). Although Sobol stated that Tuttle later "reaffirmed that the monies that were being issued initially were to be used to operate the business of the golf club," (*id.*), this later reaffirmation reasonably related back to his earlier indication that the Policyholders could use the money for

repairs and to pay their bills. Once again, those bills certainly could have included bills to rebuild the country club.

Therefore, the Court finds that no reasonable jury could conclude that the Insurers knowingly paid the Policyholders $800,000 for the specific purpose of running their business during the summer of 2014.[5] And, since the *Insurers* did not direct the Policyholders to spend the $800,000 on operating the business, if the Policyholders did decide to spend the money in that fashion, *they* must have been the ones that made that decision.[6] Thus, the Policyholders have not offered evidence indicating that the $1,573,092.72 that the Insurers allegedly paid for the damage to the building was not in fact paid to compensate the Policyholders for the damage to the country club. Accordingly, the Court holds that the Insurers did not act in bad faith with respect to their payments to the Policyholders.

---

[5] As noted earlier, Advantage Golf Advisors estimated that it would have cost the Policyholders approximately $782,984 to run the golf course during the 8-month primary golf season in 2014. (ECF No. 46, Exhibit 9). The Policyholders offer this as evidence that they experienced approximately $800,000 in bills to run the business during the summer of 2014. (ECF No. 46 at ¶ 38). However, Advantage Golf Advisors' estimate accounted for things like payroll. (ECF No. 46, Exhibit 9). And, although the Policyholders mention the Policy covering loss of business *income* (ECF No. 1-2 at ¶ 12), they do not point to any provision in the Policy indicating that the Insurers would pay the salaries of the Policyholders' employees in the event of a disaster like a fire. (*See* ECF Nos. 1-2, 46). Because there is no evidence that the Policy covered *business operating costs* such as paying employees, and because the Policyholders appear to premise their lost business income estimate on paying employees (at least in part), it is especially unlikely that the Insurers knowingly paid the Policyholders $800,000 for the express purpose of operating their business.

[6] The Court notes that the Policyholders reference the testimony of Ronald Lykens, an individual associated with Dubois Country Club, with respect to this issue. (ECF No. 46 at ¶ 26). However, because the Policyholders do not direct the Court to any record evidence containing the testimony of Lykens, the Court need not consider their contentions regarding what he said. Moreover, even if the Court had testimony from Lykens to the effect that he "was authorized to spend the first $800,000 paid by [the Insurers] on the operation of the golf club," (*id.*), the Court's holding would not change. The Insurers allowing or even authorizing the Policyholders to spend $800,000 to operate the golf club does not mean that they specifically allotted $800,000 to that expenditure.

3.   **No Reasonable Jury Could Conclude that the Insurers Acted in Bad Faith by Continuing to Decline to Pay the Policyholders $2.3 Million Under the Policy**

As noted earlier, the Policyholders argue that the Insurers' "continued refusal to pay the full amount of this claim" without a "reasonable basis" also evidences their bad faith. (ECF No. 46 at ¶ 56). In a related vein, the Policyholders note that Richard Hughes estimated that it would cost $2,320,090.00 to reconstruct the country club, (ECF No. 46 at ¶ 23), an estimate that is higher than Leisenring's second estimate and Komarnicki's estimate combined. *See supra* Section II.B.

Pennsylvania courts "have not recognized bad faith where the insurer makes a low but reasonable estimate of the insured's loss." *Brown v. Progressive Ins. Co.,* 860 A.2d 493, 501 (Pa. Super. Ct. 2004). However, "low-ball offers which bear no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of § 8371." *Seto v. State Farm Ins. Co.,* 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) (citing *Brown,* 860 A.2d at 501). On the one hand, the Pennsylvania Superior Court has found bad faith where an insurer, "misrepresented the amount of coverage …and forced the insured into arbitration by presenting an arbitrary 'low-ball' offer which bore no reasonable relationship to the insured's reasonable medical expenses, and which proved to be 29 times lower than the eventual arbitration award." *Brown,* 860 A.2d at 501. (citing *Hollock v. Erie Ins. Exch.,* 842 A.3d 409 (Pa. Super. Ct. 2004) (en banc)). On the other hand, the Pennsylvania Superior Court has held that an insurer did not act in bad faith where it made an offer that was

slightly less than fifty percent of the eventual award in arbitration. *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784–85 (Pa. Super. Ct. 2008).

Here, as noted earlier, the Policyholders have failed to offer any evidence that would lead a reasonable jury to conclude that the Insurers did not pay the Policyholders approximately $1.6 million to rebuild or repair the country club. *See supra* Sections V.B.1, V.B.2. This payout is more than fifty percent of the highest of the Policyholders' estimates—that, is Hughes' estimate of approximately $2.3 million. Therefore, because the Insurers have paid the Policyholders an amount of money for the damage to the building, based upon an estimate which may be low but appears to be reasonable, the Court holds that no reasonable jury could find that they have acted in bad faith.[7] Further, because they were not acting in bad faith prior to this litigation or at an earlier point during it (when Hughes' estimate was prepared), the Court holds that they are not now acting in bad faith by continuing to litigate the amount of money they owe under the Policy. *Johnson*, 987 A.2d at 784–85 (finding no bad faith where an insurer offered fifty percent of the ultimate arbitration award, which was not itself an act of bad faith, and then continued to litigate the issue of how much money it owed).

---

[7] The same analysis applies with respect to the Policyholders' claim that they are entitled to roughly $2.23 million for the damage to the country club, $1.63 million for their lost personal property, and their lost business income (which the Policyholders appear to contend amounted to $800,000). (ECF No. 46 at ¶¶ 15, 18). The Insurers have paid out approximately half of the total amount the Policyholders seek (roughly $4.66 million), and while they *may* end up owing the Policyholders more under the Policy, the Policyholders have not demonstrated that the Insurers' payment of roughly $2.4 million was in bad faith.

### 4.  No Reasonable Jury Could Conclude That the Insurers Acted in Bad Faith with Respect to Their Discovery Requests

Finally, the Policyholders argue that the Insurers acted in bad faith by requiring the Policyholders' counsel to answer discovery requests concerning the start of the fire at the Dubois Country Club, even though the Insurers reviewed the circumstances leading to that fire in February of 2014. (ECF No. 46 at ¶ 13). Indeed, the Policyholders state that their "claims for bad faith are also based on [the Insurers'] ongoing litigation of matters such as the source of the fire when, in fact, [the Insurers] knew that the fire was accidental." (*Id.* at ¶ 52).

The Pennsylvania Superior Court has held that while:

> [I]t is true that a finding of bad faith under [S]ection 8371 may be premised upon an insurer's conduct occurring before, during or after litigation, we have refused to recognize that an insurer's discovery practices constitute grounds for a bad faith claim under [S]ection 8371, absent the use of discovery to conduct an improper investigation.

*Berg,* 189 A.3d at 1055 (citation omitted). [8] Section 8371 is "designed to provide a remedy for bad faith conduct by an insurer in its capacity as an insurer … not as a legal adversary in a lawsuit filed against it by an insured." *Id.* On the one hand, the Pennsylvania Superior Court has found bad faith based on "conduct engaged in during the litigation … that far exceeded mere discovery matters," such as an insurer's witness attempting to undermine the truth finding process. *Hollock,* 842 A.2d at 415. On the other hand, the Pennsylvania

---

[8] The Pennsylvania Superior Court has explained that "[d]iscovery violations are governed under the exclusive provisions of the Pennsylvania Rules of Civil Procedure." *Berg,* 189 A.3d at 1055. In like fashion, Rule 26 of the Federal Rules of Civil Procedure allows parties to seek a protective order from discovery that they believe subjects them to oppression, undue burden, or the like. FED. R. CIV. P. 26(c). Here, the Policyholders have not sought a protective order shielding them from the Insurers' discovery requests related to the start of the fire.

Superior Court has declined to find bad faith where an insured alleged that during discovery, the insurer requested unnecessary information and information that had already been submitted to it. *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 907 (Pa. Super. Ct. 1999).

Here, the four requests that the Insurers submitted regarding the cause of the fire do not constitute bad faith. (ECF No. 46, Exhibit 4). The Court finds that these circumstances are highly similar to those in *O'Donnell* and highly distinguishable from those in *Hollock*—far from undermining the truth-finding process, the Insurers, at worst, compelled the Policyholders to submit unnecessary and duplicative information. The Policyholders have offered no evidence indicating that the Insurers were motivated by a dishonest purpose or ill motive, or otherwise breached their fiduciary duty by using the discovery process to conduct an improper investigation. *Hollock*, 842 A.2d at 415. Therefore, the Court holds that no reasonable jury could find that the Insurers acted in bad faith with respect to their discovery requests.

In sum, the Court reiterates that the Insurers have paid the Policyholders approximately $2.4 million for the damages that they suffered. While the Court expresses no opinion as to the merits of the Policyholders' breach of contract claim, it also finds that the Policyholders have failed to produce evidence that could lead a reasonable jury to find in their favor on their bad faith claim. Indeed, the Policyholders have not offered evidence that could lead a reasonable jury to conclude that the Insurers did not have a reasonable

basis for denying benefits under the Policy and knowingly or recklessly disregarded their lack of a reasonable basis. *Rancosky,* 170 A.3d at 377.

**VI.    Conclusion**

For the reasons stated above, the Court grants the Insurers' Motion for Partial Summary Judgment with respect to the Policyholders' bad faith claims (Count II).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUBOIS COUNTRY CLUB, LTD and | ) | Case No. 3:19-cv-190 |
| JUNIATA LAKE PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| DEPOSITORS INSURANCE | ) | |
| COMPANY, ALLIED PROPERTY & | ) | |
| CASUALTY INSURANCE COMPANY, | ) | |
| NATIONWIDE MUTUAL INSURANCE | ) | |
| COMPANY, and AFFILIATED | ) | |
| COMPANIES, | ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, this <u>29th</u> day of October 2021, upon consideration of "Defendants'

Motion for Partial Summary Judgment Pursuant to Federal Rule of Civil Procedure

56(a)—Bad Faith Claims" (ECF No. 45) and for the reasons set forth in the memorandum

opinion accompanying this order, it is **HEREBY ORDERED** that Defendants' motion is

**GRANTED**. It is **FURTHER ORDERED** that Count Two of Plaintiffs' Complaint is

**DISMISSED WITH PREJUDICE**.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE