IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUBOIS COUNTRY CLUB, LTD and | ) | Case No. 3:19-cv-190 |
| JUNIATA LAKE PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| DEPOSITORS INSURANCE COMPANY, | ) | |
| ALLIED PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY, NATIONWIDE | ) | |
| MUTUAL INSURANCE COMPANY, and | ) | |
| AFFILIATED COMPANIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

Plaintiffs Dubois Country Club, LTD ("Dubois Country Club") and Juniata Lake Properties, LLC's ("Juniata") (collectively the "Policyholders") remaining claim against Defendants Depositors Insurance Company ("Depositors"), Allied Property & Casualty Insurance Company ("Allied"), and Nationwide Mutual Insurance Company and Affiliated Companies ("Nationwide") (collectively the "Insurers") is a claim for Breach of Contract. (ECF No. 1-2; ECF No. 50).

Specifically, the Policyholders state[1] that they own and operate a club house, banquet center, restaurant, and golf course in DuBois, Pennsylvania (the "Property"). (ECF No. 55 at 1–2;

---

[1] The Court notes that this background information comes primarily from the Policyholders' Pretrial Statements. (ECF Nos. 55, 56). In offering this introductory information, the Court does not deem the Policyholders' assertions established facts. Further, the Court notes that it relays this information for the sole purpose of outlining the Policyholders' claims.

ECF No. 56 at 1–2). From December 23, 2013, to December 23, 2014, the Policyholders had a commercial insurance policy (the "Policy") with Allied (a Nationwide company), which Allied placed through Depositors (another Nationwide company). (ECF No. 55 at 2; ECF No. 56 at 2). The Policy covered the buildings on the Property, among other things. (ECF No. 55 at 2; ECF No. 56 at 2).

On February 24, 2014, a fire occurred at the Property. (ECF No. 55 at 2; ECF No. 56 at 2). Although the Insurers paid the Policyholders under the Policy, the Policyholders claim that those payments were insufficient under the terms of the Policy. (*See* ECF No. 1-2; ECF No. 55; ECF No. 56). It is that alleged insufficiency that forms the basis of the Policyholders' Breach of Contract claim. (ECF No. 1-2).

Pending before the Court are the following motions in limine filed by the Insurers (each of which is accompanied by a brief in support) to:

1. Preclude Testimony of William J. George, Ph.D. ("Dr. George") (ECF Nos. 59, 60);

2. Preclude [the Policyholders'] Damage Claims on the Basis of Failure of [the Policyholders] to Prove Damages with Reasonable Certainty (ECF Nos. 61, 62);

3. Preclude [the Policyholders'] Claims for Fire Suppression, ADA Compliance and Other Code Compliance Costs, Mortgage Payments and Business Income Loss (ECF Nos. 63, 64);

4. Preclude Testimony of Richard T. Hughes P.E. ("Mr. Hughes") on Reconstruction Costs (ECF Nos. 65, 66);

5. Preclude Testimony of [Mr. Hughes] at Trial (ECF Nos. 67, 68);

6.  Preclude or Limit Testimony of Anthony M. Komarnicki, RA ("Mr. Komarnicki") (ECF Nos. 69, 70).

The Policyholders have responded to all of the Insurers' motions (ECF Nos. 71, 72, 73, 74, 75, 76). The time for filing responses has passed (*see* ECF No. 53) and the motions are ripe for disposition.

For the following reasons, the Court:

1.  **GRANTS** the Insurers' Motion to Preclude Testimony of William J. George, Ph.D. ("Dr. George") (ECF No. 59);

2.  **DENIES** the Insurers' Motion to Preclude [the Policyholders'] Damage Claims on the Basis of Failure of [the Policyholders] to Prove Damages with Reasonable Certainty (ECF No. 61);

3.  **DENIES** the Insurers' Motion to Preclude [the Policyholders'] Claims for Fire Suppression, ADA Compliance and Other Code Compliance Costs, Mortgage Payments and Business Income Loss (ECF No. 63);

4.  **DENIES** the Insurers' Motion to Preclude Testimony of Richard T. Hughes P.E. ("Mr. Hughes") on Reconstruction Costs (ECF No. 65);

5.  **DENIES** the Insurers' Motion to Preclude Testimony of [Mr. Hughes] at Trial (ECF No. 67); and

6.  **DENIES** the Insurers' Motion to Preclude or Limit Testimony of Anthony M. Komarnicki, RA ("Mr. Komarnicki") (ECF No. 69).

II.     Background[2]

The Insurers filed their motions in limine and briefs in support on August 12, 2022. (ECF Nos. 50-70). The Policyholders filed their responses in opposition to the Insurers' motions on September 2, 2022. (ECF Nos. 71-76).

III.    Discussion

A. The Insurers' Motion to Preclude Testimony of William J. George, Ph.D. ("Dr. George") (ECF No. 59)

For reasons that the Court outlines below, the Court will grant the Insurers' Motion to preclude Dr. George from testifying at trial.

1.      Parties' Arguments

In arguing that the Court should exclude Dr. George's testimony, the Insurers contend that the Policyholders "never disclosed this witness prior to filing their Pretrial Statement (on July 22, 2022) and have not provided any report for the expert." (ECF No. 59 at 2). Due to the Policyholders' failure to comply with Federal Rule of Civil Procedure 26(a)(2), the Insurers assert that the Court should bar Dr. George from testifying at trial. (*Id.*).

In response, the Policyholders admit that they did not disclose Dr. George's identity prior to filing their Pretrial Statements. (ECF No. 72 at 2). However, the Policyholders argue that the Insurers would not be prejudiced by Dr. George testifying at trial because "he has published dozens if not hundreds of articles that are available on the Internet along with his Curriculum Vitae … [and] [h]e will testify only concerning those matters about which he has published as

---

[2] A detailed description of the factual background of this case can be found in the Court's Memorandum Opinion and Order resolving the Insurers' Partial Motion for Summary Judgment. (ECF No. 50).

they relate to the mold in the lower level of the DuBois Country Club[.]" (*Id.*). Further, the Policyholders argue that they did not previously believe an expert in toxicology would be necessary, and it is only because the Insurers have "dismissed the seriousness of the problem" of the mold in portions of the structure on the Property that the Policyholders have decided that they may need to call Dr. George at trial. (*Id.*).

     **2.**     **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), a "party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702 (the rule governing expert testimony)." FED. R. CIV. P. 26(a)(2)(A). This "disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." FED. R. CIV. P. 26(a)(2)(B). That report must contain items such as: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them[,]" among other things. FED. R. CIV. P. 26(a)(2)(B)(i)–(vi).

In terms of the timeframe for these disclosures, a "party must make [these disclosures] at the times and in the sequence that the court orders. Absent a stipulation or court order, the disclosures must be made: (i) at least 90 days before the date set for trial or for the case to be ready for trial[.]" FED. R. CIV. P. 26(a)(2)(D)(i).

Rule 37(c)(1) provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e), … is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

harmless." FED. R. CIV. P. 37(c)(1). "A party's misconduct is harmless if it involves an honest

mistake, coupled with sufficient knowledge by the other party of the material that has not been

produced." *Tolerico v. Home Depot*, 205 F.R.D. 169, 176 (M.D. Pa. 2002). In determining whether to

exclude evidence as a sanction for failure to comply with a discovery order, the Court must

consider several factors, including:

> (1) [T]he prejudice or surprise in fact of the party against whom the excluded
> witness[] would have testified, (2) the ability of that party to cure the prejudice, (3)
> the extent to which waiver of the rule against calling unlisted witnesses would
> disrupt the orderly and efficient trial of the case or of other cases in the court, and
> (4) bad faith or willfulness in failing to comply with the court's order.

*Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977), *overruled on

other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985). The Court is also to consider

the importance of the excluded testimony. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d

Cir. 1997).

Finally, although the "exclusion of evidence for violation of a discovery order is an

extreme sanction … [a] trial court's exclusion of testimony for failure of counsel to adhere to a

pretrial order will not be disturbed on appeal absent a clear abuse of discretion." *In re TMI Litig.*,

193 F.3d 613, 721 (3d Cir. 1999) (internal quotation marks and citations omitted).

### 3.    Analysis

The Court begins its analysis by examining whether the Policyholders failed to comply

with Federal Rule of Civil Procedure 26(a)(2)(B).

Here, the Court initially directed the parties to make their "disclosure of experts required

by Rule 26(a)(2) by May 29, 2020." (ECF No. 15 at 2). On July 2, 2020, the Court extended that

deadline until July 20, 2020. (ECF No. 20 at 1). Finally, after the Policyholders requested an

enlargement of time within which to complete discovery, (ECF No. 28), the Court directed the Policyholders to "comply with all expert disclosure requirements and produce expert reports to [the Insurers] no later than **OCTOBER 30, 2020**." (ECF No. 34 at 3) (emphasis in original).

As the Policyholders admitted in their response to the Insurers' Motion to Preclude Dr. George from testifying at trial, they did not disclose Dr. George's identity until they filed their Pretrial Statements, (ECF No. 72 at 2), which they submitted on July 22, 2022. (ECF Nos. 55, 56). Therefore, the Policyholders violated Rule 26(a)(2)(D) by failing to disclose Dr. George's identity "in the sequence that [this] Court order[ed]"—that is, they failed to disclose Dr. Geroge's identity by the October 30, 2020, deadline set by this Court. FED. R. CIV. P. 26(a)(2)(D).

Further, in their Pretrial Statements, the Policyholders indicated that, if Dr. George's testimony "is deemed to be necessary, he will supply a report and will be called at trial." (ECF No. 55 at 8; ECF No. 56 at 8). In other words, the Policyholders had not supplied the Insurers with Dr. George's report as of July 22, 2022. (ECF Nos. 55, 56). And the Policyholders have offered the Court no indication that they have supplied the Insurers with Dr. George's report as of the date of this Memorandum Opinion and Order. Accordingly, the Policyholders have likewise violated Rule 26(a)(2)(D) by failing to disclose Dr. George's report "in the sequence that [this] Court order[ed]." FED. R. CIV. P. 26(a)(2)(D).

Therefore, the Court must apply the factors set forth by the Third Circuit in deciding whether to exclude Dr. George's testimony as a sanction for the Policyholders' failure to comply with this Court's order. *Meyers*, 559 F.2d at 904–05 ("(1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would

disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.").

Turning to the first factor, the Court is especially concerned by the fact that the Policyholders have offered no indication that they have provided the Insurers with Dr. George's report as of the date of this Memorandum Opinion and Order. Indeed, even assuming that Dr. George's general views regarding mold and its effects are widely available, (ECF No. 72 at 2), that does not mean that the Insurers have been provided any opportunity to review any of Dr. George's views *with respect to the mold at the Property*. Further, with trial scheduled to begin on October 24, 2022, (ECF No. 53), the Court finds that, even if the Policyholders were to provide the Insurers with Dr. George's report between the date of this Memorandum Opinion and Order and the date that trial begins, the Insurers would still lack sufficient time to review Dr. George's opinions in any meaningful way. Accordingly, because the Insurers have been wholly deprived of the opportunity to review Dr. George's opinions—which, in turn, will significantly detract from their ability to meaningfully cross-examine him at trial—the Court finds that permitting Dr. George to testify at trial would significantly prejudice the Insurers. Thus, the Court finds that the first factor weighs in favor of excluding Dr. George's testimony.

Turning to the second factor, because the trial in this matter is days away, and because the Policyholders have still failed to disclose Dr. George's report to the Insurers, the Court finds that there is no way for the Insurers to cure the prejudice against them. Although the Insurers may be able to scour the internet, find Dr. George's publications, and then speculate as to how his opinions *may* apply in this case, that is no substitute for being informed as to the opinions he *will* express in this case. In short, with trial only days away, the Court finds that there is no way

for the Insurers to meaningfully be made aware of the opinions that Dr. George would express during trial. Therefore, the Court finds that the second factor likewise weighs in favor of excluding Dr. George's testimony.

Turning to the third factor, the Court will not require the Insurers to go into trial without knowledge of the opinions that Dr. George will express, and, given the other pending matters and trials on the Court's calendar, the Court will not delay trial in this matter in order to permit the Policyholders to disclose Dr. George's report to the Insurers. Delaying trial would be especially inappropriate here, where the Policyholders are already almost two years behind on their obligation to disclose Dr. George's report to the Insurers. Accordingly, the Court finds that the third factor also weighs in favor of excluding Dr. George's testimony.

Turning to the fourth factor, on the one hand, given the Court's familiarity with the Policyholders' conduct in this case, the Court cannot say that they have acted in bad faith. The Court is inclined to believe the Policyholders' statement that they only recently came to believe that Dr. George's testimony may be necessary at trial. (ECF No. 72 at 2). On the other hand, it is an inescapable fact that the Policyholders missed the deadline for disclosing Dr. George's identity by almost two years, and it is likewise an inescapable fact that the Policyholders still have not provided the Insurers with Dr. George's report, even though trial is just days away. Thus, the Court finds that the fourth factor weighs slightly in favor of excluding Dr. George's testimony.

Finally, as the Court noted earlier, the Third Circuit has directed district courts to consider the importance of the excluded testimony in determining whether exclusion is an appropriate sanction pursuant to Rule 37(c). *Konstantopoulos*, 112 F.3d at 719. Here, the Court notes that in their pretrial statements, the Policyholders indicate that they will call Dr. George at trial if he is

"deemed to be necessary[.]" (ECF No. 55 at 8; ECF No. 56 at 8). Further, the Policyholders have indicated that they have two other witnesses that they will offer to testify as to the "mold problems in the portions of the structure remaining after the fire[,]" the subject of at least most of Dr. George's testimony. (ECF No. 72 at 2). Therefore, the Court finds that Dr. George's testimony likely would not be highly significant to the Policyholders' case, meaning that this consideration likewise weighs in favor of exclusion.

In sum, given the high prejudice to the Insurers that would result if the Court permitted Dr. George to testify at trial, coupled with the other considerations outlined above, the Court will bar Dr. George from testifying at trial pursuant to Federal Rule of Civil Procedure 37(c)(1). *See Vorhes v. Mittal Steel USA, Inc.*, No. 06-CV-1130, 2009 WL 959579, at *3–4 (W.D. Pa. Apr. 6, 2009) (excluding an expert from testifying on similar facts). Accordingly, the Court will grant the Insurers' Motion at ECF No. 59.

### B. The Insurers' Motion to Preclude [the Policyholders'] Damage Claims on the Basis of Failure of Plaintiff to Prove Damages with Reasonable Certainty (ECF No. 61)

For reasons the Court outlines below, the Court will deny this Motion.

### 1.     Parties' Arguments

The Insurers request that the Court preclude the Policyholders from advancing their damage claims because they assert that the Policyholders have failed to prove their damages with reasonable certainty. (ECF No. 61 at 1). Specifically, the Insurers state that the Policyholders' Complaint "fails to allege any amount of basis to determine an amount of damages for any claim including damage to the building, damage to business personal property or business income loss." (*Id.* at 2). With respect to business personal property, the Insurers contend that the

Policyholders "have produced no reliable evidence to prove a claim for business personal property with reasonable certainty beyond the amount [the Insurers] paid for this part of the claim." (*Id.*). Further, with respect to business income loss, the Insurers argue that the Policyholders have "produced no reliable evidence to prove any business income loss with reasonable certainty beyond the amount Defendants paid for this part of the claim." (*Id.*). Finally, with respect to building damage, the Insurers assert that the Policyholders "have produced no reliable evidence to prove with reasonable certainty how or why the [Insurers'] payment to reconstruct the buildings damaged in the fire is insufficient[.]" (*Id.* at 3). In short, the Insurers argue that the Policyholders' "evidence on damages is speculative and vague and does not provide the factfinder evidence from which damages may be calculated with reasonable certainty." (*Id.* at 4).

In response, the Policyholders vigorously deny the suggestion that they have failed to prove damages with reasonable certainty, citing to various pieces of record evidence that they intend to offer at trial. (*See* ECF No. 104).

### 2.    Legal Standard

The Third Circuit has explained that, unlike a "summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion *in limine* is designed to narrow evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.3d 1064, 1069 (3d Cir. 1990). Indeed, "although motions in limine are not designed to eliminate claims or theories … the Federal rules of Civil Procedure do not prohibit a grant of summary judgment when said motions have been filed." *Forrest v. Parry*, 930 F.3d 93, 111 (3d Cir. 2019). However, whenever the "summary

judgment ruling is made, the Court must provide the parties with adequate notice and an opportunity to oppose." *Id.*

Courts applying *Bradley* have considered a motion in limine "to be an improper motion for summary judgment under at least two scenarios." *Alpha Prof'l Tools v. Sure-Guide, Inc.*, No. 07-CV-5280 (PS), 2010 WL 11698255, at *1 n.3 (D.N.J. May 19, 2010) (collecting cases). For example, a motion in limine is improper "when it 'call[ed] upon the Court to weigh the sufficiency of the evidence in support of the parties' claims and defenses, and, in effect, … resolve the parties' factual disputes on the eve of trial.'" *Id.* (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 508, 532 (D.N.J. 2008)). Similarly, "'[i]f a party's motion in limine seeks to preclude all evidence that would support the other party's claims, their motion in limine is essentially acting like a motion for summary judgment.'" *Id.* (quoting *Davis v. Gen. Accident Ins. Co. of America*, No. CIV.A. 98-4736, 20000 WL 1780235, at *4 (E.D. Pa. Dec. 4, 2000)).

Along these lines, in *Galentine v. Estate of Stekervetz*, the United States District Court for the District of Delaware was confronted with a purported motion in limine contending that the "[p]laintiff [had] failed to establish a sufficient factual foundation for his claims of personal property and equipment damages." 273 F. Supp. 2d 528, 543 (D. Del. 2003). Ultimately, that court concluded that the defendant's motion in limine "[was] a dispositive motion that was untimely filed because it was filed after the dispositive motion deadline … contained in the [c]ourt's Scheduling Order." *Id.* Accordingly, the court dismissed the motion in limine as untimely and, following a bench trial, considered the sufficiency of the plaintiff's damages claims in the course of outlining its findings of fact and conclusions of law. *Id.* at 544.

3.    **Analysis**

The Court finds that the Insurers' Motion to "Preclude [the Policyholders'] Damage Claims on the Basis of Failure of [the Policyholders] to Prove Damages with Reasonable Certainty[,]" is a dispositive motion. Indeed, in order to maintain a "successful cause of action for breach of contract, a plaintiff must demonstrate the following: (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) damages resulting from a breach of that duty." *Reeves v Middletown Athletic Ass'n*, 866 A.2d 1115, 1125 (Pa. Super. Ct. 2004). Therefore, because the Insurers are asking the Court to find that the Policyholders have failed to offer sufficient evidence of their damages claims (and bar the Policyholders from advancing a claim for damages at trial), and because damages is an element of a claim for breach of contract, the Insurers are effectively asking the Court to dispose of the Policyholders' breach of contract claim altogether.

However, the deadline for filing dispositive motions passed approximately twenty (20) months ago—on February 8, 2021. (ECF No. 42 at 1). Therefore, because the Insurers' motion in limine is actually a dispositive motion that the Insurers filed after the deadline for such motions passed, the Court will deny the Motion at ECF No. 61.[3]

---

[3] The Court notes that, even if the deadline for filing dispositive motions had not passed as of the date that the Insurers filed their purported motion in limine, the Court would still be inclined to deny the motion, for two reasons.

First, insofar as the Insurers' Motion asks the Court to find that the Policyholders have presented insufficient evidence to support their claims, it is essentially a motion for summary judgment. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.3d 1064, 1069 (3d Cir. 1990) (noting that a motion for summary judgment is "designed to eliminate a trial in cases where there are no genuine issues of fact"). However, trial in this matter is just days away, and the Court will not continue trial, meaning that there is not enough time to afford the Policyholders the necessary notice and opportunity to oppose the motion for summary judgment. *Forrest v. Parry*, 930 F.3d 93, 111 (3d Cir. 2019) ("[A] district court may not grant summary judgment without providing the losing party notice, or a notice-equivalent, and an opportunity to oppose."); *Bradley*, 913 F.2d at 1069–70 (stating that, in the "absence of a formal motion for summary

**C. The Insurers' Motion to Preclude [the Policyholders'] Claims for Fire Suppression, ADA Compliance and Other Code Compliance Costs, Mortgage Payments and Business Income Loss (ECF No. 63)**

The Insurers' Motion at ECF No. 63 advances similar arguments as those set forth in their Motion at ECF No. 61, and the Court will deny the Insurers' Motion at ECF No. 63 for similar reasons as the Motion at ECF No. 61.

By way of example, the Insurers point to the terms of the Policy and argue that the Policyholders' claim "for increased costs of construction for ADA, fire suppression and other ordinance or code compliance are excluded by the Policy." (ECF No. 63 at 5). Further, the Insurers contend that "[m]ortgage payments made during the period of restoration represent business debts, not business expenses incurred to keep the business operating because of the fire. This is a standard business debt having nothing to do with the fire and is not covered by the Policy." (*Id.* at 6). Finally, broadly speaking, the Insurers again contend that the Policyholders' "damage claims are speculative and have not been proven with reasonable certainty." (*Id.* at 5).

In response, the Policyholders again vigorously argue that their claims are valid under the Policy, and that they have sufficient evidence to prove their claims at trial. (*See* ECF No. 71).

---

judgment, plaintiff was under no formal compulsion to marshal all of the evidence in support of his claims. Although he may in fact have done so, we cannot be sure").

Second, and in a related vein, although the Court does not reach any finding as to whether the Policyholders' damages claims would survive summary judgment, the Court does note that they offer a myriad of factual evidence in support of those claims. (*See* ECF No. 74). Therefore, summary judgment may well have been inappropriate even if the Insurers had moved for it in a timely fashion.

In short, in this case, where (1) the deadline for filing dispositive motions has passed, (2) the bench trial is just days from beginning, and (3) the party opposing what is effectively a request for summary judgment offers multiple reasons why summary judgment would be inappropriate, the Court will deny the Insurers' request to bar the Policyholders from advancing their damages claims at trial. The Policyholders may or may not ultimately succeed in proving their claims, but the Court will make that determination in its Findings of Fact and Conclusions of Law following trial, not at this juncture.

This Motion implicates the same legal principles as the previous Motion. *See supra* Section III.B.2. Therefore, the Court will not reiterate those principles here.

Applying the principles set forth in Section III.B.2, the Court finds that this Motion constitutes a dispositive motion that was filed after the February 8, 2021, deadline set by the Court. (ECF No. 42 at 1). Indeed, insofar as the Insurers ask the Court to find that certain of the Policyholders' claims are not covered by the Policy, they effectively ask the Court to find that at least certain of the Policyholders' claims fail the second element of a claim for breach of contract. *Reeves*, 866 A.2d at 1125 (noting that the second element of a claim for breach of contract is breach of a duty imposed by that contract). And, insofar as the Insurers ask the Court to find that certain of the Policyholders' claims for damages are not supported by sufficient evidence, they again effectively ask the Court to find that at least certain of the Policyholders' claims fail the third element of a claim for breach of contract. *Id.* (noting that the third element of a claim for breach of contract is damages resulting from the breach). Therefore, because the Insurers' motion in limine is actually a dispositive motion that the Insurers filed after the deadline for such motions had passed, the Court will deny the Insurers' Motion. (ECF No. 63).

The Insurers are free to advance these arguments during the upcoming bench trial in this case. And the Court will, of course, consider and resolve all relevant issues in its Findings of Fact and Conclusions of Law. However, the motion in limine stage is not an appropriate time to resolve the issues that the Insurers raise in their Motions at ECF Nos. 61 and 63.

### D. The Insurers' Motion to Preclude Testimony of Richard T. Hughes P.E. on Reconstruction Costs (ECF No. 65)

On September 14, 2020, and September 16, 2020, Richard T. Hughes, P.E. ("Mr. Hughes") provided the Policyholders with estimates of the cost to rebuild the 17,905 square foot structure on the Property. (ECF Nos. 65-4, 65-5). In both reports, Mr. Hughes stated that his "building estimate" was based on a relocated building "due to the inability to reuse the foundation walls, floor slab on grade or structural steel." (ECF No. 65-4 at 3; ECF No. 65-5 at 3). In their Motion at ECF No. 65, the Insurers argue that the Court should bar Mr. Hughes from testifying at trial regarding the cost of rebuilding the structure. (*See* ECF No. 65).

For reasons the Court outlines below, it will deny the Insurers' Motion.

1.    **Parties' Arguments**

The Insurers argue that the Court should not permit Mr. Hughes to testify regarding rebuilding costs at trial because he testified at his deposition that he would "'put more weight towards actual contractors that are doing the work.'" (*Id.* at 2) (quoting ECF No. 65-7 at 4). In spite of this testimony, the Insurers contend that Mr. Hughes did not review any of the invoices submitted by the company that performed the reconstruction of the buildings on the Property. (*Id.*). Therefore, the Insurers assert that Mr. Hughes' "opinions on the cost to reconstruct the country club are unreliable and will not assist the factfinder in determining damages … [and] [b]ecause the actual reconstruction costs are known, opinions including those of Mr. Hughes on the cost to rebuild will serve only to confuse the factfinder[.]" (*Id.* at 3).

In response, the Policyholders argue that Mr. Hughes "actually stated that he would put more weight toward the estimates of the actual contractors that are doing the work *than the insurance company's repair estimates*." (ECF No. 76 at 2) (emphasis added). Further, the Policyholders contend that Mr. Hughes did not review the invoices submitted by the company

that performed the reconstruction because those invoices were submitted in 2015 based on 2015

costs, but the fire occurred in 2014, making 2014 costs the best estimate of the price to rebuild the

building on the Property. (*Id.*). And indeed, the Policyholders state that Mr. Hughes based his

estimates on 2014 costs. (*Id.* at 2–3). Finally, the Policyholders generally assert that Mr. Hughes'

testimony is admissible at trial under Rule 702. (*See* ECF No. 76).

> 2.    **Legal Standard**

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that

'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford*

*Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Kannakeril v. Terminix Int'l, Inc.*, 128 F.3d 802,

806 (3d Cir. 1997)). Therefore, "when a party seeks to admit expert testimony, the Court must

make a preliminary determination that the requirements of Federal Rule of Evidence 702 have

been met." *Abed-Rabuh v. Hoobrajh*, No. 3:17-CV-15, 2019 WL 2298711, at *3 (W.D. Pa. May 30,

2019) (citing *Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F. App'x 356, 356 (3d Cir. 2003)).

> Under Federal Rule of Evidence 702:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

FED. R. EVID. 702; *see also United States v. Walker*, 657 F.3d 160, 175 (3d Cir. 2011).

In determining "the admissibility of expert testimony, courts have categorized the Rule

702 requirements as (1) the expert's qualifications, (2) the reliability of the expert's methods, and

(3) the 'fit' of the expert's methods to the facts of the case (i.e., whether the expert's methods are

helpful to the fact finder)." *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 616 (W.D. Pa. 2012) (citing *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)).

With respect to the qualification prong, it "requires 'that the witness possess specialized expertise.'" *Pineda*, 520 F.3d at 244 (quoting *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404). The Third Circuit has "interpreted Rule 702's qualification requirement liberally … [it] has held that a broad range of knowledge, skills, and training qualify an expert." *Id.* (internal quotation marks and citation omitted).

Turning to the reliability prong, the Third Circuit has identified several factors for courts to consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000).

This list is "non-exclusive and … each factor need not be applied in every case." *Id.* at 746. Indeed, the "reliability inquiry is flexible, and the relevance of each factor depends on the nature of the issues and the subject of the testimony." *Abed-Rabuh*, 2019 WL 2298711, *4 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). In certain cases, the "relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co., Ltd.*, 526 U.S. at 150.

In short:

> The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology. The admissibility inquiry thus focuses on principles and methodology, not on the conclusions generated by the principles and methodology. The goal is reliability, not certainty. Once admissibility has been determined, then it is for the trier of fact to determine the credibility of the expert witness.

*In re TMI Litig.*, 193 F.3d at 665 (internal quotation marks and citations omitted).

Finally, turning to the "fit" prong, the "Rule 702 inquiry 'requires that the expert testimony 'fit' by assisting the trier of fact.'" *Galentine*, 273 F. Supp. 2d at 542 (quoting *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.,* 198 F. Supp. 2d 598, 602–03 (E.D. Pa. 2002)). Admissibility "thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (quoting *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994)). However, "this standard does not require that the plaintiff prove that the opinions of their experts are correct, rather they only have to demonstrate that they are reliable." *Galentine*, 273 F. Supp. 2d at 542–43 (citing *Oddi*, 234 F.3d at 145). Finally, "'expert testimony based on assumptions lacking factual foundation in the record is properly excluded under the fit requirement.'" *Abed-Rabuh*, 2019 WL 2298711, at * 4 (quoting *Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009)).

### 3.    Analysis

Turning to the first prong, the Court finds that Mr. Hughes is qualified to opine as to the costs to rebuild the structure on the Property, for several reasons. First, Mr. Hughes: (1) is registered as a professional engineer in seven states, (2) has a Bachelor of Science in Civil

Engineering and a Master's Degree in Engineering Services, and (3) has spent the last twenty (20)

years operating his "own engineering firm which has designed over 200 buildings (industrial,

institutional and commercial)[.]" (ECF No. 67-4 at 21). Second, Mr. Hughes testified that estimates

such as the ones he provided to the Policyholders "are the types of estimates that I produce on all

types of projects. And we do—in my office, we design buildings every day." (ECF No. 76-8 at

84:6–13). Third, the Insurers have not argued that Mr. Hughes is unqualified to opine as to the

cost of rebuilding (ECF Nos. 65, 66). Therefore, the Court finds that Mr. Hughes' education and

experience qualify him to offer an opinion as to the costs to rebuild the country club building(s)

on the Property.

Turning to the second prong, the Court finds that Mr. Hughes' opinions relative to the

costs of rebuilding are based on valid reasoning and reliable methodology because Mr. Hughes

consulted reliable sources in offering his estimate, which he coupled with his extensive education

and experience in this area. Several pieces of information support this conclusion.

First, in both of Mr. Hughes' reports, he noted that he utilized the American Institute of

Architects' format for providing construction estimates. (ECF No. 65-4 at 2; ECF No. 65-5 at 2;

ECF No. 76-5 at 81:1–6). Second, in both of his reports, he noted that he considered CBF

Contracting's estimate, as well as two estimates provided by FRANJO, meaning that Mr. Hughes

considered what two different contractors had to say relative to at least certain of the issues in his

reports. (ECF No. 65-4 at 2; ECF No. 65-5 at 2). Third, in his first report, Mr. Hughes noted that

his estimate for rebuilding the country club on the Property was within 5% of the 2014 R.S. Means

book estimate. (ECF No. 65-4 at 3).  In like fashion, in his second report, Mr. Hughes noted that

his estimate was within 7% of the 2014 R.S. Means book estimate. (ECF No. 65-5 at 3). According

to Mr. Hughes, the 2014 R.S. Means book is "an industry standard for cost estimating[.]" (*Id.*). Fourth, Mr. Hughes confirmed that he feels very comfortable with his estimates given his "35 years of managing construction projects." (ECF No. 76-8 at 87:5–13). Finally, the Insurers have not raised any issues with the American Institute of Architects' format for providing construction estimates, the 2014 R.S. Means book, or any of the specifics of Mr. Hughes' calculations. (ECF Nos. 65, 66).[4] Therefore, for all of these reasons, the Court finds that Mr. Hughes' opinions relative to the costs of rebuilding are based on valid reasoning and reliable methodology.

Further, the Court holds that the Insurers' lone argument on this subject—that Mr. Hughes testified that he would put more weight toward actual contractors (ECF No. 65 at 2)— does nothing to change the Court's finding. That testimony proceeded as follows:

> **Q:** You would have considered the insurance company's repair estimates to be relevant to your investigation, would you not?
> **Mr. Hughes:** Yes, but I would put more weight towards actual contractors that are doing the work. In other words, an insurance company making an estimate, I respect that …

(ECF No. 65-7 at 31:18–24). As the Policyholders point out, and as Mr. Hughes' references to the 2014 R.S. Means book in his reports make clear, (ECF No. 65-4 at 3; ECF No. 65-5 at 3; ECF No. 76

---

[4] Indeed, the Court has considered Mr. Hughes' opinions relative to the factors set forth in *Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000), and the Court finds that they are reliable. Specifically, in this case, the Court credits Mr. Hughes' testimony that the R.S. Means book is an industry standard for cost estimating. Because that book is an industry standard (i.e., it is generally accepted), it is a fair inference that it is likewise subject to peer review, has a low rate of error, and performs well relative to the other factors the Third Circuit directs courts to consider. And the Court has every indication that these findings apply equally to the American Institute of Architects' format for providing construction estimates.

Moreover, this is very much a case where the "reliability concerns … focus upon personal knowledge or experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). And the Court finds that Mr. Hughes has significant personal knowledge and experience that qualify him to reliably testify as to the cost to rebuild the building on the Property.

at 2–3), Mr. Hughes' estimates were aimed at the cost of rebuilding the structure on the Property as of 2014. Therefore, as the Policyholders note, the actual costs of construction, which were incurred in 2015, (ECF No. 76 at 2), were not the basis for Mr. Hughes' reports. Accordingly, the fact that Mr. Hughes did not review the invoices submitted by the construction company (*id.*) does not change the fact that Mr. Hughes is offering an estimate of the cost to rebuild the structure on the Property as of 2014 that is based on valid reasoning and reliable methodology.

Turning finally to the third prong, the Court holds that Mr. Hughes' testimony would assist the trier of fact in this case. As the Court noted previously, the broad issue before the Court is whether the Insurers properly paid the Policyholders under the Policy, or whether they are instead liable to the Policyholders for breach of contract. Mr. Hughes' testimony with respect to rebuilding costs goes directly to the issue of whether the Insurers properly paid the Policyholders under the Policy. Therefore, given the close connection between the testimony to be offered and the particular factual disputes of this case, *Oddi*, 234 F.3d at 145, the Court finds that the third prong is likewise satisfied.[5]

---

[5] The Court briefly addresses the Insurers' contention that because "the actual construction costs are known, opinions including those of Mr. Hughes on the cost to rebuild will only serve to confuse the factfinder[.]" (ECF No. 65 at 3). In responding to this argument, the Court again stresses that it is not presently resolving the issue of what duties the Insurers owed to the Policyholders under the Policy. Therefore, at the time that the Court does construe the Policy, the Court *may* find that the Insurers *did* owe the Policyholders' an amount equal to what it would have cost to rebuild the structure on the Property as of 2014. In that event, Mr. Hughes' testimony would not only *not* confuse the trier of fact, but it would likely prove to be more helpful than the actual costs of the rebuild. On the other hand, if, for example, the Court finds that the actual costs of construction *are* what the Insurers owed to the Policyholders under the Policy, the Court could simply disregard Mr. Hughes' testimony to the extent appropriate. In short, the Court is not concerned that permitting Mr. Hughes to testify at trial regarding the costs to rebuild the structure on the Property as of 2014 runs the risk of confusing the factfinder in this case.

Therefore, the Court will permit Mr. Hughes to testify at trial with respect to the cost of rebuilding the structure on the Property. Accordingly, the Court will deny the Insurers' Motion at ECF No. 65.

### E. The Insurers' Motion to Preclude Testimony of Richard T. Hughes P.E. at Trial (ECF No. 67)

In addressing the Insurers' Motion to preclude Mr. Hughes' testimony at trial, the Court notes that in the Policyholders' Pretrial Statements, they indicate that Mr. Hughes:

> [W]as asked to reconstruct the results of the fire and its effect on the structural steel based on all available information and issued an opinion regarding the propriety of using structural steel that has suffered the intense heat of a fire for a period of two hours or more as well as the costs of re-purposing structures such as a basement and structural steel vs. rebuilding and all other matters involving the replacement costs for building and golf course warranted as a result of the fire and all other matters within his expertise.

(ECF No. 55 at 8; ECF No. 56 at 8). In short, it appears to the Court that the Policyholders intend to elicit testimony from Mr. Hughes at trial regarding the following subjects: (1) the propriety of reusing the steel that was in the basement of the building on the Property, (2) the costs of re-purposing the building on the Property as opposed to rebuilding it, and (3) the costs of rebuilding the structure on the Property. The Court has already found that Mr. Hughes may testify at trial regarding the third subject (i.e., the costs of relocating and rebuilding the structure on the Property). *See supra* Section III.D. Therefore, the Court now turns to whether, pursuant to Rule 702, Mr. Hughes may testify at trial regarding subjects one and two (i.e., the propriety of re-using the steel that was in the basement and the costs of re-purposing the building on the Property as opposed to rebuilding it).

For the reasons the Court outlines below, the Court finds that Mr. Hughes may testify regarding these issues at trial, and the Court therefore denies the Insurers' Motion at ECF No. 67.

### 1.    Mr. Hughes' Reports and Deposition Testimony

There are three particular categories of information that are relevant to the Insurers' Motion to preclude Mr. Hughes from testifying at trial: (1) Mr. Hughes' July 31, 2020, report; (2) Mr. Hughes' deposition testimony; and (3) Mr. Hughes' August 15, 2022, report. The Court begins its analysis of the Insurers' Motion by overviewing those categories of information.

Turning first to Mr. Hughes' July 31, 2020, report, that document outlined his opinion with respect to the following issue: "[whether] it [was] reasonable for engineering and code consideration to consider moving the club house to a new location on the [Property] and abandoning the existing basement and superstructure." (ECF No. 67-4 at 2–5). In that report, based on a myriad of factors, as well as his professional experience, Mr. Hughes offered the following three conclusions, "with [a] high degree of engineering certainty":

> 1. The existing super structure steel framing could not be reused unless extensive structural analysis calculations were developed which never occurred. The process for analysis is attached;
> 2. The basement walls were cracked and out of plumb and had a compromised structural integrity. Combined with the heaved floor slab made the option of relocating and replacing the entire basement a more feasible cost-effective option (see attached figure and allowable tolerances);
> 3. The replacement cost of the existing building would now require accessibility to the basement level plus a sprinkler system to comply with industry standards and state building codes. This increased cost of construction would be covered by a property coverage extension allowance of $25,000.

(*Id.* at 8).[6]

---

[6] The Court notes that in his September 14, 2020, and September 16, 2020, reports, Mr. Hughes likewise stated that his estimate of the cost to reconstruct the building on the Property "correlates with my opinion that the masonry basement walls and basement floor slab were damaged as well as the structural steel, and therefore all three including the first floor plank need replaced." (ECF No. 65-4 at 2; ECF No. 65-6 at 2). In

Turning to Mr. Hughes' deposition, he testified regarding the first conclusion that he set forth in his July 31, 2020, report. (*See* ECF No. 75-3). He stated that he attached a chart to his July 31, 2020, report from a PCI Design Handbook. (ECF No. 75-3 at 27:1–15). In that chart, he indicated that the "steel [in the basement of the building on the Property was] between 1,000 and 1,2000 degrees [during the fire] … And then I show you graphically what the reduction of that steel capacity is." (*Id.* at 27:1–4). Later, Mr. Hughes indicated that he had stated that the steel reached temperatures of 1,000 degrees during the fire because of the fuel type involved in the fire. (*Id.* at 40:1–8). Further, he stated that the steel was subject to a temperature of approximately 1,000 degrees for two hours based on the fire department's report, which had indicated that the fire at the country club lasted for at least three hours. (*Id.* at 40:14–20).

Turning finally to Mr. Hughes' August 15, 2022, report, counsel for the Policyholders avers that she became aware, in or around the summer of 2022, that the steel from the fire was not discarded but rather was moved to a certain location on the Property. (ECF No. 75 at 2). Accordingly, Mr. Hughes physically went to the Property, inspected the steel that was damaged in the fire, and issued a new report, dated August 15, 2022. (*Id.*).[7] In his August 15, 2022, report,

---

short, Mr. Hughes opined, in each of his reports, that the structure on the Property should be relocated and replaced.

[7] The Court finds that it is appropriate to consider Mr. Hughes' August 15, 2022, report (the "Supplemental Report"), for several reasons.

First, the Policyholders made the Insurers aware of the Supplemental Report no later than September 2, 2022. (ECF No. 75-2). Nonetheless, the Insurers have not objected to the Court considering the Supplemental Report as of the date of this Memorandum Opinion and Order.

Second, under Federal Rules of Civil Procedure 26(e)(2) and 26(a)(3), for an expert whose report must be "disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in

Mr. Hughes noted that, in his initial evaluation of the "structural steel and during my deposition, I opined that due to the severe exposure to high heat (over 1,200 degrees Fahrenheit for several hours) the material had its structural integrity compromised." (ECF No. 75-2 at 2). Further, in his August 15, 2022, report, Mr. Hughes noted that there are three methods that are typically used to "assess the reduced strength of steel to severe temperatures." (*Id.*). Mr. Hughes stated that based on these "three methods and their required protocol [he was] very comfortable with the evaluation process [he] used" previously. (*Id.* at 3). Accordingly, he stated that it was his "professional opinion to a high degree of engineering certainty the prudent course of action during reconstruction was to scrap the small amount of untrustworthy superstructure steel and replace it with new." (*Id.*).

2.     **Parties' Arguments**

---

the report and to information given during the expert's deposition[,]" and such supplements are due at least thirty (30) days before trial, unless the court orders otherwise. Fed. R. Civ. P. 26(a)(3), (e)(2). Here, the Court did not set a specific deadline for the disclosure of any supplemental expert reports. (ECF Nos. 15, 20, 34, 42, 52, 53). Further, the Court did set deadlines for certain information outlined in Rule 26(a)(3), but those deadlines all fell within one month of the date for trial in this matter. (ECF Nos. 52, 53). Therefore, because trial in this matter is scheduled to begin on October 24, 2022, (ECF No. 53), and because the Policyholders provided the Insurers with the Supplemental Report more than one month before that date, it appears to the Court that the Policyholders' disclosure of the Supplemental Report was timely.

Third, even assuming that the Supplemental Report (or related information in Mr. Hughes' deposition) was submitted in an untimely fashion, in accordance with the legal standard and analysis above regarding exclusion of untimely disclosures, *see supra* Section III.A, the Court will not preclude the Policyholders from introducing the Supplemental Report and related information during trial. Indeed, even if the Supplemental Report and related information were untimely, the Court finds that the prejudice to the Insurers is not high given the fact that they were able to depose Mr. Hughes about many of the issues in that Report, and given the fact that they had access to the Supplemental Report and related information for more than a month and a half before trial. For similar reasons, the Court finds that the Insurers had an opportunity to cure any prejudice against them. Finally, given the conduct of the Policyholders throughout this case, coupled with the fact that the Court believes counsel for the Policyholders that she only recently became aware that the steel at the Property had not been discarded, the Court finds that the Policyholders did not act in bad faith or willingly disobey a Court order.

The Insurers advance multiple arguments in support of their Motion to preclude Mr. Hughes from testifying at trial. (*See* ECF No. 67). The Court begins by reviewing their arguments with respect to each of Mr. Hughes' three conclusions.

With respect to Mr. Hughes' first conclusion, the Insurers argue that his July 31, 2020, report "fails to identify or contain any analysis on the size or type of fuel load, the reduction stress capacity determined or how his opinion that the steel structures could not be reused is derived." (ECF No. 67 at 3). With respect to Mr. Hughes' second conclusion, the Insurers argue that his July 31, 2020, report fails to "provide any analysis of when the cracks first appeared[,]" or any "analysis of any fact to support the conclusion as to the cause of the horizontal crack." (*Id.*). With respect to Mr. Hughes' third conclusion, the Insurers state that it is "not relevant to any claim or issue in the case because the Policy limit for this coverage was paid." (*Id.* at 4).

Turning to the Insurers arguments regarding Mr. Hughes' expert testimony as a whole, the Insurers assert the following: (1) at his deposition, Mr. Hughes stated that he *thought* certain materials were the documents upon which he had based his opinions; (2) Mr. Hughes gave his opinion approximately five (5) years after the Policyholders decided to move the building on the Property; (3) Mr. Hughes was never actually at the Property and did not physically inspect the basement or remaining steel supports; (4) Mr. Hughes did not consult with two other engineers who reported on the condition of the steel after the fire; (5) Mr. Hughes failed to clearly articulate his method; (6) and Mr. Hughes did not perform sufficient analysis to support his conclusions. (*See* ECF No. 67).

In response, with respect to Mr. Hughes' first conclusion, the Policyholders state that Mr. Hughes offered a "drawing and a graph on pages 15 and 16 of [his] report detailing the

relationship between the temperature of the fire and the strength of the steel." (ECF No. 75 at 3). With respect to Mr. Hughes' second conclusion, the Policyholders argue that he provided "an extensive opinion as to the cause of the cracks and his methodology and reasons therefor" on page six (6) of his report. (*Id.* at 5). With respect to Mr. Hughes' third conclusion, the Policyholders deny that "either the excavation of the basement or the installation of a sprinkler system are covered by the $25,000.00 limits in the [P]olicy as those items would have been taken into consideration at the time that the policy was issued and the replacement value of the structure was determined." (*Id.*). Finally, the Policyholders generally dispute the Insurers' remaining contentions and argue that Mr. Hughes should be permitted to testify at trial under Rule 702. (*See* ECF No. 75).

### 3. Legal Standard

This Motion implicates the same legal principles that the Court set forth in Section III.D.2 above. Therefore, the Court will not reiterate those principles here.

### 4. Analysis

#### a. Qualifications

Turning to the first prong, the Court finds that Mr. Hughes is qualified to testify regarding (1) the propriety of using the steel that was in the basement of the building on the Property and (2) the costs of re-purposing the building on the property as opposed to rebuilding it because of his education and extensive experience in this area. Indeed, the Court outlined Mr. Hughes' education and extensive experience in the realm of evaluating existing buildings and providing estimates for new buildings above. *See Supra* Section III.D.3. Additionally, the Court notes that Mr. Hughes has: "inspected 3,000 buildings in [his] career. [He] has designed 400 new ones. [He]

was the engineer that was brought down to look at the crash site on [9/11]. [And he has] designed an addition to the CIA headquarters in Langley, Virginia[,]" which very much indicates that he is qualified to opine on these issues. (ECF No. 75-6 at 8:4–10). Finally, the Court notes that the Insurers do not challenge Mr. Hughes' qualifications. (ECF Nos. 67, 68). Therefore, the Court finds that the first prong is satisfied.

### b. Reliability

Turning to the second prong, the Court will review each of Mr. Hughes' three conclusions in turn.

### i.   Mr. Hughes' First Conclusion

Regarding Mr. Hughes' first conclusion—that the existing super structure steel framing could not be reused unless extensive structural analysis calculations were developed, as well as his related conclusions regarding the propriety of reusing the steel in the basement of the Property—the Court finds that Mr. Hughes' opinions satisfy the reliability inquiry, for several reasons.

First, Mr. Hughes applied valid reasoning and reliable methodology in reaching his conclusions. Indeed, in his August 15, 2022, report, Mr. Hughes stated that he examined the photographs from the night of the fire, and the "smoke color (gray-brown) of the fire revealed the fuel was predominantly wood. This corresponds to the known superstructure materials. The flame color (red-yellow) would be consistent with the wood fuel." (ECF No. 75-2 at 2). Based on

this information, Mr. Hughes stated that the "heat levels of this fire would be in the 1,500-degree range." (*Id.*).[8]

Further, in his deposition, Mr. Hughes testified that based on a letter he received from the fire department regarding the fire at the Property, the fire was going on for at least three hours. (ECF No. 75-4 at 40:14–17).  And Mr. Hughes stated that "the duration of the fire, [coupled] with the temperature of the fire equals reduction in strength of the steel." (*Id.* at 41:5–7). According to Mr. Hughes, that information was reflected in the graph he attached to his July 31, 2020, report. (*Id.* at 40:4–8). Therefore, upon considering the duration of the fire coupled with the temperature of the fire, Mr. Hughes testified that the steel in the basement of the building on the Property suffered a "serious reduction[.]" (*Id.* at 44:12–24). The Court has every indication that these considerations constituted valid reasoning based on reliable methodology. Mr. Hughes clearly articulated his basis for his findings relative to the duration and temperature of the fire, and he provided a chart by which his conclusions can be evaluated.

Second, Mr. Hughes indicated that his conclusions regarding the steel were "based on [his] formal education with two degrees (BS Civil Engineering and MS Engineering Science), the compliance with the National Fire Protection Regulations, NFPA 921 plus 40 years in the business inspecting over 3,000 structures for all the major insurance companies, including the buildings at the [9/11] crash site[.]" (ECF No. 75-2 at 3).

---

[8] The Court notes that, in his deposition, Mr. Hughes testified to the following regarding the fire at the Property: "I'm not saying [it] went to 2,000 [degrees], but it definitely went up to 1,000." (ECF No. 75-4 at 45:2–5). Therefore, insofar as Mr. Hughes mentioned 1,000 degrees at his deposition, it appears that he was using that figure as a conservative estimate of the temperature of the fire.

Third, the Insurers do not object to Mr. Hughes' underlying methodology—their objection focuses on whether he properly articulated and applied that methodology, (ECF Nos. 67, 68), exercises that the Court finds that Mr. Hughes has properly performed.[9]

Therefore, the Court finds that Mr. Hughes knows how to evaluate steel to determine if it remains functional, and he applied that knowledge in this case in a way that is reliable.[10] Accordingly, the Court finds that Mr. Hughes' first conclusion, as well as his opinion regarding the propriety of reusing the steel in the basement of the building on the Property satisfies the second prong.

### ii.     Mr. Hughes' Second Conclusion

Turning to Mr. Hughes' second conclusion—that the basement walls were cracked and out of plumb and had a compromised structural integrity, and that those issues combined with the heaved floor slab made the option of relocating and replacing the entire basement a more cost-effective option—the Court finds that Mr. Hughes' opinion is based on valid reasoning and reliable methodology.

---

[9] The Court notes that although Mr. Hughes' reasoning may not have been explicitly set forth in his July 31, 2020, report, (ECF No. 67-4), he clearly laid out his reasoning and methodology between his July 31, 2020, report; his deposition testimony; and his Supplemental Report, all of which the Insurers have had for sufficient time to be able to review in preparation for trial. In other words, even if the Insurers received certain of this information in an untimely fashion, the Court would still permit its introduction at trial given the lack of any significant prejudice to the Insurers.

[10] In a similar fashion to the previous Motion, the Court finds that this is an instance where the "relevant reliability concerns … focus upon personal knowledge or experience." *Kumho Tire Co., Ltd.*, 526 U.S. at 150. Further, the Court reiterates that Mr. Hughes' method consists of a testable hypothesis and appears to perform well relative to the other reliability factors that are relevant in this case. *Elcock*, 233 F.3d at 745–46 (listing factors).

Indeed, Mr. Hughes reached these conclusions after reviewing: (1) the report of David Bernhard, an engineer whom the Insurers intend to call at trial, (ECF No. 80 at 3), and the same engineer who reported that the "masonry basement walls had sustained horizontal cracks below grade" (ECF No. 67-4 at 6); (2) the photographs in Mr. Bernhard's report, which indicated that the "approximate crack width in the wall was $1/32^{nd}$ of an inch which correlates to the wall being over one-inch out of plumb … This bowed in wall is over the industry standard tolerances" (*id.*); and (3) the report of a registered architect, who indicated that there were two "uplift cracks … discovered in the basement floor slab." (*Id.*).

Given that Mr. Hughes: (1) took this objective information, which was provided by other seemingly qualified individuals, (2) reviewed it in light of his extensive experience in this area, and then (3) provided his own conclusions as to the feasibility of replacing the entire basement, the Court finds that the second prong is likewise satisfied for Mr. Hughes' second conclusion.[11]

### iii.    Mr. Hughes' Third Conclusion

---

[11] The Court briefly addresses the Insurers' primary arguments regarding Mr. Hughes' second conclusion. They argue that he neither: (1) provided any analysis of when the cracks first appeared nor (2) provided analysis of any fact to support the conclusion as to the cause of the horizontal crack. (ECF No. 67 at 3). The Court finds that these arguments do not mean that Mr. Hughes' reasoning lacks validity or his methodology is unreliable, for two reasons.

First, when the cracks appeared and the cause of the crack have little, if any, bearing on Mr. Hughes' assertion that it would be more cost-effective to replace the entire basement. What matters relative to that conclusion is that the crack(s) were present and would be costly to repair, not when or how they occurred.

Second, in terms of the cause of the horizontal crack, Mr. Hughes referenced an article that he authored and attached to his report in support of his conclusion regarding the cause of the crack. (ECF No. 67-4 at 6). It appears to the Court that that article sets out reasoned methodology at least generally supporting Mr. Hughes' opinion on this issue. (*Id.* at 18–19). Finally, it appears to the Court that Mr. Hughes' extensive qualifications mean that he can reliably opine on issues such as the cause of the horizontal crack.

Turning to Mr. Hughes' third conclusion—that the replacement cost of the existing building would require accessibility to the basement level plus a sprinkler system to comply with industry standards and state building codes, and that this increased cost of construction would be covered by a property coverage extension allowance of $25,000—the Court finds that Mr. Hughes' opinion is based on valid reasoning and reliable methodology.

Indeed, just before setting forth this conclusion, Mr. Hughes referenced various code provisions that he contends support his conclusions on this issue. (ECF No. 67-4 at 6). Given Mr. Hughes' extensive experience in this area, coupled with the fact that the Insurers do not allege that these code provisions call for anything other than what Mr. Hughes has stated that they require, (ECF Nos. 67, 68), the Court finds that the second prong is satisfied relative to this conclusion.

Further, the Insurers' arguments on this issue do not change the Court's holding. The Insurers contend that Mr. Hughes should be barred from testifying that "the cost to bring the building into compliance with codes, fire suppression system or ADA, because the Policy at issue provides $25,000 in coverage for increased costs of construction related to code or regulation requirements and this amount was paid. The testimony would serve only to confuse the factfinder[.]" (ECF No. 67 at 7).

In response to this assertion, the Court again notes that it is not presently construing the terms of the Policy, and it is not presently determining whether the Insurers properly paid the Policyholders under that agreement. Further, the Court will make its own determination as to what the Policy required when it crafts its Findings of Fact and Conclusions of Law. Therefore, the Court will permit Mr. Hughes to testify to the cost-effectiveness of replacing the building

based on his experience, methodology, and understanding of the Policy, and the Court will then give his testimony whatever weight the Court deems appropriate given the Court's interpretation of the Policy. In short, the Court is not concerned that permitting Mr. Hughes to testify on this issue will confuse the finder of fact.

Finally, with respect to the Insurers' remaining arguments regarding Mr. Hughes' testimony, the Court finds that they do not merit barring Mr. Hughes from offering opinions at trial, but rather are subjects for the Insurers to raise during their cross-examination of Mr. Hughes. *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded [from the trier of fact.]") (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

Therefore, the Court adheres to its conclusion that the second prong is satisfied.

### c.  Fit

Turning finally to the third prong, the Court holds that Mr. Hughes' testimony regarding (1) the propriety of using the steel that was in the basement of the building on the Property and (2) the costs of re-purposing the building on the property as opposed to rebuilding it would assist the trier of fact in this case. As the Court noted previously, the broad issue before the Court is whether the Insurers properly paid the Policyholders under the Policy, or whether they are instead liable to the Policyholders for breach of contract. Mr. Hughes' testimony with respect to these issues is closely related to the issue of whether the Insurers acted appropriately relative to the Policyholders under the Policy. Therefore, given the close connection between the testimony

to be offered and the particular factual disputes of this case, *Oddi*, 234 F.3d 136 at 145, the Court

finds that the third prong is likewise satisfied.

Accordingly, the Court will permit Mr. Hughes to testify at trial and will deny the

Insurers' Motion at ECF No. 67.

### F. The Insurers' Motion to Preclude or Limit Testimony of Anthony M. Komarnicki, RA (ECF No. 69)

Anthony M. Komarnicki, RA ("Mr. Komarnicki") provided the Policyholders with two

letters—one on February 17, 2015, and one on June 4, 2015. (ECF No. 69-4; ECF No. 69-5). In his

February 17, 2015, letter, Mr. Komarnicki provided the Policyholders with an "Opinion of

Probable Cost" letter for the reconstruction of the country club. (ECF No. 69-4).

In his June 4, 2015, letter, Mr. Komarnicki stated that:

> Within a reasonable degree of architectural and technical certainty, and subject to
> revisions should additional information become available, it is my professional
> opinion that the existing basement, which was non-usable in its current condition
> post-fire, without excessive costs being allocated to the reuse of the existing
> basement, should be removed in its entirety. The monies would be best utilized
> and should be allocated towards the new construction based upon the finding
> above.

(ECF No. 69-5 at 5). In that same letter, Mr. Komarnicki provided an estimate of how much it

would cost to re-use or renovate the existing structure on the Property. (*See* ECF No. 69-5).

For the following reasons, the Court denies the Insurers' Motion to preclude or limit Mr.

Komarnicki's testimony at trial.

#### 1. Parties' Arguments

In the Insurers' Motion, they first argue that Mr. Komarnicki should be precluded from

offering opinion testimony regarding the feasibility of reusing the basement (i.e., part of the

subject of Mr. Komarnicki's June 4, 2015, letter). (ECF No. 69 at 2). Specifically, the Insurers contend that Mr. Komarnicki "lacks the scientific expertise to give opinions on reuse of the basement and structural steel in construction of the country club buildings." (*Id.* at 3). Further, the Insurers assert that Mr. Komarnicki's "written opinion on reuse of the basement is not based on sufficient facts or scientific data particularly because scientific testing he testified was needed was not done and he cites to no scientific testing or data in support of his conclusion." (*Id.* at 4). Finally, the Insurers maintain that Mr. Komarnicki's estimate of the cost to reuse the basement included items that were inappropriate for him to include in that estimate. (*Id.* at 6).

With respect to Mr. Komarnicki's testimony regarding the cost to rebuild the structure on the Property (i.e., the subject of his February 17, 2015, letter), the Insurers argue that Mr. Komarnicki's "opinions are not the actual cost to rebuild the country club, which is evidenced by the actual payments made to rebuild the structures." (*Id.*). Additionally, the Insurers argue that Mr. Komarnicki's "opinion is not based in fact, is unreliable and will not assist the trier of fact in any way." (*Id.* at 5).

In response, the Policyholders argue that Mr. Komarnicki based his opinion regarding the feasibility of reusing the basement on his "qualifications as a Registered Architect and his direct observation of the condition of the basement[.]" (ECF No. 73 at 2). Further, in terms of Mr. Komarnicki's opinions relative to the costs of rebuilding the structure on the Property, the Policyholders contend that he "reviewed all of the proposed bids and invoices for payment and, as a result, is competent to testify to construction costs as part of his professional duties when he designs a building to be constructed by contractors and subcontractors[.]" (*Id.* at 4–5).

2.      **Legal Standard**

This Motion implicates the legal principles that the Court set forth in Section III.D.2 above. Therefore, the Court will not reiterate those principles here.

### 3.     Analysis

As the Court implied above, Mr. Komarnicki offered an opinion with respect to three broad categories: (1) whether it was feasible to reuse the basement of the building on the Property given the damage caused by the fire, (2) an estimate of the cost to renovate the existing structure on the Property, and (3) an estimate of the cost to reconstruct the country club separate from the previous structure. (ECF No. 69-4; ECF No. 69-5). The Court now turns to whether it is appropriate for Mr. Komarnicki to offer opinion testimony at trial regarding those three categories.

#### a.   Qualifications

Turning to the first prong, the Court finds that Mr. Komarnicki is qualified to offer an opinion as to all three categories because of his education and experience in these areas. The Court makes this finding for several reasons.

First, Mr. Komarnicki is a registered architect. (ECF No. 69-4; ECF No. 69-5). Second, according to counsel for the Policyholders, Mr. Komarnicki has worked as an architect for "many years[,]" (ECF No. 73 at 3, 6), a contention that the Insurers have not disputed. Third, in Pennsylvania, "the licensing statutes demonstrate that there is overlap between the engineering and architectural professions." *Corner Pocket, Inc. v. Travelers Ins.*, No. 12-CV-288, 2013 WL 3993967, at *4 (W.D. Pa. Aug. 5, 2013). Finally, the practice of architecture is defined "as services in connection with the design and construction of structures for the principal purpose of human habitation or use, to include planning, providing preliminary studies, designs, drawings,

specifications, and other design documents, construction management and administration of construction contracts." *Id.* at *4 n.9.

Therefore, because the Third Circuit applies a liberal interpretation to the qualification requirement, *Pineda*, 520 F.3d at 244, and because Mr. Komarnicki has many years of experience practicing a profession in which he designs structures and manages construction projects, the Court finds that he is qualified to opine as to the feasibility of reusing the basement of the structure on the Property, as well as the costs of renovating the existing structure on the Property and reconstructing the building on the Property. *See Plywood Prop. Associates v. Nat'l Flood Ins. Program*, 928 F. Supp. 500, 507–08 (D.N.J. 1996) (finding that an individual who had a degree in architecture and who had worked as an architect for over twenty (20) years was qualified to offer expert testimony "regarding the magnitude of damages sustained by" the plaintiffs' property).

### b. Reliability

Turning to reliability, the Court will consider whether Mr. Komarnicki's opinions ((i) regarding the feasibility of reusing the basement of the structure on the Property and (ii) regarding the costs of renovating the existing structure on the Property and reconstructing the building on the Property) are based on valid reasoning and reliable methodology.

### i.    The Feasibility of Reusing the Basement of the Structure on the Property

Regarding this opinion, the Court notes that Mr. Komarnicki testified that he personally walked through the basement of the structure on the Property in May or June 2014. (ECF No. 69-6 at 56:1–22). During that time, he could see mold on the walls and ceiling, and he stated that the "horizontal crack that [he] saw appeared to be a newer crack because it did not show signs of dirt

or anything else." (*Id.* at 57–59). Mr. Komarnicki also testified that he could see that the floor "was upheaved" and had new cracks. (*Id.* at 59:3–6).

Finally, Mr. Komarnicki stated that he performed deflection testing on the steel in the basement of the structure. (*Id.* at 29:1–10). Specifically, he stated that he and the other individuals present in the basement with him "ran a string line up there (on the steel) and measured it from beam end to beam end in that span, and it deflected a quarter of an inch to five-sixteenths." (*Id.* at 29:19–30:3). This finding was significant because, according to Mr. Komarnicki, "plus or minus sixteenth of an inch … is not standard in steel construction, because you don't want a belly in the beam." (*Id.* at 30:4–7).

Therefore, because Mr. Komarnicki formulated his opinion regarding the feasibility of reusing the basement of the structure after physically examining the basement and performing deflection testing on the steel therein,[12] and because he is a registered architect with many years of experience, the Court finds that his opinion regarding the feasibility of reusing the basement of the structure is based on valid reasoning and reliable methodology. *See Plywood Prop. Associates*, 928 F. Supp. at 507–08 (finding that a witness's testimony regarding the "cost of repair work necessitated by the damages allegedly caused by the flood" was reliable where that witness was an architect and based his opinion on his professional experience and information provided to him from an individual who inspected the property).

        ii.       **The Costs of Renovating the Existing Structure on the Property and the Costs of Reconstructing the Building on the Property**

---

[12] In a similar fashion to the previous two Motions, the Court finds that this is an instance where the "relevant reliability concerns … focus upon personal knowledge or experience." *Kumho Tire Co., Ltd.*, 526 U.S. at 150 (1999). Further, the Court notes that Mr. Komarnicki's method of deflection testing involves a testable hypothesis and appears to perform well relative to the other reliability factors that are relevant in this case. *Elcock*, 233 F.3d at 745–46 (listing factors).

The Court likewise finds that Mr. Komarnicki's opinions regarding the costs of (1) renovating the existing structure on the Property and (2) reconstructing the building on the Property are based on valid reasoning and reliable methodology. Mr. Komarnicki's reports regarding costs involve detailed, step-by-step statements of how he reached his conclusions. (ECF No. 69-4; ECF No. 69-5). By way of example, for one of his estimates, Mr. Komarnicki noted and incorporated an estimate provided by a contractor. (ECF No. 69-5 at 3). Therefore, given Mr. Komarnicki's extensive analysis, which can easily be reviewed and challenged, coupled with his many years of experience designing buildings and managing construction projects, the Court finds that the second prong is satisfied relative to his opinions regarding renovation and reconstruction costs.

Finally, with respect to the Insurers' other objections to the reliability of Mr. Komarnicki's testimony, the Court finds that those objections fall into one of the following two categories: (1) objections that the Court has already found unavailing in the context of another motion(s), or (2) objections that are best addressed while cross-examining Mr. Komarnicki.

### c. Fit

Turning finally to the third prong, the Court holds that Mr. Komarnicki's testimony regarding: (1) the feasibility of reusing the basement of the building on the Property given the damage caused by the fire, (2) the estimated cost to renovate the existing structure on the property, and (3) the estimated cost to reconstruct the country club separate from the previous structure would assist the trier of fact in this case. As the Court has noted previously, the broad issue before the Court is whether the Insurers properly paid the Policyholders under the Policy,

or whether they are instead liable to the Policyholders for breach of contract. Mr. Komarnicki's testimony with respect to these issues is closely related to the issue of whether the Insurers acted appropriately relative to the Policyholders under the Policy. Therefore, given the close connection between the testimony to be offered and the particular factual disputes of this case, *Oddi*, 234 F.3d 136 at 145, the Court finds that the third prong is likewise satisfied.

Accordingly, the Court will permit Mr. Komarnicki to testify at trial and will deny the Insurers' Motion at ECF No. 69.

## IV.   Conclusion

For the foregoing reasons, the Court:

1.   **GRANTS** the Insurers' Motion to Preclude Testimony of [Dr. George] (ECF No. 59);

2.   **DENIES** the Insurers' Motion to Preclude [the Policyholders'] Damage Claims on the Basis of Failure of [the Policyholders] to Prove Damages with Reasonable Certainty (ECF No. 61);

3.   **DENIES** the Insurers' Motion to Preclude [the Policyholders'] Claims for Fire Suppression, ADA Compliance and Other Code Compliance Costs, Mortgage Payments and Business Income  Loss (ECF No. 63);

4.   **DENIES** the Insurers' Motion to Preclude Testimony of [Mr. Hughes] on Reconstruction Costs (ECF No. 65);

5.   **DENIES** the Insurers' Motion to Preclude Testimony of [Mr. Hughes] at Trial (ECF No. 67); and

6.   **DENIES** the Insurers' Motion to Preclude or Limit Testimony of [Mr. Komarnicki] (ECF No. 69).

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DUBOIS COUNTRY CLUB, LTD and** | ) | **Case No. 3:19-cv-190** |
| **JUNIATA LAKE PROPERTIES, LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| v. | ) | |
| | ) | |
| **DEPOSITORS INSURANCE COMPANY,** | ) | |
| **ALLIED PROPERTY & CASUALTY** | ) | |
| **INSURANCE COMPANY, NATIONWIDE** | ) | |
| **MUTUAL INSURANCE COMPANY, and** | ) | |
| **AFFILIATED COMPANIES,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

AND NOW, this _21st_ day of October, 2022, upon consideration of Defendants' Motions

to:

1. Preclude Testimony of William J. George, Ph.D. (ECF No. 59);

2. Preclude Plaintiffs' Damage Claims on the basis of Failure of Plaintiff to Prove

   Damages with Reasonable Certainty (ECF No. 61);

3. Preclude Plaintiffs' Claims for Fire Suppression, ADA Compliance and Other Code

   Compliance Costs, Mortgage Payments and Business Income Loss (ECF No. 63);

4. Preclude Testimony of Richard T. Hughes P.E. on Reconstruction Costs (ECF No. 65);

5. Preclude Testimony of Richard T. Hughes P.E. at Trial (ECF No. 67); and

6. Preclude or Limit Testimony of Anthony M. Komarnicki, RA (ECF No. 69);

and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that the Court:

1. **GRANTS** the Defendants' Motion to Preclude Testimony of William J. George, Ph.D. (ECF No. 59);

2. **DENIES** the Defendants' Motion to Preclude Plaintiffs' Damage Claims on the Basis of Failure of Plaintiff to Prove Damages with Reasonable Certainty (ECF No. 61);

3. **DENIES** the Defendants' Motion to Preclude Plaintiffs' Claims for Fire Suppression, ADA Compliance and Other Code Compliance Costs, Mortgage Payments and Business Income Loss (ECF No. 63);

4. **DENIES** the Defendants' Motion to Preclude Testimony of Richard T. Hughes P.E. on Reconstruction Costs (ECF No. 65);

5. **DENIES** the Defendants' Motion to Preclude Testimony of Richard T. Hughes P.E. at Trial (ECF No. 67); and

6. **DENIES** the Defendants' Motion to Preclude or Limit Testimony of Anthony M. Komarnicki, RA (ECF No. 69).

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**