## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUBOIS COUNTRY CLUB, LTD and | ) | Case No. 3:19-cv-190 |
| JUNIATA LAKE PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| DEPOSITORS INSURANCE COMPANY, | ) | |
| ALLIED PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY, and | ) | |
| NATIONWIDE MUTUAL INSURANCE | ) | |
| COMPANY & AFFILIATED COMPANIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This matter comes before the Court following a bench trial held from October 24, 2022, until October 26, 2022. (ECF Nos. 86, 87, 88). That trial centered on one issue: whether the Defendants, Depositors Insurance Company ("Depositors"), Allied Property and Casualty Insurance Company ("Allied"), and Nationwide Mutual Insurance Company and Affiliated Companies ("Nationwide")[1] are liable to the Plaintiffs Dubois Country Club, LTD (the "Country Club") and Juniata Lake Properties, LLC ("Juniata") (collectively, the "Plaintiffs") for Breach of Contract. More specifically, the issue before the Court is whether the Defendants failed to make

---

[1] The Plaintiffs' Complaint indicates that Nationwide Mutual Insurance Company and Affiliated Companies is a single entity. (*See* ECF No. 1–2 at ¶ 7) (stating "[t]hat NATIONWIDE MUTUAL INSURANCE COMPANY and all of its affiliated companies *is* an insurance company …") (emphasis added).

sufficient payments under an insurance policy that covered various types of property that were owned by the Plaintiffs and that were destroyed or damaged in a fire.

The parties filed their Proposed Findings of Fact and Conclusions of Law and briefs in support on January 18, 2023, (ECF Nos. 96–98), and they filed additional briefing thereafter. (ECF Nos. 103, 104, 107, 109). The matter is now ripe for disposition. For the reasons explained below, the Court denies the Plaintiffs' request for relief and enters judgment in favor of the Defendants.

## II.   Jurisdiction and Venue

The Court has subject-matter jurisdiction over this dispute under 28 U.S.C. Section 1332. On the one hand, Depositors is a citizen of Iowa, Allied is a citizen of Iowa, and Nationwide is a citizen of Ohio. (ECF No. 1 at ¶ 5). *See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 34 (3d Cir. 2018) (noting that the "citizenship of a corporation is both its state of incorporation and its principal place of business").  On the other hand, the Country Club is a citizen of Pennsylvania, and the Court lacks any information indicating that Juniata is a citizen of either Iowa or Ohio. (ECF No. 1-2 at ¶¶ 1–2). *See GBForefront, L.P.*, 888 F.3d at 34 (explaining that a limited liability company is a citizen of all the states of its members).[2] Therefore, there is

_____

[2] As the Court noted in its summary judgment opinion, (ECF No. 50 at 2), it may raise the issue of subject-matter jurisdiction on its own initiative at any stage in the litigation. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (explaining that the "objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment. Rule 12(h)(3) instructs: 'Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'"). Here, the parties have not provided the Court with any indication that any member of Juniata is a citizen of Iowa or Ohio, and the Court is not aware of any information that would indicate the same. Therefore, the Court continues to proceed with the understanding that Juniata, which is based in Pennsylvania, (ECF No. 1-2 at ¶ 2), is neither a citizen of Iowa nor Ohio.

complete diversity among the parties. Additionally, the amount in controversy exceeds $75,000. (ECF No. 1-2 at 30).

Venue is proper under 28 U.S.C. Section 1391(b)(2) because a substantial part of the events giving rise to the Plaintiffs' claims occurred in the Western District of Pennsylvania.

### III.    Procedural Background

On October 15, 2019, the Plaintiffs filed a Complaint against the Defendants in the Court of Common Pleas of Clearfield County, Pennsylvania. (ECF No. 1-2 at 1, 14). At Count One ("Count I"), the Plaintiffs brought a claim for Breach of Contract. (*Id.* at 11–12). At Count Two ("Count II"), the Plaintiffs brought a claim for Bad Faith. (*Id.* at 12–13).

On November 5, 2019, the Defendants filed a Notice of Removal, indicating that they were removing the case to this Court pursuant to 28 U.S.C. Sections 1441 and 1446. (ECF No. 1 at 2).

On February 5, 2021, the Defendants filed a Motion for Partial Summary Judgment, requesting that the Court dismiss the Plaintiffs' Bad Faith claims at Count II. (ECF No. 45). On October 29, 2021, the Court issued a Memorandum Opinion and Order granting the Defendants' Motion for Partial Summary Judgment and dismissing the Plaintiffs' Bad Faith Claims at Count II with prejudice. (ECF No. 50 at 21).

Accordingly, it was the Plaintiffs' Breach of Contract claim at Count I that went to trial in October 2022, and it is that claim that the Court now resolves.

### IV.    Legal Standard

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court may enter judgment following a trial without a jury. *See* FED. R. CIV. P. 52(a). In making a decision

following a bench trial, "the court must find the facts specially and state its conclusions of law separately." *Id.*; *see also In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 196 (3d Cir. 2013). Accordingly, the Court will discuss its factual findings and then proceed to its conclusions of law.

## V.      Factual Background

The factual background of the case with regard to the remaining issue in this case, namely whether the Defendants[3] are liable to the Plaintiffs for Breach of Contract, is the following.

### A.      Background Regarding the Country Club and the Fire That Occurred There on February 24, 2014

The Country Club[4] consists of two buildings that are relevant to the Court's verdict—a clubhouse and a pro shop. (ECF No. 91 at 24:10–25). Further, the Country Club includes a golf course consisting of twenty greens. (*Id.* at 54:24–25).

On February 24, 2014, there was a fire at the Country Club. (ECF No. 84 at 1; ECF No. 91 at 20:1–6). John "Herm" Suplizio ("Mr. Suplizio") was both the City Manager of the City of Dubois and a firefighter at the time of the fire. (ECF No. 91 at 18–20). In describing his

---

[3] The Court notes that: (1) Depositors is a subsidiary of Nationwide and Allied and (2) it was Depositors that issued the insurance policy in this case. (ECF No. 93 at 168:19–169:3). In other words, the Plaintiffs' Breach of Contract claim is primarily centered on the actions (or inaction) of Depositors—no other named Defendant played any significant role in the factual events that form the basis of the Plaintiffs' claim. Therefore, the Court will use "Depositors" and the "Defendant" (or the "Defendants") as interchangeable terms throughout this Memorandum Opinion. In doing so, the Court stresses that it finds that the Plaintiffs' have failed to prove their Breach of Contract claim against any of the Defendants in this case.

[4] The Court notes that the Country Club, a Plaintiff in this matter, is a corporation. (ECF No. 1-2 at ¶ 1). However, the parties agree that the Country Club operates a physical Country Club at 10 Lakeside Avenue, DuBois, Pennsylvania. (ECF No. 1-2 at ¶ 4; ECF No. 96 at 1; ECF No. 98 at 1). Therefore, throughout this Memorandum Opinion, the Court uses the term "Country Club" to refer to both the Country Club that is a Plaintiff in this matter and the physical buildings and land at 10 Lakeside Avenue, DuBois, Pennsylvania.

recollection of what occurred during the night of February 24, 2014, Mr. Suplizio testified to the following:

> So that night I was on a water break for the city, so I happened to be one of the first ones to arrive at the fire. And once we got there, you could tell that [the Country Club] was fully engulfed. We tried to make an interior attack, but at that point in time it was just too … engulfed. So … we backed out and went to an exterior operation[.]

(*Id.* at 20:8–13). Mr. Suplizio stated that the fire started in the clubhouse and moved into the pro shop. (*Id.* at 24:21–25). All told, the firemen fought the fire for approximately three-and-a-half hours, using approximately 152,000 gallons of water in an effort to stop or control the fire. (*Id.* at 23:8–24:9).

On March 25, 2014, Mr. Suplizio, in his capacity as City Manager, wrote a letter to Ron Lykens ("Mr. Lykens"), who was the president of the Country Club at that time. (*Id.* at 25:21–26:6; Plaintiffs' Exhibit 4). In that letter, Mr. Suplizio wrote the following:

> Let me first start by saying, how sorry I am for your fire loss on Monday, February 24, 2014. I have always considered the … Country Club a very significant part of the City of DuBois not to mention the entire community.
>
> That being said, we consider the remaining structure to be in very poor condition and a hazard to all the residents in this area. We are asking you to demolition the remaining structure and have all the debris removed **immediately.**

(Plaintiffs' Exhibit 4; ECF No. 89 at 1) (emphasis in original). When asked at trial whether the directive that he gave to the Country Club was "specifically limited to removing everything above ground[,]" Mr. Suplizio responded "[t]hat's correct." (ECF No. 91 at 33:16–34:6).

Zachary Lawhead ("Mr. Lawhead"), the code and zoning enforcement officer for the City of DuBois as of the date of the fire at the Country Club, also testified at trial. (*Id.* at 36:25–37:6). Mr. Lawhead stated that, at the time of the fire in 2014, there were no sprinklers in the

clubhouse at the Country Club, and he did not believe that there was an elevator from the basement of the clubhouse to the first floor of the clubhouse. (*Id.* at 44:14–45:2).

With respect to the sprinkler systems, Mr. Lawhead explained that when the Country Club was renovated in 2003 or 2004, the International Building Code did not require buildings to have a sprinkler system unless the occupant load was at least 300 people. (*Id.* at 43:1–10; Plaintiffs' Exhibit 15; ECF No. 89 at 1). Therefore, Mr. Lawhead indicated that, because the occupant load of the Country Club was 250 people at the time of the renovation, the International Building Code did not mandate that the clubhouse contain a sprinkler system at that point. (ECF No. 91 at 43:7–10; Plaintiffs' Exhibit 15). However, according to Mr. Lawhead, in 2009, the International Building Code changed, and buildings with an occupancy load greater than 100 people had to have sprinkler systems. (ECF No. 91 at 43:10–12; Plaintiffs' Exhibit 15).

Finally, there was testimony at trial indicating that, given its condition prior to the fire, the basement of the clubhouse was not handicapped accessible and therefore was not compliant with the Americans with Disabilities Act (the "ADA"). (*See* ECF No. 92 at 71:20–72:4; ECF No. 98 at ¶ 10).

Following the fire, the Country Club built the clubhouse in a new location on the property, resulting in: (1) a clubhouse with more usable space than the pre-fire clubhouse and (2) a clubhouse that is completely handicapped accessible. (*See* ECF No. 93 at 21:21–22:16).

B.      **The Insurance Policy**

Dale W. Sobol ("Mr. Sobol"), a commercial insurance producer for Evergreen Insurance, wrote the Insurance Policy (the "Policy") that covered the properties in question in this action. (ECF No. 91 at 72:2–73:2). The Policy was in effect from December 23, 2013, until December 23,

2014, and therefore was effective at the time of the fire at the Country Club. (ECF No. 89 at 1; Plaintiffs' Exhibit 16). When asked to describe the Policy, Mr. Sobol testified that it was a "varied commercial package policy, actually what Nationwide called it—or [what] Depositors called it was a golf course package. And they changed some of the coverages to include things like tees and greens, which you wouldn't normally see in a package." (ECF No. 91 at 72:13–18).

There are four portions of the Policy that are especially relevant to the Court's verdict in this case: (1) provisions pertaining to coverage on the buildings at the Country Club, (2) provisions pertaining to coverage for Business Income Loss and Extra Expense, (3) provisions pertaining to coverage for Business Personal Property, and (4) provisions pertaining to Replacement Cost. The Court now outlines those four portions of the Policy in turn.

### 1. Coverage on the Buildings at the Country Club

The Policy covers both the clubhouse and the pro shop at the Country Club. (Plaintiffs' Exhibit 16). In the portion of the Policy entitled "Building and Personal Property Coverage Form[,]" there is a provision entitled "Loss Payment[.]" (Plaintiffs' Exhibit 16; "Building and Personal Property Coverage Form[;]" page 10 of 15). In relevant part, that provision provides as follows:

> a. In the event of loss or damage covered by this Coverage Form, at our option, we will either
>
> > (1) Pay the value of lost or damaged property;
> > (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;
> > (3) Take all or any part of the property at an agreed or appraised value, or
> > (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below

> We will determine the value of lost or damaged property, or the cost of its repair or replacement in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the valuation condition.
>
> b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(*Id.*).

Further, with respect to the coverage on the buildings at the Country Club, both parties have referred the Court to the provisions in the Policy governing Replacement Cost. (ECF No. 96 at 4; ECF No. 98 at 28–29). Critically, the Policy indicates that the Plaintiffs paid for Replacement Cost coverage. (Plaintiffs' Exhibit 16).

The Policy states that "Replacement Cost (without deduction for appreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form[.]" (Plaintiffs' Exhibit 16; "Building and Personal Property Coverage Form[;]" page 14 of 15). The Policy also provides certain limitations on Replacement Cost, including the following:

> e. We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)**, or **(3)**, subject to **f.** below
>
>> **(1)** The Limit of Insurance applicable to the lost or damaged property;
>> **(2)** The cost to replace the lost or damaged property with other property
>>> **(a)** Of comparable material and quality and
>>> **(b)** Used for the same purpose, or
>> **(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.
>
> If a building is built at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property

(*Id.* at 14–15) (emphasis in original).

In short, under the Policy, when paying out Replacement Cost for loss or damages to the buildings at the Country Club, Depositors was permitted to pay the least of the following: (1) the limit of insurance applicable to the lost or damaged property, (2) the cost to replace the lost or damaged property with other property of comparable material and quality and used for the same purpose (and, in the event of a building being built at a new premises, the cost which would have been incurred if the building had been rebuilt at the original premises), or (3) the amount actually spent that is necessary to repair or replace the lost or damaged property. (*Id.*). The Policy also excludes the "increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property" from the scope of monies to be paid out under the Replacement Cost provisions. (*Id.*).

However, another portion of the Policy provides a measure of coverage for increased costs of construction due to an ordinance or law. Indeed, the "Increased Cost of Construction" provision in the Policy applies only to "buildings to which the Replacement Cost Optional Coverage applies" and provides that in the "event of damage by a Covered Cause of Loss to a building that is Covered Property[,] we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property," subject to certain limitations. (*Id.* at 4). One of those limitations

indicates that if a damaged building is "covered under a blanket Limit[5] of insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building is the lesser of $10,000 or 5 times the value of the damaged building …" (*Id.* at 5).

Finally, a later provision of the Policy raises the cap on Increased Cost of Construction. Specifically, the "Golf Course Property Endorsement" portion of the Policy "raised the [I]ncreased [C]ost of Construction coverage from $10,000 to $25,000." (ECF No. 96 at 5); (*see also* ECF No. 98 at 22). Indeed, that provision provides that the aforementioned "$10,000 amount or 5%" is "replaced by $25,000 or 10%." (Plaintiffs' Exhibit 16; "Golf Course Property Endorsement[;]" page 1 of 13).

In short, as Mr. Sobol testified, the Policy limited what Depositors would pay for Increased Costs of Construction to $25,000. (ECF No. 91 at 88:15–18; ECF No. 98 at 7).

### 2. Business Income Loss and Extra Expense

The Court now turns its attention to two additional provisions of the Policy that are relevant to the Plaintiffs' claims in this case.

The first is the "Business Income with Ordinary Payroll Limitation" provision. In relevant part, that provision provides as follows:

> 1) We will pay for the actual loss of Business Income, including "rental value", you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss or damage to property at premises which are described in the Declarations …
>
> 2) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the

---

[5] Mr. Sobol testified that the clubhouse and the pro shop were covered by blanketed coverage. (ECF No. 91 at 73:3–18).

date of direct physical loss or damage. We will only pay for "ordinary Payroll expenses" for 60 days following the date of direct physical loss or damage …

4) Business income means the

a) Net Income (New Profit or Loss before income taxes) that would have been earned or incurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and
b) Continuing normal operating expenses incurred, including payroll

(Plaintiffs' Exhibit 16; "Golf Course Property Endorsement[;]" page 3 of 13).

The second is the "Extra Expense" provision. In relevant part, that portion of the Policy

provides as follows:

1) Extra Expense coverage is provided at the premises described in the Declarations

2) We will pay the actual and necessary Extra Expense (other than the expense to repair or replace property) to:

a) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location
b) Minimize the "suspension" of business if you cannot continue "operations"

We will also pay Extra Expenses to repair or replace property to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage

3) We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage …

5) Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

(*Id.* at 3–4).

### 3. Business Personal Property

There is one provision in the Policy pertaining to Business Personal Property that is especially relevant to the Court's verdict. That provision provides that certain "**Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises" is "**Covered Property**" under the Policy. (Plaintiffs' Exhibit 16; "Building and Personal Property Coverage Form[;]" page 1 of 15) (emphasis in original).

### 4. Replacement Cost

Finally, there is one additional portion of the Replacement Cost provision that is relevant to the Court's verdict. That provision provides that Replacement Cost basis will not be paid "[u]ntil the lost or damaged property is actually repaired or replaced[.]" (Plaintiffs' Exhibit 16; "Building and Personal Property Coverage Form[;]" page 14 of 15).

### C.    The Meeting on February 25, 2014

During trial, several individuals testified regarding a meeting that occurred on February 25, 2014, the day after the fire at the Country Club. That meeting involved: (1) a representative of the Defendants and (2) the board and mortgage holders of the Country Club. (ECF No. 91 at 51:20–52:2). The meeting on February 25, 2014, the statements made by the representative of the Defendants during and after that meeting, and the Plaintiffs' actions following the meeting have significant bearing on the Plaintiffs' claims in this case. Accordingly, the Court now turns its attention to testimony by five individuals regarding the meeting on February 25, 2014, and the events following it: (1) Don Howard Erickson, III, ("Mr. Erickson"), (2) Mr. Sobol, (3) Mr.

Lykens, (4) Attorney Toni M. Cherry ("Attorney Cherry"), and (5) Edward J. Perko, III ("Mr. Perko").

### 1. Testimony of Mr. Erickson

At the time of the fire, Mr. Erickson was on the board of the Country Club and was the Chairmen of the Grounds Committee. (ECF No. 91 at 47:9–16). Mr. Erickson testified that he was at a meeting on February 25, 2014. (*Id.* at 51:20–22). Present at that meeting were (1) a representative of the insurance company, Mr. Tuttle, and (2) the board and mortgage holders of the Country Club. (*Id.* at 51:20–52:5). During the meeting, Mr. Tuttle handed a check for $500,000 to Mr. Lykens, who was the president of the board of the Country Club at that time. (*Id.* at 51:25–52:9; ECF No. 93 at 6:12–14). Mr. Tuttle also said, "We're here to make you whole." (ECF No. 91 at 52:6–9).

When asked whether there was a discussion as to what the $500,000 was to be used for, Mr. Erickson testified that he did not "think there was any specific designation for the money, other than they knew that we had to keep the business going, and we were going to have to clean up[.]" (*Id.* at 52:10–15).

Finally, Mr. Erickson testified that the Country Club used insurance money to operate the Country Club during the summer of 2014. (*Id.* at 61:3–6). However, Mr. Erickson could not say whether the Country Club used the money for that purpose with the understanding that it had the authorization from the insurance carrier to do so. (*Id.* at 61:7–9). Still, the Defendants did not object to the continued operation of the Country Club. (*Id.* at 61:10–12).

### 2. Testimony of Mr. Sobol

With respect to the $500,000 check, Mr. Sobol testified that he was aware that that check was "used to operate the [Country C]lub that summer (2014), that season, and also to make repairs to the pro shop[.]" (ECF No. 91 at 81:18–21). Further, Mr. Sobol stated that he heard Mr. Tuttle tell the representatives of the Country Club that "there had to be very detailed specific accounting as to how" the $500,000 check was used. (*Id.* at 90:22–91:1). However, Mr. Sobol testified that the detailed accounting that the Plaintiffs were to keep of the $500,000 "wasn't specifically limited to the building." (*Id.* at 91:9–13). Indeed, Mr. Sobol "did not hear" Mr. Tuttle tell the representatives of the Country Club that the $500,000 was going to be "reconciled in the estimate and payments on the structure." (*Id.* at 91:14–19).

### 3. Testimony of Mr. Lykens

With respect to the $500,000 check that Mr. Tuttle gave to the representatives of the Plaintiffs on February 25, 2014, Mr. Lykens testified that portions of the $500,000 were used to repair the pro shop. (ECF No. 93 at 11:23–12:13). Mr. Lykens also stated that the Plaintiffs used "the first $500,000 that was given to [them] by Mr. Tuttle … to operate the [Country Club] and maintain the employees as directed." (*Id.* at 25:7–10). However, when Mr. Lykens was asked whether the Plaintiffs used every "dollar of the $500,000 advance payment … on business expenses to keep the golf course in operation[,]" he responded that he could not "honestly answer that … *We had to have used some of that for the building, also.*" (*Id.* at 25:24–26:4) (emphasis added). Mr. Lykens also stated that he did not "make any moves or decisions without first consulting Mr. Tuttle[.]" (*Id.* at 14:25–15:2). Finally, Mr. Lykens testified that he understood that the $500,000 check that Mr. Tuttle gave to the representatives of the Plaintiffs during the

meeting on February 25, 2014, "would have to be reconciled ultimately out of the total insurance claim payments made for the fire[.]" (*Id.* at 29:23–30:2).[6]

### 4. Testimony of Attorney Cherry

Attorney Cherry testified that, as of the date of the fire at the Country Club, she and her husband were shareholders in Juniata and the mortgage holders for the Country Club. (ECF No. 93 at 43:6–22).

With respect to the meeting on February 25, 2014, and the $500,000 check, Attorney Cherry was asked the following question: "what was your overall understanding of how the … Country Club, its board, and its members were to proceed?" (*Id.* at 49:10–12). In response, Attorney Cherry testified that it was not "just the understanding. It was stated: You are to use this $500,000 to take care of the expenses, return monies that you need to return, that you need to begin making repairs so that you can set up shop again in the pro shop and otherwise

---

[6] Mr. Lykens had two additional interactions with Mr. Tuttle that are relevant to the Plaintiffs' claims.

First, Mr. Lykens informed Mr. Tuttle that certain individuals associated with the Country Club were considering relocating the clubhouse to a different location on the property at 10 Lakeside Avenue. (ECF No. 93 at 21:1–22:2). According to Mr. Lykens, Mr. Tuttle responded in the following manner: "I don't care where you put the building. We're going to—we're going to take care of it." (*Id.* at 21:14–15).

Second, according to Mr. Lykens, when workers conducted the temporary repair of the pro shop following the fire, they used the same color of shingles that had previously been on the roof. (*Id.* at 10:20–11:16). However, because there were also older shingles on the roof, and because those older shingles had aged for approximately ten years, the older shingles did not match the newer shingles. (*Id.* at 11:13–17). Mr. Lykens testified that he discussed that fact with Mr. Tuttle, and Mr. Tuttle said: "[y]ou need to replace the—all the shingles; we'll take care of the shingles." (*Id.* at 11:18–22). Although Mr. Lykens appeared to initially indicate that the Defendants did not in fact take care of those shingles, (*id.* at 11:22), he also testified that he had no reason to doubt that the Defendants included a payment in their final building estimate to remove and replace the "entire roof surface area of the pro shop[.]" (*Id.* at 35:15–25). And indeed, the Defendants included a payment for the roof of the pro shop in their Final Building Repair Estimate. (Defendants' Exhibit 19).

conduct business." (*Id.* at 49:13–17). Finally, Attorney Cherry testified that the Country Club did in fact proceed in that manner. (*Id.* at 49:18–20).

### 5. Testimony of Mr. Perko

Mr. Perko explained that, as of the date of the trial in this matter, he was employed by Nationwide. (ECF No. 93 at 168:15–18). Further, Mr. Perko testified that he was involved, to an extent, in the insurance claims submitted by the Country Club, as well as the claim investigation and valuation relative to the fire at the Country Club. (*Id.* at 169:13–170:5). Finally, Mr. Perko testified that, as of trial, he was "knowledgeable … to testify regarding all of the Depositors repair estimates[.]" (*Id.* at 170:6–8).

When Mr. Perko was asked to outline his understanding of the phrase "make you whole" in the context of the insurance business, he responded that he looks at it "as the same term as indemnification. I think sometimes it's more of a layperson specific term, but it's basically bringing you back to the same condition you would have been [in] should the fire never have occurred." (*Id.* at 195:22–196:2).

Finally, with respect to the $500,000 check, Mr. Perko was asked whether, in Depositors' "custom and practice in 2014 and 2015, would that advance payment, used however the insured wants to use it, … have to be reconciled somewhere in the final claim dates?" (*Id.* at 204:5–8). Mr. Perko responded: "absolutely. And the way we issue payment is we would issue it off of the building coverage because it's easy to get lost if you apply it to all different coverages." (*Id.* at 204:9–11). Indeed, Mr. Perko averred that the file for the Plaintiffs' claims indicates that they were told that the $500,000 would be reconciled against what Depositors would pay for the rebuilding of the building at 10 Lakeside Avenue. (*Id.* at 204:25–205:10). However, Mr. Perko

was not present when that information was purportedly relayed to the Plaintiffs. (*Id.* at 205:10–12).

### D.    Amounts the Defendants Paid to the Plaintiffs Under the Policy

At trial, Mr. Perko testified regarding Defendants' Exhibit 15, which is a "spreadsheet of all the payments that had been issued [by Depositors] on the claim and the date that they had been issued and for which coverages." (ECF No. 93 at 182:22–183:6).

According to Defendants' Exhibit 15, Depositors paid a total of $2,396,082.15 to the Country Club under the Policy. (Defendants' Exhibit 15; ECF No. 89 at 2). More specifically, Depositors paid to the Country Club: $1,573,092.72 for the "Building"; $315,638.01 for "Business Personal Property"; $261,823.00 for "Business Income"; $116,653.63 for "Extra Expense"; $67,977.83 for "Temporary Repairs"; $31,491.75 for "Debris Removal"; $25,000.00 for "Increased [C]ost of [C]onstruction"; and $4,405.21 for "Personal Property of [O]thers". (*Id.*).

Mr. Perko stated that he had reviewed Defendants' Exhibit 15 prior to trial, and he believes that it "accurately reflects the total amount of claim payment dollars paid by Depositors to the [C]ountry [C]lub following the fire[.]" (ECF No. 93 at 183:14–19). Further, with respect to the various types of claim payments set forth within Defendants' Exhibit 15, Mr. Perko testified that they are "accurate in terms of what was actually paid by Depositors" to the Country Club. (*Id.* at 184:4–10).

For her part, Attorney Cherry, who is counsel for the Plaintiffs in this matter, was asked at trial whether she has any basis to dispute the notion that the $2,396,082.15 "is the total claim payments, insurance claim payments, made to the [C]ountry [C]lub by Depositors[.]" (*Id.* at 80:16–20). In response, Attorney Cherry stated that she does not "dispute that." (*Id.* at 80:21).

At this juncture, the Court will delve into additional information regarding two categories of claim payments represented on Defendants' Exhibit 15—the payments for Business Personal Property and the payments for Business Income.

### 1. Payments for Business Personal Property

#### a.      Compiling Information for the Business Personal Property Payout

Dr. Paul Joseph Valigorsky, II, ("Dr. Valigorsky"), a member of the board of the Country Club, testified at trial. (ECF No. 91 at 94:1–18). Relative to the Business Personal Property payment, Dr. Valigorsky indicated that certain employees of the Country Club did in fact compile a list(s) of the business personal property that burned in the fire. (*Id.* at 123:16–124:4).[7] Specifically, Dr. Valigorsky stated that "two Vickies, one was the accountant and one was the event planner, and another lady who worked in the kitchen" would have been the individuals who worked to compile the list of business personal property that burned in the fire and then submitted that list to Depositors. (*Id.*).

Indeed, Mr. Sobol testified that he instructed the Country Club "that they were required, in order to secure payment under the [P]olicy, to put together a detailed content list." (*Id.* at 85:21–24). Mr. Sobol also stated that he believed he was aware of the fact that "based upon the content lists that were compiled by representatives of the [C]ountry [C]lub, that a claim payment for [B]usiness [P]ersonal [P]roperty was made by Depositors." (*Id.* at 86:18–22).

---

[7] This line of questioning noted that it was an *allegation* that this list(s) was completed and submitted to Depositors. (ECF No. 91 at 132:16–124:4). However, the Court finds, based on the substance of Dr. Valigorsky's testimony and its observations of Dr. Valigorsky as he offered that testimony, that his testimony indicated that the list *was in fact* compiled by the above-mentioned employees of the Country Club and submitted to Depositors.

Finally, Mr. Perko explained that the $315,638.01 Business Personal Property payment was based on "the inventory that was submitted, the pricing of that inventory, and as—well, the CEIPS[.]"[8] (ECF No. 93 at 201:7–17).

  **b.**  **Replacement Cost Holdback**

One issue that arose at trial pertained to the Replacement Cost holdback for the Business Personal Property payment. Mr. Perko testified that per Depositors' own Replacement Cost Business Personal Property evaluation, the Replacement Cost for the Business Personal Property destroyed in the fire was $365,660.41. (ECF No. 93 at 205:19–22; Defendants' Exhibit 14; ECF No. 89 at 4). However, Mr. Perko also stated that Depositors only paid out $315,638.01 for Business Personal Property. (ECF No. 93 at 205:23–25; Defendants' Exhibit 15).

In explaining why Depositors have not paid this approximately $50,000 difference to the Country Club, Mr. Perko testified that Depositors "paid the actual cash value of the contents that were lost. Replacement cost is supported by the receipts and the amount of money you paid. So if all that money isn't paid to replace the contents, then not all of that money would be recoverable." (ECF No. 93 at 206:7–14).

Indeed, Mr. Perko offered the following explanation of the Policy's Replacement Cost holdback provision:

> So let's just assume that you have a table that's lost, one item, just to make it simple. That table, to purchase it today, may be a thousand dollars. But it's five years old. So the value of the table—the actual cash value would be $750.

---

[8] According to Mr. Perko, CEIPS stands for "commercial equipment inventory and pricing specialists[.]" (ECF No. 93 at 200:12–14). This company would have been brought in to "evaluate, and they would work with the insured. When there's no contents left, we rely on the insureds to create their inventory for us; and then we would work with them to make sure we get as much detail as possible to assume—ensure that we're pricing it appropriately." (*Id.* at 200:14–19).

If you have a replacement cost policy, once you replace the item and submit a receipt, and show that you spent at least a thousand dollars, you would get the 250 [dollars] back. If you would spend 900 [dollars], you'd get $150 back.

So the replacement cost holdback would be the difference between the actual cash value, the used value of the product, and the replacement cost would be what it would cost on the day of the loss to buy it new.

(*Id.* at 185:3–19).

Along these lines, Mr. Perko testified regarding certain invoices that Plaintiffs submitted to Depositors for payments made by Dr. Valigorsky. Specifically, Mr. Perko was asked whether "every one of the invoices submitted by Dr. Valigorsky that was payable under the [P]olicy was paid and the replacement cost holdback was released[.]" (*Id.* at 186:1–3). Mr. Perko responded: "Yes—especially related to contents. When it came to the building, we did release all the holdback on the building as well." (*Id.* at 186:4–6). Indeed, with respect to the invoices submitted by Dr. Valigorsky, Mr. Perko stated that, given the documentation that Depositors have received, there is nothing left to pay under the Policy. (*Id.* at 186:10–16).[9] However, there may be Business Personal Property items for which the Plaintiffs have paid, but for which they have not submitted receipts to Depositors. (*Id.*).[10]

---

[9] Mr. Perko also testified that, after Attorney Cherry submitted Dr. Valigorsky's invoices to Depositors, Depositors responded with three letters requesting additional information from the Country Club. (ECF No. 93 at 173–81). Mr. Perko further stated that, to his knowledge, Depositors never received a response from Attorney Cherry or the Country Club in general. (*Id.*).

[10] Relative to the Business Personal Property payment, the Plaintiffs contend that Depositors included $116,470.64 worth of kitchen equipment that was not permanently installed in the money that Depositors paid to the Plaintiffs on the "Building" claim. (ECF No. 107 at 3; Defendants' Exhibit 19; ECF No. 89 at 4). The Plaintiffs argue that this money is properly categorized as a Business Personal Property payment rather than a payment on the "Building" claim. (ECF No. 107 at 2). In response, the Defendants generally assert, among other things, that as "long as the items are listed on the estimates and the [P]olicy limits are not implicated, the final legal classification of a particular piece of equipment is not a relevant issue." (ECF No. 109 at 4).

### 2. Payments for Business Income Loss

As the Court previously noted, Depositors contends that it paid $261,823.00 on the Business Income Loss claim. (Defendants' Exhibit 15). Attorney Cherry indicated that she does not dispute that Depositors made that payment on that claim. (ECF No. 93 at 82:11–14).

With that fact established, the Court now outlines the testimony at trial regarding how Depositors reached the conclusion that it needed to pay the Country Club $261,823.00 for the Business Income Loss claim.

At trial, Mr. Lykens was asked whether he was "familiar … with the fact that submissions were made by the [C]ountry [C]lub to an accounting firm, Meaden & Moore, to assess the [B]usiness [I]ncome [L]oss claim under the [P]olicy[.]" (*Id.* at 33:21–24). In response, Mr. Lykens stated: "I believe Mark Freemer would have talked to them. That's the only—I never—I can't really say I ever talked to them." (*Id.* at 33:25–34:1).

Further, the Defendants offered testimony by Tyler Hawkins ("Mr. Hawkins") a Certified Public Account ("CPA") at Meaden & Moore. (*Id.* at 96:18–971). After Mr. Hawkins testified regarding his educational background and experience, the Court ruled that Mr. Hawkins would be permitted to "offer expert testimony in the field of accounting—CPA and forensic accounting." (*Id.* at 97–100).

Mr. Hawkins stated that his company was asked to perform "a business income evaluation for the … Country Club[.]" (*See id.* at 100:24–101:1). Mr. Hawkins testified that he

---

Insofar as the Plaintiffs are correct that this $116,470.64 worth of kitchen equipment is properly classified as money paid out for Business Personal Property rather than the "Building" claim, the Court notes that that fact would reduce the amount that the Defendants paid the Plaintiffs for the "Building" claim to $1,456,622.08 (the $1,573,092.72 listed on Defendants' Exhibit 15 minus the $116,470.64 for the kitchen equipment that was not permanently installed).

had concluded, "to a reasonable degree of accounting certainty[,]" that the Business Income Loss claim in this case is $261,823. (*Id.* at 107:4–16). Mr. Hawkins also outlined the process by which he reached that conclusion. (*See id.* at 101–16). Among other things, Mr. Hawkins testified that he received various pieces of information from the Country Club in reaching his conclusion regarding the proper payment for the Business Income Loss claim. (*Id.* at 105–09).

Finally, Mr. Lykens testified that he has no reason to disagree with the assertion that the Country Club's 2013 tax return shows an ordinary income loss of $136,804, and the Country Club's 2014 tax return shows an ordinary income business loss of $145,014. (*Id.* at 40:8–18).[11] With respect to the similarities between these numbers, Mr. Hawkins testified that it "gives you a good sense that—and I don't have all the details on the insurance payment in terms of how that relates to our overall measurement, but it should represent that *the amount of payment is sufficient to offset any losses they had due to the claim incident.*" (*Id.* at 119:6–22) (emphasis added). Indeed, it is "expected that whatever profit was or whatever the loss is would be the same from both years after factoring in the [B]usiness [I]ncome payment[.]" (*Id.* at 119:23–120:1).

### E.   Building Estimates

One of the central issues in this case is whether Depositors paid the Plaintiffs a sufficient amount of money under the Policy to rectify the damage to the clubhouse and the pro shop. Relative to that issue, there was testimony at trial regarding the following five categories of estimates: (1) the estimate prepared by Depositors itself; (2) the estimates prepared by Anthony Michael Komarnicki ("Mr. Komarnicki"); (3) the estimate prepared by Richard T. Hughes ("Mr.

---

[11] Indeed, the Country Club's 2013 income tax return reports an ordinary business income (loss) of $136,804, and the Country Club's 2014 income tax return reports and ordinary business income (loss) of $145,014. (Plaintiffs' Exhibits 18–19; ECF No. 89 at 1).

Hughes"); (4) the estimate prepared by CBF Contracting Company ("CBF"); and (5) the estimates prepared by Kevin Leisenring ("Mr. Leisenring") of FranJo Restoration Services ("FranJo Restoration"). The Court examines those five categories of estimates in turn.

### 1.   The Estimate Prepared by Depositors Itself

#### a.   Depositors' Estimate and the Source of Their Disagreement with the Plaintiffs

Defendants' Exhibit 19, which is Depositors' "final building repair estimate[,]" was admitted into evidence during trial. (ECF No. 93 at 94:25–95:4; Defendants' Exhibit 19; ECF No. ECF No. 89 at 4). Depositors' sixty-five-page repair estimate (the "Defendants' Final Building Repair Estimate") concludes that the cost of repairing the damage to the clubhouse and the pro shop was $1,573,092.72. (Defendants' Exhibit 19).

According to Mr. Sobol, a significant point of disagreement between Depositors and the Plaintiffs in terms of the payment to rectify the issues with the clubhouse was "whether or not the basement was salvageable and whether or not the steel was salvageable." (ECF No. 91 at 81:8–17). Indeed, Mr. Komarnicki, a licensed registered architect in the State of Pennsylvania, (ECF No. 92 at 2:17–24), testified that he observed issues with the steel in the clubhouse. (*Id.* at 5:23–6:17). Further, he averred the following with respect to the conditions in the basement:

> The floor had heaved in a couple of areas. That would be the basement concrete floor, the lower level concrete floor. There [were] horizontal flectional cracks or bowing cracks in the masonry walls. We kind of knew that those were newer because there was no dirt there, there was no soot, there was nothing that was actually in that horizontal crack, so it was happening, it was a live crack.

(*Id.* at 7:4–11).

Because issues pertaining to the steel and the conditions in the basement are relevant to whether Depositors made appropriate payments to the Plaintiffs under the Policy, the Court now shifts its attention to those issues and how they relate to Depositors' repair estimate.

> **b.      The Interplay Between: (1) the Steel and the Conditions in the Basement and (2) Depositors' Repair Estimate**

Mr. Komarnicki testified that he recommended Providence Engineering Corporation ("Providence") "to do the engineering services for the [C]ountry [C]lub." (ECF No. 92 at 62:8–11).[12] According to Mr. Komarnicki, David W. Bernhardt ("Mr. Bernhardt") of Providence is a good engineer, and Providence in general has highly qualified engineers. (*Id.* at 62:12–25).

Mr. Komarnicki also testified regarding two letters that Mr. Bernhardt wrote to Mr. Lykens.

Mr. Bernhardt wrote his first letter to Mr. Lykens on May 2, 2014. (*Id.* at 13:8–17; Defendants' Exhibit 10; ECF No. 89 at 2). In that letter, Mr. Bernhardt indicated that, at the request of Mr. Lykens, Providence had performed a "visual review of the remaining structure at the site of the previous … Country Club." (Defendants' Exhibit 10 at 1). Mr. Bernhardt further stated that the purpose of Providence's visit to the Country Club was to "provide a written structural due-diligence report of the remaining structure … and to provide comment on the feasibility of re-using the remaining structural steel[.]" (*Id.*).

With respect to the top level of the clubhouse, Mr. Bernhardt wrote the following:

> The structural steel from the first floor that has not be[en] adversely affected by the fire (this issue has been addressed previously) can theoretically be re-

---

[12] Indeed, Mr. Komarnicki requested that Mr. Bernhardt conduct "an evaluation." (ECF No. 92 at 28:19–23). Specifically, Mr. Komarnicki recommended that the Country Club hire Mr. Bernhardt and Providence to "come up with an evaluation, to see what was good, what was not good as far as the structure, could it be saved, and so on and so forth." (*Id.* at 4:16–20).

purposed for use in the design and construction of the new country club. The steel columns may need to be lengthened to accommodate a higher eave elevation and spans (and therefore column placement) in the new floor plan would be affected by the length and strength of the existing steel. These considerations would need to be given thought and attention in both the architecture and structure of the new building, to the extent the steel is determined to be reused.

(*Id.* at 2).

With respect to the lower level of the clubhouse, Mr. Bernhardt wrote the following:

The lower level, below the hollow core slab, was used primarily as locker room space in the former country club. These spaces appeared somewhat dated with regard to their size, layout and functionality, but could be reused if determined to be building code compliant and satisfactory to the owner. Some of the below grade walls and pilasters in this area have a horizontal crack in the mortar joint at approximately the mid-point of the wall. Horizontal cracking at the midpoint of the masonry walls often suggests flexural failure of the wall.

The location of the cracks in the below grade masonry walls coordinate with the locations where the walls are retaining the maximum amount of earth load, further suggesting that the walls are overstressed. We would recommend that these walls be repaired prior to, or as part of, the rebuilding of the country club. *The walls in question could be reinforced with carbon fiber sheets applied to the interior face of masonry or by adding vertical posts elements at +/- 5'0"o.c. that would span from slab on grade to floor diaphragm above.*

(*Id.*) (emphasis added).

In closing, Mr. Bernhardt stated that, in Providence's "professional opinion, the existing structure that remains can be incorporated into the design of a new country club." (*Id.*).

Mr. Bernhardt wrote a second letter, this one addressed to the attention of Mr. Komarnicki, on September 10, 2015. (ECF No. 92 at 65:15–20; Defendants' Exhibit 11; ECF No. 89 at 2). In relevant part, that letter provides as follows:

The following is written to provide you with some additional clarity with respect to the letter we penned to Mr. … Lykens of the … Country Club on May 2nd of 2014. Based on our limited visual review and understanding of the conditions at

the time of that letter, we stand by the opinions offered at that time, in that letter. Based on conversations that have occurred following the submission of the letter, and information that we have learned since that time (contained in your letter of June 4, 2015) we offer the following clarifying comments.

Although as pointed out in our letter, the basement structure could be repaired and reused from a structural point of view, there are other considerations, beyond the scope of structural engineering or our structural evaluation, that are associated with non-structural portions of the building code, budgetary realities and/or the owner's needs that would also have bearing on the practicality of reuse of the remaining building. These items would have been beyond the scope of a structural due diligence report, and beyond our expertise to provide an exhaustive list, but could have included items such as ADA requirements, the presence of mold or other potentially harmful elements, undersized spaces, non (architectural) building code compliant portions of the remaining building, or undersized and/or damaged mechanical/electrical systems …

Although, with unlimited construction budget, the basement structure could be repaired and reused from a structural point of view, that is not the same as stating that reuse would be the most cost effective or practical way to move forward when looking at the project as a whole.

(Defendants' Exhibit 11 at 1).

Notably, on page forty-one of Depositors' estimate for the repairs to the clubhouse and the pro shop, the company allotted $7,318.91 for "vertical posts figured for basement walls as explained in the Providence … report. This was figured for areas to have damage on wall facing the lake side of the basement." (Defendants' Exhibit 19 at 41). Further, Depositors' estimate indicates that the company allotted: (1) $15,562.50 for "Concrete & Asphalt[,]" (2) $7,542.20 for "Steel Components[,]" and (3) $9,212.58 for "Temporary Repairs[.]" (*Id.* at 64–65).

Finally, for his part, Mr. Komarnicki was asked whether the "reuse of steel that has been in a fire [is] recommended … from a design standpoint[.]" (ECF No. 92 at 22:13–14). In response, Mr. Komarnicki stated, in essence, that you "can do anything and make anything work depending on where the dollars and cents comes down to." (*Id.* at 24:23–25).

### 2.  Mr. Komarnicki's Estimates

During trial, Mr. Komarnicki testified regarding two estimates that he personally prepared—Plaintiffs' Exhibit 25 and Plaintiffs' Exhibit 26. (Plaintiffs' Exhibit 25; Plaintiffs' Exhibit 26; ECF No. 89 at 2).

In Plaintiffs' Exhibit 25, which Mr. Komarnicki provided to Mr. Lykens on February 17, 2015, Mr. Komarnicki set forth his opinion of the probable cost to reconstruct the former Country Club. (ECF No. 92 at 30:12–15, 48:5–11; Plaintiffs' Exhibit 25 at 1). Indeed, relative to this estimate, Mr. Komarnicki testified that it was going to be the "least cost method … to demolish and build anew." (ECF No. 92 at 31:12–15). All told, and using RS Means (an industry standard) to complete his estimate, Mr. Komarnicki opined that the reconstruction of the Country Club would cost $3,889,145.05. (*Id.* at 33:11–34:21; Plaintiffs' Exhibit 25 at 3). Mr. Komarnicki stated that he rendered that opinion "within a reasonable degree of architectural, design and construction certainty[.]" (ECF No. 92 at 35:23–36:6). Finally, Mr. Komarnicki clarified that $3,889,145.05 was the estimated cost, not of "incorporating the basement that … was in place at the time of the fire; but, rather, excavating, yanking that out of the ground and building a completely new structure." (*Id.* at 51:15–52:2).

On cross-examination, Mr. Komarnicki affirmed that an opinion of probable cost "is a [high-level] overview of the project, including pricing that is likely to change during construction." (*Id.* at 52:8–11). Further, Mr. Komarnicki testified that the new clubhouse that the Country Club built cost less than $100 per square foot to build and was designed as an approximately 17,900 square foot building. (*Id.* at 53:3–11, 58:6–13). However, in Mr. Komarnicki's opinion of probable cost, which indicated that a new, approximately 17,905

square foot clubhouse would cost $3,889,145.05 to build, he estimated a cost of approximately $217 per square foot. (*Id.* at 56:5–8; Plaintiffs' Exhibit 25).

In Plaintiffs' Exhibit 26, which Mr. Komarnicki provided to Dr. Valigorsky on June 4, 2015, Mr. Komarnicki offered an evaluation of what it would cost to re-use the existing basement at the clubhouse. (ECF No. 92 at 36:14–19; Plaintiffs' Exhibit 26). Mr. Komarnicki issued this report because the Country Club was "still looking [at whether] it was possible … to reuse the basement[.]" (ECF No. 92 at 36:20–25). In crafting this evaluation, Mr. Komarnicki considered three categories of information and related expenses: (1) "the structural damage to the walls with the bowing," (2) the "black mold that was growing on the walls," and (3) the "ADA accessibility egress code application to see what would need to be done to that building to bring it up to current codes." (ECF No. 92 at 37:3–11).

For the first category, Mr. Komarnicki stated that the way to rectify the issues with the walls and the cement floor was "either using the structural metal panels on the interior walls and/or putting up pilasters on the inside[,]" which was the methodology suggested by Mr. Bernhardt. (*Id.* at 37:12–23). According to Mr. Komarnicki, the cost of the structural panels was almost $61,000, and the cost of the pilasters was $8,400. (*Id.* at 38:6–8).

For the second category, Mr. Komarnicki testified that he was not given a definite total cost for the mold remediation. (*Id.* at 40:6–8).

Finally, after estimating at least $99,000 in costs to make the basement ADA compliant, Mr. Komarnicki's evaluation indicated that the total "structural/mold/ADA/build out costs for [the] lower level" would cost approximately $782,375.00. (Plaintiffs' Exhibit 26 at 2–3). And, accounting for "like/similar & build out costs[,]" the total estimate was for $891,006.00. (*Id.* at 3).

Given the foregoing, Mr. Komarnicki opined that the "existing basement, which is unusable in its current condition post-fire, without excessive costs being allocated to the remediation of the existing basement should be removed in its entiret[y]. The monies would be best utilized and should be reallocated towards new construction[.]" (*Id.* at 44:1–9).

On cross-examination, Mr. Komarnicki confirmed that Mr. Bernhardt's letter indicated that the basement walls could be repaired using *either* the "carbon fiber on the walls or the pilasters." (*Id.* at 68:14–23). And Mr. Komarnicki estimated that the pilasters would cost $8,400. (*Id.* at 69:1–3).

### 3. Mr. Hughes's Estimates

Mr. Hughes, a consulting engineer, was permitted to offer "opinion testimony in the field of civil engineering" during trial. (ECF No. 92 at 80:23–83:2). Mr. Hughes explained that he had been "contacted to perform an investigation as to the integrity of the steel and the basement structure of the … Country Club building (the clubhouse) subsequent to a fire that it sustained on February 24th, 2014[.]" (*Id.* at 87:20–24). Ultimately, he prepared two reports regarding those issues. (*Id.* at 88:24–89:12).

In authoring his first report, which is dated July 31, 2020, Mr. Hughes addressed two issues: (1) whether "the super structure steel that survived the fire[] could … be reused" and (2) whether "the foundation including the basement floor and the walls of the building, the foundation[] could … be reused[.]" (*Id.* at 89:18–25; Plaintiffs' Exhibit 27; ECF No. 89 at 2).

With respect to super structure steel, Mr. Hughes *testified* that it had "lost so much of its strength, that it wouldn't be safe to reuse." (*Id.* at 101:16–25). However, in his *report*, Mr. Hughes wrote that the "existing super structure steel framing could not be reused unless extensive

structural analysis calculations were developed which never occurred." (Plaintiffs' Exhibit 27 at

7). Mr. Hughes also testified regarding the process by which he reached these opinions. (*Id.* at

90–101). And he asserted that you cannot visually determine whether steel can safely be reused.

(*Id.* at 96:19–97:4).

With respect to the basement, and specifically the repairs suggested by Mr. Bernhardt,

Mr. Hughes opined as follows:

> So what I'm saying is that when you combine that with the floor slabs—there
> was no testing done. I never saw anybody run analysis calculations to prove. But,
> typically, when I see a wall that's bowed like that—you can see it in the
> photographs—and it's obviously cracked, you could see the cracks—no. You
> know what I mean, it's—*it's not worth it.*

(*Id.* at 109:19–112:24) (emphasis added).[13]

Turning to Mr. Hughes's second report, which is dated August 15, 2022, he noted that

the "steel was exposed for several hours in the fire, but not every beam and column would have

had the same exposure." (Plaintiffs' Exhibit 33 at 1; ECF No. 89 at 2). Ultimately, Mr. Hughes

opined that the "prudent course of action during reconstruction was to scrap the small amount

of untrustworthy superstructure steel and replace it with new." (Plaintiffs' Exhibit 33 at 2). He

stated that the "estimated cost of the superstructure steel … combined with the cost of further

destructive testing, [and] the results of the calculated estimate of heat exposure led me to this

decision." (*Id.*).

Mr. Hughes also prepared his own estimate to "rebuild a 17,905 square foot building

consisting of a 10,000 square foot first floor and 7,905 square foot basement[.]" (*Id.* at 115:20–

---

[13] Mr. Hughes also indicated that there were issues with the basement floor in addition to the issues with
the basement walls. (ECF No. 92 at 109). In his July 31, 2020, letter, Mr. Hughes opined that given the
cracks in the basement floor slab, combined with the "wall integrity issue[,]" it would be "cost effective to
rebuild the entire basement." (Plaintiffs' Exhibit 27 at 5).

116:9; Plaintiffs' Exhibit 35; ECF No. 89 at 2). Ultimately, Mr. Hughes estimated that the project would cost $2,284,596.00. (ECF No. 92 at 119:8–11; Plaintiffs' Exhibit 35). Mr. Hughes testified that his estimate was for the "construction of an entirely new building[.]" (*Id.* at 130:14–21). Finally, Mr. Hughes's estimate: (1) has a line item for steel for brand new construction in the amount of $12,000; (2) takes into account the fact that the building must be compliant "with existing building codes and ADA and other federal regulations[;]" and (3) includes approximately $50,000 for a sprinkler system that was not present in the clubhouse that was damaged in the fire in February 2014. (*Id.* at 134:7–135:21).

### 4. CBF's Estimate

At trial, Mr. Lykens testified that he received a proposal "to build the [clubhouse] on the existing basement and assuming that the steel was reusable from [CBF] for … approximately [$1.8 million]." (ECF No. 93 at 22:20–24). On cross-examination, Mr. Lykens noted that this two-page estimate was to use the existing basement and "construct an entirely new 10,000 square foot [clubhouse] in exactly the same measurements as it existed at the time of the fire[.]" (*Id.* at 28:2–22; Plaintiffs' Exhibit 32; ECF No. 89 at 2). Finally, Mr. Lykens testified that he noticed that the estimate from CBF included $231,121 for plumbing. (*Id.* at 29:13–15). When he was asked whether he "understood that the majority of that plumbing allowance was for a sprinkler system[,]" he responded "I can't—no. No, I didn't, didn't think about that." (*Id.* at 29:16–18).

### 5. Mr. Leisenring's Estimates

Mr. Lykens testified that the Country Club received two estimates from Mr. Leisenring of FranJo Restoration for the cost to replace the clubhouse on the existing basement. (ECF No. 93

at 23:15–21; 131:2–4).[14] The first estimate was for $2,320,717.31, and the second estimate was for $1,384,330.51. (*Id.* at 23:15–21). When asked whether he had "any idea what caused that drop in price[,]" Mr. Lykens testified that he had "[n]o idea." (*Id.* at 23:22–24:2).

Regarding the first estimate that Mr. Leisenring and FranJo Restoration submitted to the Country Club, Mr. Leisenring stated that he included $332,348.14 for the restoration of the basement. (*Id.* at 155:8–11). Further, Mr. Leisenring testified that, when he submitted this first estimate to the Country Club, he "had the conversation that this estimate will be high, this is what we're submitting to Nationwide to start with, to start discussions of an agreed scope[.]" (*Id.* at 142:20–143:1) (*See also* ECF No. 93 at 148:23–149:8).

With respect to the second estimate that Mr. Leisenring and FranJo Restoration submitted to the Country Club, FranJo Restoration represented to the Country Club that the cost to "rebuild the [C]ountry [C]lub from where it was at this point in time to use again" was $1,384,330.51. (ECF No. 93 at 135:3–9, 143:20–144:2). In this estimate, Mr. Leisenring allotted $144,317.51 to restore the basement to its pre-fire condition. (*Id.* at 163:8–16). This estimated cost to restore the basement did not "contain any cost to make it ADA complaint," and it did not contain any additional monies to install a sprinkler system. (*Id.* at 163:17–24). Further, Mr. Leisenring was asked whether, when he was constructing this estimate, he had "any thoughts or hopes that FranJo Construction[15] would be awarded the job to build the [C]ountry [C]lub[.]" (*Id.* at 144:3–5). In response, Mr. Leisenring stated: "yeah, we were hoping FranJo Restoration

---

[14] These estimates entailed "a pricing for what it would cost to reconstruct the first floor that had been completely destroyed and to restore the basement area[.]" (ECF No. 93 at 146:5–9).

[15] According to Mr. Leisenring, FranJo Construction is owned by the same individual as FranJo Restoration, but they are two separate entities. (ECF No. 93 at 131:10–14).

would have been awarded the project and then FranJo Construction was going to build the project." (*Id.* at 144:6–8). Indeed, Mr. Leisenring testified that he was one "hundred percent" comfortable with this "final repair estimate in terms of whether the job could be done to completion for that number[.]" (*Id.* at 144:14–18).

On cross-examination, Mr. Leisenring was asked whether it was typical for him to "overestimate by close to a million dollars[.]" (*Id.* at 149:17–18). In response, Mr. Leisenring testified as follows:

> Um, it depends on—on percentage wise for a project, it may be exactly that. It's almost, what, 40 percent (difference between the two estimates)? And it's as simple as sometimes as when we go in [and the difference is caused by] those two settings on the Xactimate system for commercial and for homeowner. And to work on behalf of the [C]ountry [C]lub, we left it on homeowner, which figures the rates on a different schedule than what it does for commercial repairs.
>
> And if Nationwide catches that, we have to take it out. So we tried on the [C]lub's behalf to—and our behalf, too, actually, because we're being paid by a percentage, to see what we can get approved for repairs.

(*Id.* at 149:19–150:4). Later in his testimony, Mr. Leisenring stated that switching the "toggle" from residential to commercial construction takes approximately "15 percent or so [off of the price] automatically[.]" (*Id.* at 156:2–9). Finally, Mr. Leisenring testified that, in the course of compiling his second estimate, he spoke with Nationwide regarding the scope of the project— namely, what "was allowable and what was not" under the Policy. (*Id.* at 150:24–151:25).

In short, Mr. Leisenring testified that the second estimate "was a more fair representation of what we could do the project for; and we felt that … we could do it for that … amount of money." (*Id.* at 150:13–16).

F.      The Invoices in Plaintiffs' Exhibits 21 Through 24

During trial, the Plaintiffs produced four exhibits containing invoices paid (at least primarily) by Dr. Valigorsky. (Plaintiffs' Exhibits 21–24; ECF No. 89 at 2). Because those invoices form part of the basis of the Plaintiffs' claims in this case, the Court reviews each of them in turn.

### 1. Plaintiffs' Exhibit 21

As Dr. Valigorsky testified at trial, Plaintiffs' Exhibit 21 consists of "costs that [he] advanced to Tod Brunetti [("Mr. Brunetti")], the builder" of the new clubhouse, in the total amount of $437,854.25. (ECF No. 91 at 101:14–102:9; Plaintiffs' Exhibit 21 at 1). All told, the Exhibit contains ten bills submitted by Mr. Brunetti, and photocopies of several checks that Dr. Valigorsky issued paying most of those bills. (Plaintiffs' Exhibit 21).

The first bill was for: "[c]leaning floors, installing fire tape, finish[ing] drywall, locksmith fees, [Mr. Brunetti's] labor and cost, electric company, and paint." (ECF No. 91 at 103:3–10). Dr. Valigorsky paid that bill in the amount of $16,016.12. (*Id.* at 103:11–12).

The second bill was for: "[m]aterial cost ending 8/1/15, remaining balance of exterior siding, fiberboard, drywall, thin set, grout, ceiling tile, Jewell Electric, Bloom Plumbing and Heating, labor, and drywall labor." (*Id.* at 103:13–25). Dr. Valigorsky paid that bill in the amount of $75,785.48. (*Id.*).

The third bill was for: "final payment insulation, labor and material, labor ending 8/21, interior trim, drop ceilings, install framing room, labor and material[.]" (*Id.* at 104:3–6). Dr. Valigorsky paid that bill in the amount of $26,195.00. (*Id.*).

The fourth bill was for: "labor and material, final exterior concrete work, stamp crete, wire and color additives[.]" (*Id.* at 104:7–10). Dr. Valigorsky paid that bill in the amount of $21,987.00. (*Id.*).

The fifth bill was for "labor and material cost, tile kitchen, hallway, small rooms, install carpet, cost of final for drop ceilings, ceiling tile, interior aluminum door for entrance to bar, final payment fire protection completed and certified, labor and material, drywall finishing, locker rooms and hallway[.]" (*Id.* at 104:15–21). Dr. Valigorsky paid that bill in the amount of $57,696.32. (*Id.*). Relative to this bill, Dr. Valigorsky testified that: (1) the old Country Club had locker rooms, (2) the banquet room was carpeted in the original Country Club, and (3) there were bathrooms in the old Country Club. (*Id.* at 104:22–105:5).

The sixth bill was for: (1) labor; (2) final interior painting, material and labor; (3) labor, Initial Solutions, cooler installation; (4) Kohlhepp granite material cost; (5) ADA brackets; (6) material costs, grout, trim, marble window sills; (7) a Jewell Electric bill; (8) a payment to Mike's Locksmith; (9) a payment to GM Equipment Lift Rental; (10) a payment to Probuilt Building Supplies; (11) a payment to Advanced Disposal; (12) a Payment to Bloom Heating and Plumbing (gas lines); and (13) a payment to Bloom Plumbing and Heating. (*Id.* at 105:6–19; Plaintiffs' Exhibit 21 at 7). Dr. Valigorsky paid that bill in the amount of $75,814.54. (ECF No. 91 at 105:6–19; Plaintiffs' Exhibit 21 at 7).

The seventh bill was for: "labor … remaining balance, paint and sand wall—sand drywall in locker rooms … kitchen plumbing and gas connectors, prep sink[s] … material costs, storage room, five-eighths fire code shower walls[.]" (ECF No. 91 at 105:22–106:2). Dr. Valigorsky paid that bill in the amount of $9,929.54. (*Id.*).

The eighth bill was for a "fire protection system[.]" (*Id.* at 106:8–14). Dr. Valigorsky paid that bill in the amount of $125,000.00. (*Id.*). Dr. Valigorsky also testified that he was aware that he paid this $125,000 for sprinklers that the Country Club did not have on the date of the fire. (*Id.* at 139:13–15).

The ninth bill was for: "labor and material cost, ceiling grid, both locker rooms, install shelves in the kitchen … final Bloom [H]eating[.]" (*Id.* at 106:15–18). Dr. Valigorsky paid that bill in the amount of $23,739.00. (*Id.*).

The tenth and final bill was for: "four shower stalls, ADA approved, for the locker rooms … framing material, treated plates, tap cons and studs … [and] labor cost[.]" (*Id.* at 106:3–7). Dr. Valigorsky paid that bill in the amount of $5,691.25. (*Id.*).

### 2. Plaintiffs' Exhibit 22

Plaintiffs' Exhibit 22 contains fourteen payments that Dr. Valigorsky made to various entities. (Plaintiffs' Exhibit 22).

The first payment that Dr. Valigorsky made was for $21,834.92 to TAFCO for a walk-in cooler and walk-in freezer. (ECF No. 91 at 109:3–8; Plaintiffs' Exhibit 22 at 1). Dr. Valigorsky testified that the old Country Club had a walk-in cooler and a walk-in freezer. (ECF No. 91 at 109:9–11). With respect to these items, Dr. Valigorsky stated that he had no reason to disagree with Defense counsel's assertion that they were paid for completely in line 69 of Depositors' building repair estimate. (*Id.* at 139:23–140:19).[16]

The second payment that Dr. Valigorsky made was for $2,392.20 to National Fuel for fuel lines to the new clubhouse at 10 Lakeside Drive. (*Id.* at 109:19–110:1; Plaintiffs' Exhibit 22 at

---

[16] Indeed, on page seven of Depositors' building repair estimate, there is a $26,040.00 allotment for a walk-in refrigerator, and there is a $13,800 allotment for a walk-in freezer. (Defendants' Exhibit 19 at 7).

1). Dr. Valigorsky testified that this new gas line was "necessitated by the fact that the [clubhouse] was moved from its location at the time of the fire to a new location." (ECF No. 91 at 139:19–22).

The third and fourth payments that Dr. Valigorsky made were for $110,000.00 and $64,333.00, respectively, and they were made to Dave Roman Excavating, Inc. ("Dave Roman") for the cost of site preparation for the new clubhouse. (*Id.* at 110:2–14; Plaintiffs' Exhibit 22 at 1).

The fifth payment that Dr. Valigorsky made was for $9,593.73 to Argo Mosaic, LLC for the cost of ceramic tile. (ECF No. 91 at 110:15–20). Dr. Valigorsky testified that the old Country Club had similar types of flooring for the bar and the bathrooms. (*Id.* at 110:24–111:4).

The sixth payment that Dr. Valigorsky made was for $15,015.50 to Phoenix Group for an Irish bar. (*Id.* at 111:5–16). Dr. Valigorsky testified that the old Country Club had a big bar. (*Id.* at 111:23–25).

The seventh payment that Dr. Valigorsky made was for $1,260.00 to Bill Ray to take the bar apart and put it in the hallway of the clubhouse. (*Id.* at 111:18–22; Plaintiffs' Exhibit 22 at 1). The eighth payment that Dr. Valigorsky made was for $9,749.00 to United Transportation to have the bar shipped from the state of Washington or Oregon to the new clubhouse. (ECF No. 91 at 111:8–18; Plaintiffs' Exhibit 22 at 1).

The ninth payment that Dr. Valigorsky made was for $3,389.21 to Golden Dragon for a used skillet to be used in the kitchen. (ECF No. 91 at 112:3–9).

The tenth payment that Dr. Valigorsky made was for $8,750.00 to Dubick for a cooler, freezer, refrigerator, and cabinet. (*Id.* at 112:10–17).

The eleventh payment that Dr. Valigorsky made was for $15,242.80 to Tri-State Detergent for a dish machine. (*Id.* at 112:18–22). Dr. Valgiorsky testified that the old Country Club had a dishwashing machine. (*Id.* at 112:23–24).

The twelfth payment that Dr. Valigorsky made was for $16,616.19 for kitchen supplies to NPS equipment. (*Id.* at 112:25–113:4).

The thirteenth payment that Dr. Valigorsky made was for $4,350.35 to A City Discount/Peach Trader, Inc. for a stainless steel ice well, a tilting kettle for making soups, and a five-well hot table. (*Id.* at 113:5–10; Plaintiffs' Exhibit 22 at 1). Dr. Valigorsky testified that all of those items were in the original Country Club. (ECF No. 91 at 113:11–14).

The fourteenth and final payment that Dr. Valigorsky made was for $59,653.60 to JAW Company, Fire, Inc., for "ventilation hoods, convection hoods over the cooking area, and the subsequent fire extinguisher system that goes with it." (*Id.* at 113:15–19). Dr. Valigorsky testified that the original Country Club had those items. (*Id.* at 113:20–21). Finally, Dr. Valigorsky testified that he had no reason to disagree with Defense counsel's assertion that the restaurant hood was listed on line 71 of Depositors' building repair estimate. (*Id.* at 141:23–142:12).[17]

### 3. Plaintiffs' Exhibit 23

Plaintiffs' Exhibit 23 indicates that it consists of bills and payments in the amount of $25,958.40. (Plaintiffs' Exhibit 23 at 1). According to Dr. Valigorsky, this exhibit consists of bills "from the GeoTech Engineering Company in Morrisdale, Pennsylvania, for site evaluation and water testing and land development on the property for [the] Country Club." (ECF No. 91 at 114:19–25). Further, one of the bills in Plaintiffs' Exhibit 23 is "for delivery of the deed to the

---

[17] Indeed, page 7 of Depositors' building repair estimate includes an allotment of $27,360.00 for a commercial hood system. (Defendants' Exhibit 19 at 7).

Office of the Recorder and for a basic … recording [of] the same" and was paid in the amount of $107.80. (*Id.* at 115:3–116:1; Plaintiffs' Exhibit 23 at 2). Finally, Dr. Valigorsky testified that the "sole reason that [GeoTech Engineering Company was] hired was that … the type of work they were doing [was] required because [the Country Club was] building the [clubhouse] in a new location." (*Id.* at 142:13–23).

### 4. Plaintiffs' Exhibit 24

Plaintiffs' Exhibit 24 contains several bills and photocopies of checks issued by Dr. Valigorsky for "miscellaneous expenses to finish interior, purchase kitchen equipment, carpeting and furnishings[.]" (Plaintiffs' Exhibit 24 at 1; ECF No. 91 at 120:12–121:18).

According to Dr. Valigorsky, the first bill "could have been [for] bathrooms [the Country Club was] finishing [in November 2015] because [he] didn't have the money to finish everything at one time[.]" (ECF No. 91 at 116:19–117:1). Dr. Valigorsky paid that bill in the amount of $2,066.62. (Plaintiffs' Exhibit 24 at 2).

The second bill was for the Country Club's "communications system and for hooking up the pro shop to the [clubhouse] for audio and visual counters and telephones[.]" (ECF No. 91 at 117:2–8). Dr. Valigorsky paid that bill in the amount of $5,213.74. (*Id.* at 117:2–12). He also testified that the old Country Club had "audio visual and telephones[.]" (*Id.* at 117:9–10).

The third bill was for additional kitchen equipment. (*Id.* at 117:13–21). Dr. Valigorsky paid for these items in the amounts of $15,000.00 and $10,000.00. (*Id.*). Further, he testified that this was not "any more than what was in the original [C]lub[.]" (*Id.* at 117:22–23).

The fourth bill was for "dinner forks, salad forks, dinner forks, bouillon spoons, teaspoons, and steak knives[.]" (*Id.* at 117:24–118:16). Dr. Valigorsky paid $7,665.47 for those items. (*Id.*). He also testified that the old Country Club had silverware. (*Id.*).

The fifth bill was for "[t]ablecloths, skirts around the tables[.]" (*Id.* at 118:17–119:2). Dr. Valigorsky paid $4,540.73 for those items, and he testified that the old Country Club had these items. (*Id.*). Dr. Valigorsky also stated that he had no reason to dispute that Depositors estimated and paid $4,504.93 for these same items "in Lines 958, encompassing all the way up to Lines 1930 of their business personal property estimate[.]" (*Id.* at 143:20–144:2).[18]

The sixth bill was for a "fire alarm system monitor." (*Id.* at 119:3–9). Dr. Valigorsky paid $420 for that item, and he testified that the old Country Club had a fire alarm system monitor. (*Id.*; Plaintiffs' Exhibit 24 at 7).

The seventh bill was for chairs. (ECF No. 91 at 119:10–16). Dr. Valigorsky paid $9,419.00 for these chairs, and he testified that the old Country Club likewise had chairs. (*Id.*; Plaintiffs' Exhibit 24 at 8). Dr. Valigorsky also testified that he had no reason to dispute that banquet chairs were "covered specifically in Line 834 of Depositors' building personal property estimate and paid[.]" (*Id.* at 144:3–8).[19] Dr. Valigorsky also testified that he has never reviewed an estimate prepared by Depositors. (*Id.* at 140:9–11).

---

[18] The Court has verified that allotments for these types of items are in fact included in Depositors' Building Personal Property estimate. (Defendants' Exhibit 14; ECF No. 89 at 4).

[19] Line 834 of Despositors' Building Personal Property estimate indicates a Replacement Cost Value of $28,359.24 for banquet chairs. (Defendants' Exhibit 14 at 5).

The eighth bill was for a sound system. (*Id.* at 120:4–9). $19,892.80 was paid for that sound system, and Dr. Valigorsky testified that the old Country Club likewise had a sound system. (*Id.*; Plaintiffs' Exhibit 24 at 9).

The ninth bill was for carpeting for the banquet room in the new clubhouse. (ECF No. 91 at 120:10–11). Attorney Cherry paid that bill in the amount of $12,220.75. (ECF No. 93 at 64:23–65:1; Plaintiffs' Exhibit 24 at 10).

In closing, Dr. Valigorsky testified that Plaintiffs' Exhibit 24 also contains a bill that was paid by his wife rather than him. (ECF No. 91 at 120:12–121:10). And Dr. Valigorsky stated that Plaintiffs' Exhibit 24 totals $92,438.67. (*Id.* at 121:16–18).

Finally, Attorney Cherry testified that it is in meeting "minutes that the [Country C]lub acknowledged that they owed [Dr. Valigorsky] this money" for the invoices that he paid. (ECF No. 93 at 63:3–10).

## VI. Conclusions of Law

At this stage in this case, one broad issue remains: whether the Defendants are liable to the Plaintiffs for breach of contract. Based on the Court's Findings of Fact and Conclusions of Law, the Court finds that the Plaintiffs have failed to prove that the Defendants breached the Policy in any respect. The Court now explains its reasons for reaching that conclusion.

### A. Applicable Law[20]

In order to "succeed on a breach of contract claim under Pennsylvania law, a plaintiff must establish, by a preponderance of the evidence, '(1) the existence of a contract, including its

---

[20] A "federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamerlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). Therefore, as the parties recognize, (ECF No. 96 at 28–31; ECF No. 98 at 21–24), Pennsylvania contract law governs the resolution of this case.

essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"
*Moore's Home Improvement, Inc. v. Nationwide Prop. & Cas. Ins. Co.*, No. 10-CV-0161, 2011 WL
3803587, at *5 (E.D. Pa. Aug. 25, 2011) (quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26
(3d Cir. 2003) (affirming dismissal of a breach of contract claim where the plaintiff "failed to
present evidence from which a factfinder could determine damages with reasonable certainty"
and where the plaintiff made no argument that the district court's "statements of law [were]
incorrect")).

In "Pennsylvania, the insured bears the burden of proving facts that bring its claim
within the policy's affirmative grant of coverage." *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98
F.3d 1440, 1446 (3d Cir. 1996). By contrast, "the insurer bears the burden of proving the
applicability of any exclusions or limitations on coverage, since disclaiming coverage on the
basis of an exclusion is an affirmative defense." *Id.*

Further, in breach of contract actions involving an insurance policy, the "analysis begins
with the language of the policy." *Gen. Refractories Co. v. First State Ins. Co.*, 94 F. Supp. 3d 649,
657 (E.D. Pa. 2015). The "mutual intention of the parties at the time they formed the contract
'governs its interpretation' and 'is to be inferred from the written provisions of the contract.'"
*Id.* (quoting *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517 (3d Cir. 2012) (citations and
internal quotation marks omitted)). Indeed, courts applying Pennsylvania law "'must give plain
meaning to a clear and unambiguous contract provision.'" *Id.* (quoting *Heller v. Pa. League of
Cities and Municipalities*, 32 A.3d 1213, 1220 (Pa. 2011)). However, ambiguous insurance policy
provisions are to be construed in favor of the insured. *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*,
562 F.3d 591, 595 (3d Cir. 2009).

**B.      The Plaintiffs' Arguments**

The Plaintiffs contend that the Court should afford them relief on their Breach of Contract claim for several reasons. First, the Plaintiffs allege that, due to Mr. Tuttle's statements at the meeting on February 25, 2014, as well as the terms of the Policy, they are entitled to consider the entirety of the initial $500,000 check an "Extra Expense" payment under the Policy. Second, the Plaintiffs argue that the Defendants have made insufficient payments under the Policy to rectify the damage to the pro shop and the clubhouse. Third, the Plaintiffs contend that the Defendants have not sufficiently reimbursed the Country Club for the monies that Dr. Valigorsky and others paid out to various entities. Fourth, the Plaintiffs assert that they are entitled to outstanding Replacement Cost Holdback in the amount of approximately $50,000. Fifth, the Plaintiffs argue that they are entitled to additional payments for certain kitchen equipment.

The Court examines these claims by the Plaintiffs in turn.

**C.      The Court Finds Unavailing the Plaintiffs' Claims Relative to the $500,000 Check and the Meeting on February 25, 2014**

**1.      The Parties' Arguments**

Generally speaking, the Plaintiffs argue that the $500,000 check that Mr. Tuttle gave them during the meeting on February 25, 2014, was "authorized by [the] Defendants to be used by [the] Plaintiffs to avoid or minimize the 'suspension' of business and to continue 'operations' at the [g]olf [c]ourse … and, as a result, must be counted as an [E]xtra [E]xpense rather than toward the reconstruction/restoration of the building destroyed by fire." (ECF No. 98 at 23). Indeed, the Plaintiffs assert that the Defendants assured them that this money was "to be used

to operate [their] golf course after the fire in 2014 and [the] Plaintiffs used the money for that exact purpose in reliance upon the assurance of [the] Defendants, through their agents and employees, as well as on their reasonable reliance of the clear and unambiguous language" of the Extra Expense provision in the Policy. (*Id.* at 28).

In response, the Defendants contend that Mr. Tuttle's statement about making the Plaintiffs "whole" did not alter the terms of the Policy. (ECF No. 97 at 19). Further, the Defendants argue that the Plaintiffs were instructed to keep a detailed accounting of how they spent the insurance monies, an instruction that they failed to follow. (ECF No. 104 at 1). The Defendants also note that Mr. Lykens testified that the Country Club had to have used some of the $500,000 on the building. (*Id.*). Therefore, for these and other reasons, the Defendants assert that the Plaintiffs have failed to prove that the "Extra Expenses" that they actually incurred approached the amount of $500,000. (*Id.* at 2).

### 2. Analysis

In order to address the Plaintiffs' arguments relative to the meeting on February 25, 2014, and the $500,000 check that Depositors provided to the Country Club on that date, the Court first outlines its findings of fact[21] relative to that meeting and that check.

With respect to the February 25, 2014, meeting and the $500,000 check, the Court finds as follows: first, based on the testimony of both Mr. Lykens and Mr. Perko, Mr. Tuttle told the Plaintiffs that the $500,000 check would have to be reconciled out of the "total insurance claim payments made for the fire." *See supra* Sections V.C.3, V.C.5.

---

[21] In the portion of this Memorandum Opinion entitled "Factual Background[,]" the Court outlined the *testimony* that was offered at trial and the like. In this portion of this Memorandum Opinion, the Court will clarify whose testimony it believed, etc., and use its Findings of Fact, coupled with its Conclusions of Law, to reach its verdict.

Second, as Mr. Sobol testified, Mr. Tuttle told the Plaintiffs to keep a precise accounting of how they used the $500,000, *see Supra* Section V.C.2, a fact that very much bolsters the notion that the $500,000 check was issued pursuant to the written Policy and would have to be reconciled against that Policy. However, the Plaintiffs did not produce any evidence of any such accounting for their use of the $500,000 at trial.

Finally, as Attorney Cherry testified, Mr. Tuttle instructed the Plaintiffs to *begin* using the $500,000 "to take care of the expenses, return monies that [they needed] to return, that [they needed] to begin making repairs so that [they could] set up shop again in the pro shop and otherwise conduct business." *See supra* Section V.C.4. The Court stresses that it *does* find that Mr. Tuttle instructed the Plaintiffs to *begin* using the $500,000 for these purposes, but the Court also stresses that it *cannot* find that Mr. Tuttle instructed the Plaintiffs to use the *entire* $500,000 for those purposes. The Court so limits its finding because there was no testimony expressly indicating that Mr. Tuttle told the Plaintiffs that the *entire* $500,000 was to be used for conducting business and the like. Even if there had been such testimony, in order to find that Mr. Tuttle instructed the Plaintiffs to use the *entire* $500,000 to conduct business and the like, the Court would have to disregard the following: (1) the fact that Mr. Lykens testified that the Plaintiffs had to have used some of the $500,000 on the building,[22] an action that, by Mr. Lykens's own testimony, he would not have taken without first consulting with Mr. Tuttle, *see supra* Section V.C.3, all of which would contradict the notion that Mr. Tuttle directed the Plaintiffs to use the *entire* $500,000 to conduct business and the like; (2) the fact that Mr. Tuttle

---

[22] Having heard and considered Mr. Lykens's testimony on this issue, the Court finds that he was indicating that the Plaintiffs used some of the $500,000 for the building of the new clubhouse and/or the work on the pro shop.

told the Plaintiffs to keep a detailed accounting of how they spent the $500,000, which would be strange if he gave them specific instructions as to how they were to spend the entirety of those funds; and (3) the fact that such a finding would mean that Mr. Tuttle, on behalf of the Defendants, concluded with certainty the day after the fire that the Plaintiffs were entitled to a payment of $500,000 as an "Extra Expense" under the Policy. The Court declines to disregard this strong evidence, and the Court therefore finds that Mr. Tuttle directed the Plaintiffs to *begin* using the funds to conduct business and the like, but he did not instruct them to use the *entire* $500,000 check for those expenses alone.

With those factual findings in place, the Court holds that the Plaintiffs have failed to show that the entire $500,000 check was an "Extra Expense" payment under the Policy. Relatedly, the Court holds that the Plaintiffs have failed to show a breach of the Policy relative to the $500,000 check or Mr. Tuttle's comments (or the two in combination). The Court reaches that holding for the following reasons.

### a.    There Was No Oral Modification to the Policy

The Court first finds that because Mr. Tuttle told the Plaintiffs: (1) that the $500,000 check would have to be reconciled out of the "total insurance claim payments made for the fire[,]" (2) that they were to keep a detailed accounting of how they spent the $500,000, which further connected the check to the payments under the written Policy, and (3) that they were to *begin* using the $500,000 for expenses like conducting business and making repairs, expenses which were covered under the Policy, *see supra* Section V.D, Mr. Tuttle's statements to the Plaintiffs did not constitute an oral modification of the Policy. *Hampden Real Estate, Inc. v. Metro. Mgmt. Grp., Inc.*, 142 F. App'x 600, 603 (3d Cir. 2005) (noting that: (1) it is "well-settled law in

Pennsylvania that a written contract which is not for the sale of goods may be modified orally, even when the contract provides that modifications may only be made in writing. The modification may be accomplished either by words or conduct ..." and (2) an "oral modification of a written contract must be proven by clear, precise and convincing evidence") (internal quotation marks and citations omitted). It would be strange indeed if Mr. Tuttle's statements, which firmly rooted the issuance of the $500,000 check in the written insurance Policy, and which contained no hint of any oral alteration of that Policy, constituted an oral modification of that document.[23]

---

[23] At this point, the Court addresses three additional statements by Mr. Tuttle and explains why none of those statements lead the Court to the conclusion that the Plaintiffs have proven a breach of the Policy.

First, the Court considers Mr. Tuttle's comment that the Defendants were going to make the Plaintiffs "whole." *See supra* Section V.C.1. Having heard all of the testimony in this case, and having considered the evidence produced at trial, the Court credits the testimony of Mr. Perko and finds that Mr. Tuttle was simply telling the Plaintiffs that the Defendants intended to put them back into the same position that they were in prior to the fire by paying out the monies required under the Policy. *See supra* Section V.C.5. The Court's finding on this score is bolstered by the fact that Mr. Tuttle rooted his comments firmly in the Policy, as the discussion in the text above indicates. Therefore, the Court finds that Mr. Tuttle's "made whole" comments did not alter the Policy, and they do not support a finding that the Defendants were agreeing to pay for any and every expenditure that the Plaintiffs submitted, regardless of whether that expenditure was covered under the Policy.

Second, the Court considers Mr. Tuttle's alleged response when Mr. Lykens informed him that certain individuals associated with the Country Club were considering relocating the clubhouse to a different location on the property at 10 Lakeside Avenue. *See supra* Section V.C.3. According to Mr. Lykens, Mr. Tuttle responded in the following manner: "I don't care where you put the building. We're going to— we're going to take care of it." *See supra* Section V.C.3. At the outset, the Court notes that, under the Policy, the Defendants were not required to pay, in full, for a total rebuild of the clubhouse in a new location on the premises (the Policy permitted the Defendants to limit their payout for such a rebuild to the cost of rebuilding at the old location). *See Supra* Section V.B.1. Therefore, insofar as the Plaintiffs argue that Mr. Tuttle's comments indicated the Defendants' willingness to pay, in full, for a total rebuild of the clubhouse in a new location on the premises, the Plaintiffs must show that Mr. Tuttle's comments equaled an oral modification to the contract. Indeed, the burden of proving "modification of a contract is carried by the party asserting the modification[,]" and a "contract can be modified with the assent of both contracting parties if the modification is supported by consideration[.]" *Trombetta v. Raymond James Fin. Services, Inc.*, 907 A.2d 550, 558 (Pa. Super. Ct. 2006). For two reasons, the Court finds that the Plaintiffs have not met their burden of proof on this issue. First, the Plaintiffs have not referred the Court to any

possible consideration that they would have extended to the Defendants in exchange for the Defendants' agreement (via Mr. Tuttle) to pay a potentially significant amount of additional money to rebuild the clubhouse in a new location on the premises. Second, given Mr. Tuttle's other comments in this case, such as his comments about the $500,000 check being reconciled against the payments under the Policy (which indicated that he was consistently looking to the terms of the Policy), the Court finds that the Plaintiffs have failed to show that this comment by Mr. Tuttle was anything other than an indication that the Defendants would make all appropriate payments under the Policy (i.e., the Defendants would "take care of" the damage to the buildings), and the Country Club could elect to use that money to rebuild wherever it saw fit (i.e., Mr. Tuttle did not "care where [the Plaintiffs] put the building"). Finally, as further support for its holding on this issue, the Court notes that there was testimony at trial tending to indicate that the new clubhouse was built for less than $1.8 million. *See supra* Section V.E.2. And the Depositors paid out approximately $1.45 million for the repair of the clubhouse and the pro shop (at the least). *See supra* Section V.D.1.b. Therefore, the difference between what the Defendants paid for the repair of the clubhouse and what the Plaintiffs paid for erection of the new clubhouse is in the order of hundreds of thousands of dollars. That is critical because the new clubhouse has features that the original clubhouse did not have and that make the new clubhouse ADA compliant, *see supra* Section V.A, but there is absolutely no indication that Mr. Tuttle's statement altered the portion of the Policy that only required the Defendants to pay out a total of $25,000 for things like making the repaired/rebuilt clubhouse ADA compliant. *See supra* Section V.B.1. Accordingly, even if Mr. Tuttle's statement was an indication that the Defendants would agree to orally modify the Policy and pay in full for an entirely new clubhouse in a new location on the premises, the Court would still be left without a basis upon which to award damages in this case. Indeed, the Court would not know how much of the difference between what the Defendants paid out for the clubhouse and the pro shop and what the Plaintiffs paid for the new clubhouse was due to ADA compliance issues, meaning that the Plaintiffs have not given the Court evidence from which it could calculate damages to a "reasonable certainty." *Ware*, 322 F.3d at 225–26 (affirming the district court's dismissal of a breach of contract claim where the plaintiff "failed to present evidence from which a factfinder could determine damages with reasonable certainty" and where the plaintiff did not argue that the District Court's "statements of law [were] incorrect"); *see also Ins. Co. of Greater New York v. Fire Fighter Sales & Serv. Co.*, 120 F. Supp. 3d 449, 461 (W.D. Pa. 2015) ("Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages.") (internal quotation marks and citation omitted); *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984) ("However, we will not … reverse on the ground [that a plaintiff proving breach but no damages is entitled to nominal damages] *alone* where no request was made for [nominal damages] … and no establishment of a property right is involved.") (internal quotation marks and citation omitted)).

Finally, according to Mr. Lykens, when workers conducted the temporary repair of the pro shop following the fire, they used the same color of shingles that had previously been on the roof. *See supra* Section V.C.3. However, because there were also older shingles on the roof, and because those older shingles had aged for approximately ten years, the older shingles did not match the newer shingles. *See supra* Section V.C.3. Mr. Lykens testified that he discussed that fact with Mr. Tuttle, and Mr. Tuttle said: "[y]ou need to replace the—all the shingles; we'll take care of the shingles." *See supra* Section V.C.3. Although Mr. Lykens appeared to initially indicate that the Defendants did not in fact take care of those shingles, he also testified that he had no reason to doubt that the Defendants included a payment in their Final Building Repair Estimate to remove and replace the "entire roof surface area of the pro shop[.]" *See supra* Section V.C.3. And indeed, the Defendants included a payment for the roof of the pro shop in their Final Building Repair Estimate. *See supra* Section V.C.3. Therefore, because Mr. Lykens' testimony relates

Therefore, because Mr. Tuttle's statements did not constitute an oral modification of the Policy, the Plaintiffs' claims relative to the $500,000 are only meritorious if they can prove: (1) that Mr. Tuttle earmarked the $500,000 payment (or a portion thereof) for a particular category of expenditures under the Policy and (2) that that $500,000 payment (or a portion thereof) was in excess of what Depositors actually paid for that category of expenditures under the Policy.[24] Because the Court finds that the Plaintiffs have failed to meet their burden of proof on these issues, the Court finds that their claims on this score are meritless.

### b.    The Plaintiffs Have Failed to Show That the Entire $500,000 Check was an "Extra Expense" Payment Under the Policy

The Court next finds that, because Mr. Tuttle plainly instructed the Plaintiffs to *begin* using the $500,000 check for both things that can be deemed "Extra Expense" payments under the Policy *and* things that cannot be deemed "Extra Expense" payments under the Policy, the Plaintiffs have failed to show that the entire $500,000 check was an "Extra Expense" payment under the Policy. Indeed, the "Extra Expense" provision excludes from its scope the "expense to repair or replace property" (at least in certain circumstances).  *See supra* Section V.B.2. Further, the definition of "Extra Expense" under the Policy indicates that it covers "necessary expenses [the Country Club incurred] during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss or damage to the property[.]" *See supra* Section V.B.2.

---

to the condition of the roof as temporary repairs were being conducted, it does not go to proving whether the Defendants' ultimate payment for the repair of the roof on the pro shop was proper. Accordingly, the Court finds that this testimony is an insufficient basis upon which to find that the Plaintiffs have proven that the Defendants breached the Policy.

[24] Specifically, the Plaintiffs argue that the $500,000 check was for "Extra Expenses[.]" If the Plaintiffs are correct, then Mr. Tuttle told the Plaintiffs that the "Extra Expense" payment would be $500,000, but Depositors only indicated that that payment was made in the amount of approximately $116,000. *See supra* Section V.D.

In other words, expenses that the Country Club *would have incurred absent the fire*, like paying employees, are not "Extra Expenses" under the Policy. Instead, paying employees falls under the ambit of the "Business Income with Ordinary Payroll" provision, subject to the limitations therein. *See supra* Section V.B.2. Therefore, insofar as Mr. Tuttle instructed the Plaintiffs to *begin* using the $500,000 to do things like taking care of expenses and conducting business, it appears viable to consider *certain* of the $500,000 payment an "Extra Expense" payment under the Policy. However, insofar as Mr. Tuttle instructed the Plaintiffs to *begin* using the $500,000 to do things like paying employees, the Plaintiffs have failed to show that those monies were part of an "Extra Expense" payment under the Policy.

Finally, the Court stresses that the Plaintiffs have not provided the Court with an accounting of the manner in which they spent the $500,000, leaving the Court without any evidence from the Plaintiffs as to how much of the $500,000 they did in fact spend on "Extra Expenses[.]" On these facts, the Court finds that the Plaintiffs have failed to show that the entire $500,000 payment was (or should have been) for "Extra Expenses[.]"

           c.      **The Plaintiffs Have Failed to Show That Anything Related to the Issuance of the $500,000 Check or Mr. Tuttle's Comments Constituted a Breach by the Defendants**

Lastly, and relatedly, the Court finds that the Plaintiffs have failed to show that anything related to the $500,000 check or Mr. Tuttle's comments in giving that check to the Country Club (or the combination of the two) constitutes a breach of the Policy by the Defendants. The Court so finds for three interrelated reasons.

First, the Court reiterates that Mr. Tuttle instructed the Plaintiffs to *begin* using the $500,000 for things like: taking care of expenses, making repairs, conducting business, and paying employees. *See supra* Section VI.C.2.

Second, when the Court compares the expenditures that Mr. Tuttle instructed the Plaintiffs to *begin* making using the $500,000 check, the Court finds a symmetry with the payments that the Defendants issued under the Policy. Indeed, Depositors paid the Plaintiffs: $261,823.00 for "Business Income"; $116,653.63 for "Extra Expense"; $67,977.83 for "Temporary Repairs"; and $31,491.75 for "Debris Removal". *See supra* Section V.D. When the Court adds these amounts together, it arrives at a total of $477,946.21, an amount strikingly close to the $500,000 check. Critically, because the Plaintiffs have failed to produce any credible and specific evidence of their expenses in the realms of "Business Income"; "Extra Expenses"; or "Temporary Repairs"; the Court has no basis upon which to find that the approximately $477,946 payment that Depositors paid for these items (and "Debris Removal")[25] was a breach of the Policy.

Finally, as the testimony of Mr. Lykens indicates, Mr. Tuttle's comments left the Plaintiffs free to use *some* the $500,000 in other ways, such as for "the building[,]" which the Court understands to be work on the new clubhouse and/or the pro shop. *See supra* Section VI.C.2. Therefore, since Depositors paid the Plaintiffs well over $1 million for the damage to the clubhouse and the pro shop, the approximately $22,500 balance of the $500,000 check may

---

[25] There was discussion at trial indicating that the cost of the debris removal was approximately $30,000. (ECF No. 93 at 12:14–13:3; 202:4–11). Therefore, because the Defendants paid out approximately $31,000 for debris removal, the Plaintiffs have failed to show that the Defendants breached the Policy on this score.

plainly be said to be part of the payment that Depositors made for the damage to the clubhouse and the pro shop.

In summary, relative to the $500,000 check and Mr. Tuttle's comments, the Court finds that the Plaintiffs have failed to prove that there was any oral modification to the written Policy. Further, the Court finds that the Plaintiffs' own statements about the $500,000 preclude a finding that Mr. Tuttle directed them to use all of that money for "Extra Expenses[.]" Finally, the Court finds that the $500,000 payment *can* be broken down as advance payments under the following categories of the Policy: (1) a $261,823.00 payment for "Business Income"; (2) a $116,653.63 payment for "Extra Expense"; (3) a $67,977.83 payment for "Temporary Repairs"; and (4) a $31,491.75 payment for "Debris Removal". Relatedly, in light of all of the evidence produced at trial, the Plaintiffs have wholly failed to show that they are entitled to any more than these amounts for any of these categories of payments under the Policy. And the Court finds that, given the nature of Mr. Tuttle's comments and the Plaintiffs' use of certain of the $500,000, the remaining balance of the $500,000 check ($22,503.76) can plainly constitute an advance on the "Building" payment under the Policy. In other words, the Court has no indication that the $500,000 check was anything other than an appropriate payment for certain categories of expenses under the Policy that the Defendants directed the Plaintiffs to begin using in order to pay for those covered expenses. The Plaintiffs have failed to prove that the directions the Defendants gave the Plaintiffs in issuing that $500,000 were out of step with the required payments under the Policy.

Therefore, the Court holds that the Plaintiffs have failed to show that anything related to the issuance of the $500,000 check or Mr. Tuttle's comments constituted a breach of the Policy by the Defendants.[26]

### D. The Court Finds That the Plaintiffs Have Failed to Show That the Amount the Defendants Paid to Rectify the Damage to the Buildings at the Country Club Constitutes a Breach of the Policy

The Court now turns its attention to the Plaintiffs' arguments relative to the payments that the Defendants issued for the damage to the clubhouse and the pro shop.

#### 1. The Parties' Arguments

The Plaintiffs state that the Policy "allowed them to add up the individual coverage amounts provided for each of the separate six buildings on the golf course to a blanket sum of $2,228,700.00." (ECF No. 98 at 28). In support of their assertion that they are entitled to the full

---

[26] Although (1) the Plaintiffs do not explicitly cite the "reasonable expectations" doctrine and (2) it is not clear whether that doctrine applies in this case, the Court notes that "Pennsylvania case law … dictates that the proper focus for determining issues of insurance coverage is the reasonable expectation of the insured." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005) (internal quotation marks and citation omitted). The "reasonable expectations" doctrine provides as follows:

> In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations. Courts, however, must examine the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured. As a result, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage. However, this aspect of the doctrine is only applied in very limited circumstances to protect non-commercial insureds from policy terms not readily apparent and from insurer deception. [And a]bsent special justification … an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous.

*Id.* (internal quotation marks and citations omitted).

Here, in accordance with the discussion in the text above, the Plaintiffs have failed to prove that the initial $500,000 check was anything other than an advance under the Policy, and they have likewise failed to prove that the directions the Defendants gave the Plaintiffs in issuing that $500,000 were out of step with the required payments under the Policy. Therefore, the Court finds that, even if the "reasonable expectations" doctrine does apply in this case, that doctrine does not afford the Plaintiffs relief.

$2,228,700.00 available under the Policy for damage to the buildings, the Plaintiffs refer to: (1) CBF's estimate, (2) Mr. Leisenring of FranJo Restoration's first estimate, (3) the testimony and estimates offered by Mr. Hughes, and (4) Mr. Komarnicki's estimates. (*See id.* at 30–32). Further, the Plaintiffs argue that the $500,000 check that Mr. Tuttle gave them constituted an "Extra Expense" payment, not a payment to rectify the damage to the clubhouse and the pro shop, meaning that the Defendants have only paid out slightly over $1 million to rectify the damage to the clubhouse and the pro shop. (*Id.* at 32). Therefore, the Plaintiffs contend that they are entitled to "$1,155,607.28[27] as replacement value under the … [P]olicy to replace the Country Club[.]" (*Id.*).

In response, the Defendants argue that: (1) their payment of "$1,573,092.72 for the structural damage satisfied [their] obligations under the" Policy; (2) their "building estimate was reasonable and in accordance with the terms of the" Policy; and (3) the Plaintiffs have not "met their burden of proof that additional money was owed on the structural damage claim." (ECF No. 96 at 29). Indeed, with respect to the estimates offered by the Plaintiffs, the Defendants contend that the "rebuild costs testified to by [the] Plaintiffs' witnesses are unreliable and should not be considered" because those estimates include "code and regulatory compliance upgrades and features which are not covered by the Policy[,]" and because the estimates were based on "demolition of the existing basement and construction of an entirely new basement[,]" among other things. (ECF No. 97 at 11–12). Finally, the Defendants assert that "no expert

---

[27] In a later submission to the Court, the Plaintiffs seek a slightly different amount of money relative to this claim. (*See* ECF No. 107). However, because the Court finds that the Plaintiffs have wholly failed to carry their burden of proof in this case, the Court need not further concern itself with the exact amount of money that the Plaintiffs are seeking.

provided the opinion that the basement could not be repaired and reused by the Plaintiffs." (*Id.* at 11).

### 2.  Analysis

In addressing the Plaintiffs' arguments, the Court again begins by clarifying certain of its Findings of Fact and Conclusions of Law on this issue.

First, the Court finds that, under the Replacement Cost provisions of the Policy, the Defendants were permitted to pay the least of the following: (1) the limit of insurance applicable to the lost or damaged property, (2) the cost to replace the lost or damaged property with other property of comparable material and quality and used for the same purpose (and, in the event of a building being built at a new premises, the cost which would have been incurred if the building had been rebuilt at the original premises), or (3) the amount actually spent that is necessary to repair or replace the lost or damaged property. *See supra* Section V.B.1.

Second, for the reasons outlined above, *see supra* Section VI.C, the Court has found that the $500,000 check cannot be counted, in its entirety, as an "Extra Expense." Rather, as the Court has explained, it was a payment that the Defendants instructed the Plaintiffs to *begin* using on certain expenditures that were covered under the Policy. And, because the Plaintiffs have not shown that the Defendants' payments for those expenditures were inappropriate under the Policy, *see Supra* Section VI.C, the Court has no basis upon which to deduct any of the $500,000 check from the "Building" payment that the Defendants made.[28] Therefore, the Court finds that

---

[28] Of course, the portion of the $500,000 check that Mr. Lykens testified that the Plaintiffs spent on the building is properly considered as part of the "Building" payment. But at most, that fact means that that portion of the $500,000 was simply an advance on the overall "Building" payment—it would not lead the Court to conclude that any payment made by the Defendants was inappropriate under the Policy.

the Defendants paid, at the least, $1,456,622.08 for the cost of repairing the damage to the clubhouse and the pro shop. *See Supra* Sections V.D.1.b, V.E.1.a.[29]

Third, the Policy limited the amount of money that the Defendants had to pay for "the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of [the buildings]" to $25,000. *See supra* Section V.B.1. And the Defendants have paid the Plaintiffs this $25,000 in full. *See supra* Section V.D; (ECF No. 98 at 22) (stating that the "provisions of the policy found at page 4 as modified by … the Golf Course Property Endorsement increases the limit of increased cost of construction to $25,000.00 and clearly limits the amount incurred to comply with enforcement of any ordinance or law regulating construction, repair of buildings or land use in force at the time of loss to the maximum sum of $25,000.00 which has been paid by [the] Defendants.").

Fourth, the basement of the clubhouse located at 10 Lakeside Avenue prior to the fire was not compliant with the ADA. *See supra* Section V.A. In making this finding, the Court stresses that the Plaintiffs do not dispute the fact that the basement of the clubhouse was not compliant with the ADA prior to or at the time of the fire. (ECF No. 98 at 10) (noting that "Mr. Komarnicki opined that the cost of repairing the basement together with the additional cost of having to make it ADA and code compliant mitigated …"); (*id.* at 31–32) (stating that Mr. Hughes and Mr. Komarnicki "determined that the steel was unusable and the basement should

---

[29] As the Court explained above, *see supra* Section V.D.1.b, the Plaintiffs assert that a portion of the monies that the Defendants paid out for the "Building" claim is properly categorized as a payment for Business Personal Property. If the Plaintiffs are correct, then the Defendants paid out $1,456,622.08 as the "Building" payment. However, the Court need not definitively resolve the issue of exactly how much the Defendants paid out on the "Building" claim because, even if that payment was only approximately $1.45 million, the Plaintiffs have still failed to meet their burden of proof on this issue. Therefore, the Court assumes without deciding that the Defendants only paid out approximately $1.45 million on the "Building" claim.

not be reused because of the expense of trying to make it ADA compliant, which expense would not be covered by the Policy because of the $25,000.00 limitation …").

Fifth, the clubhouse did not have a sprinkler system at the time of the fire, but given changes in the law, the clubhouse was required to have a sprinkler system following the fire. *See supra* Section V.A. Once again, in reaching these conclusions, the Court stresses that the Plaintiffs do not disagree with either of these two findings. (*See* ECF No. 98 at 3).

With those findings in place, the Court turns its attention to the two broad categories of evidence that the Plaintiffs contend demonstrate that the Defendants' $1.45 million "Building" payment was insufficient under the Policy. The first such category of evidence is comprised of the estimates prepared by Mr. Komarnicki, Mr. Hughes, CBF, and Mr. Leisenring. The second such category of evidence is comprised of the testimony and reports that Mr. Hughes and Mr. Komarnicki offered regarding the steel and the basement at the old clubhouse.

Upon consideration of all of this evidence, the Court finds that the Plaintiffs have failed to show that the Defendants breached the Policy relative to their "Building" payment, as the Court now explains.

a.  **None of the Estimates Offered by the Plaintiffs Lead the Court to Conclude That the Defendants Breached the Policy Relative to the "Building" Payment**

The Court will review the estimates offered by the Plaintiffs in the following order: (1) Mr. Komarnicki's estimates, (2) Mr. Hughes's estimate, (3) CBF's estimate, and (4) Mr. Leisenring's estimates.

i.  **Mr. Komarnicki's Estimates**

As the Court explained above, Mr. Komarnicki provided two estimates. *See supra* Section V.E.2. In the first estimate, he opined that it would cost approximately $3,889,145.05 to remove the old basement that existed at the time of the fire and "build[] a completely new structure." *See supra* Section V.E.2. In his second estimate, Mr. Komarnicki opined that it would cost at least $99,000 to make the basement of the old clubhouse ADA compliant, and, partially due to that cost, he opined that it would be more cost-effective to construct a new building. *See supra* Section V.E.2.

For two reasons, the Court finds that neither of Mr. Komarnicki's estimates is a sufficient basis upon which to find that the Defendants breached the Policy relative to the "Building" payment.

First, the Court reiterates that, by Mr. Komarnicki's own testimony, the new clubhouse that the Country Club built ultimately cost under $100 per square foot to build. *See supra* Section V.E.2. However, Mr. Komarnicki's estimated cost to build a new clubhouse at the old location on the property at 10 Lakeside Avenue resulted in a cost of approximately $217 per square foot. *See supra* Section V.E.2. Therefore, because Mr. Komarnicki's first estimate was so drastically out of step with the actual cost to build the new clubhouse, the Court finds that both of his estimates are insufficient bases upon which to find that the Defendants breached the Policy. In other words, the Court discounts completely the monetary figures in both of Mr. Komarnicki's estimates, meaning that, even if the Policy required the Defendants to pay for a complete rebuild at the old location, neither of Mr. Komarnicki's estimates provides a sufficient basis to find that the Defendants' "Building" payment was insufficient under the Policy.

Second, the Court reiterates that Mr. Komarnicki's second estimate (for the reuse of the basement that existed at the time of the fire) included at least $99,000 in expenses to make that basement ADA compliant. *See supra* Section V.E.2. Because Mr. Komarnicki's second estimate manifested significant concern with ADA compliance issues, the Court finds it likely that Mr. Komarnicki's first estimate (for the construction of a new clubhouse at the old location) also contained costs to make the clubhouse fully ADA complaint. When the Court accounts for the fact that Mr. Komarnicki's first estimate was predicated on RS Means, which is an industry standard for calculating building costs, *See supra* Section V.E.2, the Court affirmatively finds that Mr. Komarnicki's first estimate also accounted for ADA compliance issues. Indeed, the Court rejects the notion that RS Means would *not* account for constructing a building in a manner that is ADA compliant. Therefore, the Court finds that both of Mr. Komarnicki's estimates included costs to make the relevant building ADA compliant.

With that finding in place, the Court stresses that the basement of the clubhouse that existed prior to the fire was not ADA compliant. *See supra* Section VI.D.2. Further, the Defendants paid out the entire amount of money ($25,000.00) that the Policy required them to pay for increased costs of construction, such as the cost of rectifying the fact that the basement of the old clubhouse was not ADA compliant. *See supra* Section VI.D.2. Therefore, because Mr. Komarnicki's estimates both contain significant considerations for ADA compliance issues,[30] and because the Policy does not require the Defendants to pay anything beyond the $25,000.00 that they have already paid for such issues, the Court further discredits Mr. Komarnicki's

---

[30] In the case of the first estimate, the Court is unaware exactly how much money is included in order to make the new clubhouse ADA compliant. However, because the second estimate includes an allotment of at least $99,000 to make the basement ADA compliant, the Court infers that the first estimate would include at least that much money to make the new clubhouse ADA compliant.

estimates as methods by which to prove that the Defendants breached the Policy relative to the "Building" payment.

Therefore, for all of the foregoing reasons, the Court entirely discredits Mr. Komarnicki's estimates as methods of proving that the Defendants breached the Policy relative to the "Building" payment.[31]

### ii.  Mr. Hughes's Estimate

Turning to Mr. Hughes's estimate for a rebuild of the entire clubhouse, he opined that the project would cost $2,284,596.00. *See supra* Section V.E.3. Notably, as the Court outlined above, Mr. Hughes's estimate takes into account the fact that the building must be compliant "with existing building codes and ADA and other federal regulations" and includes approximately $50,000 for a sprinkler system that was not present in the clubhouse that was damaged in the fire in February 2014. *See supra* Section V.E.3.

Therefore, for much the same reasons as Mr. Komarnicki's estimates, even assuming Mr. Hughes's estimate comports with the type of payment that the Defendants were required to make under the Policy (that is, a rebuild of the entire clubhouse), the Court finds that his estimate is an insufficient basis to prove that the Defendants' "Building" payment was improper. Indeed, just as with Mr. Komarnicki's estimate, Mr. Hughes's opinion of the cost for a new clubhouse is approximately $500,000.00 higher than what the new clubhouse actually cost

---

[31] For the same reasons, even if Mr. Komarnicki's estimates were evidence of a breach by the Defendants, the Court would find that neither of Mr. Komarnicki's estimates is a basis upon which the Court could award damages to the Plaintiffs with "reasonable certainty." *Ware*, 322 F.3d at 225–26.

the Country Club to build ($2,284,596.00 minus less than $1.8 million).[32] Further, Mr. Hughes's estimate includes increased costs of construction (ADA compliance and monies for the sprinkler system) that are well in excess of the $25,000.00 limit that the Policy places on payments for such increased costs of construction. In other words, under the Policy, the Defendants clearly would not owe the Plaintiffs the entire amount (or perhaps anywhere near the entire amount) of Mr. Hughes's estimate.

Accordingly, for all of these reasons, the Court finds that Mr. Hughes's estimate is not evidence upon which the Court could find that the Defendants breached the Policy.[33]

### iii. CBF's Estimate

Turning to CBF's estimate, that company opined that the cost of building "the [clubhouse] on the existing basement and assuming that the steel was reusable from [was] … approximately [$1.8 million]." *See supra* Section V.E.4. Further, the two-page CBF estimate included $231,121 for plumbing. *See supra* Section V.E.4.

With respect to this estimate, the Court does note that it is an appropriate comparison point to the estimate that the Defendants prepared—both arrive at a cost (or a projected cost) to rebuild the clubhouse on the existing basement while operating under the belief that at least some of the steel was reusable. However, the CBF estimate includes a significant allotment for plumbing (which may include the cost of a sprinkler system that was not present in the old clubhouse and that was required by law to be in the clubhouse after the fire), and the CBF

---

[32] The drastic disparity between Mr. Komarnicki's estimate for the rebuild and Mr. Hughes's estimate also causes the Court to question the accuracy of the monetary figures in both men's estimates.

[33] Just as with Mr. Komarnicki's estimates, even if Mr. Hughes's estimate was evidence of a breach by the Defendants, the Court would find that Mr. Hughes's estimate is not a basis upon which the Court could award damages to the Plaintiffs with "reasonable certainty." *Ware*, 322 F.3d at 225–26.

estimate is sixty-three pages shorter than the Defendants' estimate. Most fundamentally, the Plaintiffs have not offered the Court any reason to credit the CBF estimate over the estimate that the Defendants' prepared. That is critical because, in this case, the Plaintiffs bear the burden of proving that the amount that the Defendants paid out for the building claim was a breach of the Policy. *Ware*, 322 F.3d at 225–26. Therefore, because the Plaintiffs have not given the Court *any* reason to credit the CBF estimate over the estimate prepared by the Defendants, the Court finds that this estimate is insufficient evidence that the Defendants breached the Policy relative to the "Building" payment.

### iv.  Mr. Leisenring's Estimates

Turning to Mr. Leisenring's first estimate, he opined that the cost to reconstruct the first floor of the clubhouse and restore the basement would be $2,320,717.31. *See supra* Section V.E.5. However, Mr. Leisenring also testified that: (1) his initial estimate was high, a fact that he relayed to the Plaintiffs; (2) he purposefully used the "homeowner" setting on Xactimate for his first estimate, which would have unduly inflated the total price at which he arrived; and (3) his second estimate "was a more fair representation of what [FranJo Resoration/FranJo Construction] could do the project for[.]" *See supra* Section V.E.5. For all of these reasons, the Court finds that Mr. Leisenring's first estimate is unreliable evidence of the cost to reconstruct the first floor of the clubhouse and restore the basement, and the Court disregards it in full.

Turning to Mr. Leisenring's second estimate, he opined that it would cost $1,384,330.51 to reconstruct the first floor of the clubhouse and restore the basement. *See supra* Section V.E.5. Further, in his second estimate, Mr. Leisenring allotted $144,317.51 to restore the basement to its pre-fire condition. *See supra* Section V.E.5.

In analyzing Mr. Leisenring's second estimate, the Court first notes that it is for an amount of money that was less than what the Defendants paid out for the "Building" payment.[34] Further, while Mr. Leisenring's second estimate *may* include more monies for the restoration of the basement than the Defendants' estimate,[35] (*see* ECF No. 107 at 4), the Plaintiffs have once again given the Court no reason to find that, under the Policy, the amount of money that Mr. Leisenring allotted for the work on the basement is more accurate than the amount of money that the Defendants allotted. Therefore, the Court finds that Mr. Leisenring's second estimate is not a sufficient basis upon which to find that the Defendants breached the Policy relative to the "Buildings" payment.

In short, the Court finds that none of the estimates referenced by the Plaintiffs constitute sufficient evidence upon which the Court could conclude, by a preponderance of the evidence, that the Defendants breached the Policy relative to the "Building" claim.

> **b.     The Plaintiffs Have Failed to Show That the Defendants Breached the Policy Relative to the Steel and the Basement in the Old Clubhouse**

The Court now turns its attention to the Plaintiffs' arguments regarding the steel and the basement in the old clubhouse. Specifically, the Court considers whether the Plaintiffs have shown that the Defendants' actions relative to any of the following constitute a breach of the

---

[34] Of course, the Defendants' payment was also partially to repair the pro shop. However, having reviewed the Defendants' Final Building Repair Estimate, (Defendants' Exhibit 19), it is not clear that the $1.45 million payment included a great deal of monies for the pro shop.

[35] The Court emphasizes that it *may* include more monies because the Defendants' estimate is for a comparable amount as Mr. Leisenring's second estimate. Therefore, it may well be the case that the Defendants paid for similar materials, repairs, and the like for the basement as Mr. Leisenring, but they simply put those items under a different category of their estimate than did Mr. Leisenring.

Policy: (1) the steel in the old clubhouse, (2) the basement floor in the old clubhouse, and (3) the basement walls in the old clubhouse.

### i. The Plaintiffs Have Failed to Show That the Defendants Breached the Policy Relative to the Issue of the Steel in the Old Clubhouse

With respect to the steel in the old clubhouse, the Plaintiffs assert that Mr. Hughes and Mr. Komarnicki "determined that the steel was unusuable[.]" (ECF No. 98 at 31). Plaintiffs make this assertion as part of their claim that they are entitled to the full, blanketed "Building" payment of $2,228,700.00 under the Policy. (*Id.* at 28–32).

The Court finds that the Plaintiffs have failed to show that the Defendants breached the Policy relative to the issue of the steel in the old clubhouse. In order to explain that finding, the Court begins by outlining the opinions and testimony of the following three individuals: (1) Mr. Bernhardt of Providence, (2) Mr. Komarnicki, and (3) Mr. Hughes.

For his part, Mr. Bernhardt offered the following opinion regarding the structural steel from the first floor of the clubhouse: the "structural steel from the first floor that has not be[en] adversely affected by the fire (this issue has been addressed previously) can theoretically be re-purposed for use in the design and construction of the new country club." *See supra* Section V.E.1.b. Mr. Bernhardt then set forth items that the Country Club would need to consider if they reused the steel that had been in the fire. *See supra* Section V.E.1.b.

For his part, Mr. Komarnicki testified that Mr. Bernhardt is a good engineer, and the company for which he works has good engineers. *See supra* Section V.E.1.b. Further, with respect to the reuse of steel that has been damaged in a fire, Mr. Komarnicki stated that you

"can do anything and make anything work depending on where the dollars and cents comes down to." *See supra* Section V.E.1.b.

For his part, Mr. Hughes *testified* that the steel in the old clubhouse had "lost so much of its strength, that it wouldn't be safe to reuse." *See supra* Section V.E.3. However, in his first *report*, Mr. Hughes wrote that the "existing super structure steel framing could not be reused unless extensive structural analysis calculations were developed which never occurred." *See supra* Section V.E.3. Further, in Mr. Hughes's second report, he opined that the "prudent course of action during reconstruction was to scrap the *small amount of untrustworthy superstructure steel and replace it with new.*" *See supra* Section V.E.3 (emphasis added). And he stated that the "estimated cost of the superstructure steel … combined with the cost of further destructive testing, [and] the results of the calculated estimate of heat exposure led me to this decision." *See supra* Section V.E.3.

The Court notes that Mr. Hughes's *testimony* that the steel would not be safe to reuse is potentially inconsistent with Mr. Bernhardt's opinion that some of the steel could be reused. However, the Court stresses that Mr. Hughes's *reports* can be read in a manner that is generally harmonious with the opinions and testimony of Mr. Hughes and Mr. Komarnicki. And the Court finds Mr. Hughes's statements in his reports to be the clearest articulation of his opinion relative to the steel in the clubhouse. In those reports, he indicated that *some* of the steel might be able to be reused if appropriate testing were performed, but that cost considerations would counsel against doing such testing and potentially reusing the steel. Therefore, the Court finds that, in his trial testimony, Mr. Hughes was making a generalization about the steel based on cost—the Court eschews a reading of his trial testimony that would indicate that all of the steel

could not possibly be reused because such a reading would be inconsistent with his written reports.

Accordingly, considering the opinions and testimony of Mr. Bernhardt, Mr. Komarnicki, and Mr. Hughes, the Court finds that some of the steel in the old clubhouse may potentially have been able to be reused, but that, at the very least, certain considerations, such as those in Mr. Bernhardt's letter or Mr. Hughes's reports, would have to be undertaken before electing to reuse the steel.

This finding is critical because the Plaintiffs failed to offer evidence at trial indicating that the Defendants *did not* take into account the considerations that Mr. Bernhardt outlined when estimating the cost to repair the clubhouse. Indeed, the Court notes that the Defendants' Final Building Repair Estimate includes allotments of: (1) $7,542.20 for "Steel Components" and (2) $9,212.58 for "Temporary Repairs[.]" *See supra* Section V.E.1.b.[36] Therefore, the Court finds that the Plaintiffs have failed to prove that the Defendants neglected to account for the issue of the structural steel when paying out approximately $1.45 million on the "Building" claim.[37]

### ii. The Court Finds That the Plaintiffs Have Failed to Prove a Breach of the Policy Relative to the Issue of the Damage to the Basement Floor in the Old Clubhouse

---

[36] The Court stresses that it is not completely certain what specific expenditures these allotments were directed toward. However, the Court lists these allotments because they illustrate the point that the Plaintiffs, who bear the burden of proof in this case, have failed to prove that the Defendants did not properly account for the issues with the structural steel in making their "Building" payment under the Policy.

[37] Relatedly, because the Plaintiffs have offered neither: (1) an estimate of the cost to conduct the testing recommended by Mr. Hughes nor (2) an estimate of the cost to appropriately repair or reuse the damaged steel in the old clubhouse, the Court finds that, even if the Plaintiffs had proven a breach relative to the issue of the steel, the Court still could not calculate damages with "reasonable certainty." *Ware*, 322 F.3d at 225–26.

Turning to the damage to the basement floor in the old clubhouse, Mr. Komarnicki and Mr. Hughes both spoke to that issue.

For his part, Mr. Komarnicki testified that, when he went into the basement of the old clubhouse after the fire, "the floor had heaved in a couple of areas." *See supra* Section V.E.1.a.

Further, in Mr. Hughes's July 31, 2020, letter, he opined that given the cracks in the basement floor slab, combined with the "wall integrity issue[,]" it would be "cost effective to rebuild the entire basement." *See supra* Section V.E.3.

In short, both Mr. Komarnicki and Mr. Hughes testified that there were issues with the basement floor of the old clubhouse following the fire. However, neither man provided an opinion of what it would have cost to rectify the issues with the basement floor in a manner that accords with the Policy.

And, critically, the Plaintiffs have failed to show that the Defendants did not account for the issues with the basement floor in their sixty-five-page Final Building Repair Estimate, in which the Defendants made a payment for the repair of the clubhouse and the pro shop in an amount of approximately $1.45 million.

Therefore, the Court finds that the Plaintiffs have failed to show that the Defendants breached the Policy relative to the issue of the basement floor.[38]

### iii. The Court Finds That the Plaintiffs Have Failed to Prove a Breach of the Policy Relative to the Cracks in the Basement Walls of the Old Clubhouse

---

[38] Once again, even if the Plaintiffs had shown a breach of the Policy relative to the basement floor, the fact that they did not provide the Court with an estimate of the appropriate cost (under the Policy) to rectify the issues with the basement floor would lead the Court to conclude that it could not award damages with "reasonable certainty." *Ware*, 322 F.3d at 225–26.

Turning to the cracks in the basement walls of the old clubhouse following the fire, the Court must once again consider the testimony and opinions of: (1) Mr. Bernhardt, (2) Mr. Komarnicki, and (3) Mr. Hughes.

For his part, Mr. Bernhardt wrote the following regarding the cracks in the basement walls of the old clubhouse:

> The location of the cracks in the below grade masonry walls coordinate with the locations where the walls are retaining the maximum amount of earth load, further suggesting that the walls are overstressed. We would recommend that these walls be repaired prior to, or as part of, the rebuilding of the country club. *The walls in question could be reinforced with carbon fiber sheets applied to the interior face of masonry or by adding vertical posts elements at +/- 5'0"o.c. that would span from slab on grade to floor diaphragm above.*

*See supra* Section V.E.1.b (emphasis added).

For his part, Mr. Komarnicki indicated that the way to rectify the issues with the walls and the cement floor in the basement was "either using the structural metal panels on the interior walls and/or putting up pilasters on the inside[,]" which was the methodology suggested by Mr. Bernhardt. *See supra* Section V.E.2. Further, according to Mr. Komarnicki, the cost of the structural panels was almost $61,000, and the cost of the pilasters was $8,400. *See supra* Section V.E.2. Finally, Mr. Komarnicki clarified that Mr. Bernhardt's letter did in fact indicate that the basement walls could be repaired using *either* the "carbon fiber on the walls or the pilasters." *See supra* Section V.E.2.

For his part, when Mr. Hughes was asked to speak to the propriety of the repairs suggested by Mr. Bernhardt, Mr. Hughes testified as follows:

> So what I'm saying is that when you combine that with the floor slabs—there was no testing done. I never saw anybody run analysis calculations to prove. But, typically, when I see a wall that's bowed like that—you can see it in the

photographs—and it's obviously cracked, you could see the cracks—no. You know what I mean, it's—*it's not worth it.*

*See supra* Section V.E.3 (emphasis added).

Finally, the Court notes that, on page forty-one of Depositors' estimate for the repairs to the clubhouse and the pro shop, the company allotted $7,318.91 for "vertical posts figured for basement walls as explained in the Providence … report. This was figured for areas to have damage on wall facing the lake side of the basement." *See supra* Section V.E.1.b.

For the following reasons, the Court finds that the Plaintiffs have failed to prove that the Defendants breached the Policy relative to this payment of $7,318.91 for the pilasters.

First, the Court stresses that Mr. Hughes's testimony regarding the efficacy of the methods suggested by Mr. Bernhardt seemed to focus more on *cost* as opposed to whether Mr. Bernhardt's proposals would in fact address the structural problems with the basement walls. That fact is critical because whether it would have been more cost-effective for the Plaintiffs to build a new basement that was ADA compliant as opposed to accepting the repairs proposed by Mr. Bernhardt is not the relevant question under the Policy. Therefore, the Court finds that Mr. Hughes's testimony and reports are not a basis upon which the Court can find that the Plaintiffs have proven a breach of the Policy.

Second, although Mr. Komarnicki may have indicated that he believed the basement walls needed *both* the structural panels and the pilasters, the Plaintiffs have given the Court no reason to believe Mr. Komarnicki over Mr. Bernahrdt on these issues, especially given the fact that Mr. Komarnicki vouched for Mr. Bernhardt as an engineer.

Finally, although Mr. Komarnicki allotted $8,400 for the pilasters and the Defendants paid out $7,318.91 for the pilasters, the Plaintiffs have given the Court no reason to believe that Mr. Komarnicki's estimate was more accurate than the Defendants' estimate, especially given how drastically high Mr. Komarnicki's other estimate was in this case.

Therefore, for all of the foregoing reasons, the Court finds that the Plaintiffs have failed to show that the Defendants breached the Policy relative to their payment to rectify the issues with the walls in the basement of the old clubhouse.

In concluding this section, the Court stresses that it is not finding that the Defendants' "Building" payment was perfect in all respects. That is not the issue before the Court. Rather, the issue before the Court is whether the Plaintiffs have proven, by a preponderance of the evidence, a breach of the Policy relative to the "Building" payment. *Ware*, 322 F.3d at 225–26. On that score, the Court finds that the Plaintiffs have failed to carry their burden.[39]

### E.   The Court Holds That the Invoices Found in Plaintiffs' Exhibits 21 Through 24 Are an Insufficient Basis Upon Which to Find That the Defendants Breached the Policy

For the following reasons, the Court finds that the invoices paid by Dr. Valigorsky and others do not prove that the Defendants breached the Policy.

---

[39] While the Court does not find that the Defendants' "Building" payment was perfect in all respects, the Court does note that the Plaintiffs paid less than $1.8 million for their new clubhouse, which has features that were not present in the old clubhouse but that were necessary to comply with existing law as of the time of the rebuild (and therefore were subject to the $25,000.00 increased cost of construction limitation). Further, the Defendants paid the Plaintiffs approximately $1.45 million on the "Building" claim, with what appears to be a relatively small allotment for the damage to the pro shop included therein. In other words, the fact that the Defendants paid perhaps $1.3 million to $1.4 million for the damage to the clubhouse, and the Plaintiffs built a new clubhouse with features not covered by the Policy for under $1.8 million, further bolsters the Court's finding that the Plaintiffs have failed to prove a breach of the Policy by the Defendants relative to the "Building" claim.

First, as a general matter, the Court finds that the invoices submitted by the Plaintiffs lack credibility as proof of a breach in this case because they include items: (1) regarding which the Plaintiffs have effectively conceded that no payment is due under the Policy or (2) for which the Defendants have already paid out under the Policy. *See supra* Section V.F. Indeed, by way of example, Dr. Valigorsky testified that Plaintiffs' Exhibit 21 contains a payment that he issued in the amount of $125,000 for sprinklers that the Country Club did not have on the date of the fire. *See supra* Section V.F.1. In other words, Plaintiffs' Exhibit 21 equates to the Plaintiffs seeking $125,000 for a sprinkler system that is plainly subject to the $25,000.00 cap on increased costs of construction. *See supra* Section VI.D.2. Further, Plaintiffs' Exhibit 24 contains an invoice for a $9,419.00 payment that Dr. Valigorsky made for chairs. *See supra* Section V.F.4. However, Dr. Valigorsky testified that he had no reason to dispute that banquet chairs were "covered specifically in Line 834 of Depositors' building personal property estimate and paid[.]" *See supra* Section V.F.4. And indeed, that estimate does in fact indicate that Depositors issued a payment for banquet chairs in an amount *in excess* of what Dr. Valigorsky paid (approximately $28,000), *see supra* Section V.F.4, meaning that the Defendants have already issued a payment for this category of property under the Policy. Therefore, the Court deems Plaintiffs' Exhibits 21 through 24 an unreliable means of proving that the Defendants breached the Policy.[40]

Second, insofar as the invoices that constitute Plaintiffs' Exhibits 21 through 24 contain payments related to the construction of the new clubhouse, the Plaintiffs have failed to prove

---

[40] In making this finding, the Court stresses that it is not finding that the Plaintiffs are making any misrepresentation to the Court regarding the fact that these invoices *were in fact paid* by Dr. Valigorsky and others. Rather, the Court is simply finding that the invoices constitute an unreliable metric of proving a breach in this case because they include so many claims for items for which the Defendants have already paid or the like.

that the Defendants must pay for any such invoice under the Policy. Indeed, as the Court explained above, *see supra* Section VI.D, the Plaintiffs have failed to prove that the Defendants owe any additional monies on the "Building" claim under the Policy. Further, the Plaintiffs have not provided the Court with any specific accounting of how they spent any of the monies that the Defendants paid them under the Policy. Therefore, the simple fact that the Plaintiffs paid out monies toward the new clubhouse does not mean that the Defendants owed them those monies under the Policy—as far as the Court can tell, the Plaintiffs could have used any of the monies that the Defendants paid out for the "Building" claim on items wholly unrelated to the new clubhouse, thereby necessitating payments by Dr. Valigorsky and others for the costs of the new clubhouse.

Third, insofar as Plaintiffs' Exhibits 21 through 24 contain items for which the Plaintiffs seek additional "Business Personal Property" payments based on the theory that the Defendants breached the Policy, the Court finds that the Plaintiffs have not met their burden of proof. Indeed, the Court finds that employees of the Country Club submitted a list of the Business Personal Property destroyed in the fire to the Defendants, and that the Defendants predicated (at least in part) their $315,638.01 "Business Personal Property" payment on that list. Because that list was compiled by employees of the Country Club, the Court accepts it (as opposed to the invoices in Plaintiffs' Exhibits 21 through 24) as the conclusive list of all the Business Personal Property that was in fact: (1) damaged in the fire and (2) located in such a place that it was covered by the Policy. *See supra* Section V.B.3. Therefore, insofar as Plaintiffs' Exhibits 21 through 24 seek reimbursement for Business Personal Property for which the Defendants have not already paid under the Policy, the Court rejects the Plaintiffs' Exhibits

(and related testimony) as proof that those items were in fact: (1) damaged in the fire and (2) located in such a place that they were covered by the Policy. Further, insofar as the Plaintiffs argue that there are items for which the Defendants paid out under the Policy and that are included in the invoices in Plaintiffs' Exhibits 21 through 24, the only argument that the Plaintiffs can (potentially) successfully make is that the Defendants owe additional Replacement Cost holdback monies relative to those items. However, as the Court explains below, *see infra* Section VI.F, the Court finds that argument unavailing. Therefore, the Court finds that the Plaintiffs' Exhibits 21 through 24 are not a basis upon which the Plaintiffs have proven that the Defendants breached the Policy relative to the "Business Personal Property" payment.

Finally, insofar as the invoices that constitute Plaintiffs' Exhibits 21 through 24 include payments for items that are properly categorized under some other portion of the Policy, the Court finds that the Plaintiffs have not proven that any payment that the Defendants issued was improper under the Policy, meaning that the Plaintiffs have failed to prove that the Defendants must reimburse them for any of these invoices.

Therefore, for all of the foregoing reasons, the Court finds that the Plaintiffs have failed to prove a breach of the Policy based on Plaintiffs' Exhibits 21 through 24.

F. **The Court Finds That the Plaintiffs Have Failed to Prove a Breach of the Policy Relative to the Issue of Replacement Cost**

Turning to the issue of Replacement Cost, the Court begins by reiterating the fact that, per Depositors' own Replacement Cost Business Personal Property evaluation (the "Defendants' Business Personal Property Estimate"), the Replacement Cost for the Business Personal Property destroyed in the fire was $365,660.41. *See supra* Section V.D.1.b. However,

Depositors has only paid out $315,638.01 for Business Personal Property. *See supra* Section V.D.1.b.

Further, the Court finds that, under the Policy, Replacement Cost need not be paid "[u]ntil the lost or damaged property is actually repaired or replaced[.]" *See supra* Section V.B.4.

In light of the foregoing, the Plaintiffs contend that they are entitled to a sum of $50,022.40 in additional monies under the Replacement Cost provisions of the Policy (the $365,660.41 on the Defendants' Business Personal Property Estimate minus the $315,638.01 that the Defendants have already paid). (ECF No. 98 at 33). In support of this contention, Plaintiffs aver that they have "fully constructed a new Club and have purchased all of the furnishings and supplies listed in [the] Defendants' Business Personal Property Estimate." (*Id.*).

The Court finds this argument unavailing for the following reasons.

First, the Court notes that when the Plaintiffs allege, in their brief to the Court, that they have "purchased all of the furnishings and supplies listed in [the] Defendants' Business Personal Property Estimate[,]" they fail to cite any record testimony or evidence supporting that assertion. (*Id.*). The Plaintiffs simply offer the Court an averment that they have done so. On this basis alone, the Court cannot find that the Plaintiffs have proven that they have purchased every item on the Defendants' Business Personal Property Estimate.

Second, given all of the foregoing, the only potential argument that the Plaintiffs can make is that they are owed Replacement Cost holdback monies for certain items: (1) on the Defendants' Business Personal Property Estimate (2) that they have purchased, and (3) for

which they have not already received those Replacement Cost holdback monies.[41] However, this argument fails because the Plaintiffs have not provided the Court with an accounting of how much the Defendants have actually paid out for each item of Business Personal Property under the Policy. In other words, the Plaintiffs' argument fails because they have not provided the Court with any proof of the third requisite listed above.

Indeed, without a specific accounting of the amounts that the Defendants have already paid for each item of Business Personal Property due under the Policy, the Court cannot find that there is any single item that the Plaintiffs have purchased for which they have not already received the full Replacement Cost value set forth in the Defendants' Business Personal Property Estimate. To state it most plainly, the Court does not know which items make up the $50,000 difference between what the Defendants estimated and what they have paid out under the Policy.

Therefore, the Court finds that the Plaintiffs have failed to meet their burden of proof relative to the Replacement Cost issue.

### G.    The Court Finds that the Plaintiffs Have Failed to Prove That the Defendants Breached the Policy Relative to the Kitchen Equipment

The Plaintiffs allege that, in Mr. Leisenring's first estimate, he included an allotment of $304,383.95 for "unattached commercial kitchen equipment[.]" (ECF No. 107 at 2). Further, the Plaintiffs assert that the "costs of replacing commercial kitchen equipment not permanently attached are not included in the normal and regular costs of building the structure and were more correctly included in the coverage allocated for the replacement of [B]usiness [P]ersonal

---

[41] If the Plaintiffs do not prove the third component of this sentence, they would of course fail to prove that they are owed any additional monies for that item under the Policy.

[P]roperty[.]" (*Id.*). The Plaintiffs also note that the Defendants included an allotment of $116,470.64 in their Final Building Repair Estimate for "kitchen equipment that was not permanently installed[.]" (*Id.* at 3). All told, the Plaintiffs contend that they are entitled to the $304,383.95 from Mr. Leisenring's first estimate as part of the Business Personal Property payment. (*Id.* at 5–6).

The Court finds this argument unavailing for the following reasons.

First, Mr. Leisenring's first estimate was not admitted into evidence in this case, (ECF No. 89), meaning that the amount of money that he allotted for unattached commercial kitchen equipment is not properly before the Court.

Second, even if the entirety of Mr. Leisenring's first estimate were properly before the Court, the Court finds that the monetary figures contained therein are wholly unreliable, for the reasons the Court set forth above. *See supra* Section VI.D.2.a.iv. Therefore, the Court holds that Mr. Leisenring's first estimate is not a basis upon which to find that the Defendants' payment of approximately $116,000 for the unattached commercial equipment constitutes a breach of the Policy.[42]

Accordingly, the Court finds that the Plaintiffs have failed to prove a breach of the Policy relative to the unattached kitchen equipment.[43]

---

[42] For the same reasons, the Court rejects any additional arguments by the Plaintiffs that are premised on monetary figures from Mr. Leisenring's first estimate.

[43] As the Court has indicated above, it is possible that the Defendants included approximately $116,000 in their "Building" payment that actually should have been considered part of the Building Personal Property payment. However, the Plaintiffs have not referred the Court to any provision of law indicating that simply misclassifying an insurance payment constitutes a breach of an insurance policy, and the Court is unaware of any legal principle to that effect. On the contrary, at least as a general matter, when "an insurance company has paid the proceeds of an insurance policy, there can be no breach of contract

**H.      The Plaintiffs Have Wholly Failed to Prove That the Defendants Breached the Policy**

Before concluding, the Court stresses that it has considered: (1) all of the Plaintiffs' arguments in this case, (2) the entirety of the testimony offered at the bench trial in October 2022, and (3) the evidence before the Court. Upon doing so, the Court finds that the Plaintiffs have wholly failed to prove that the Defendants breached the Policy. *Ware*, 322 F.3d at 225–26.

## VII.   Conclusion

For the reasons stated above, the Plaintiffs' request for relief on their Breach of Contract claim is denied. Accordingly, the Court will enter judgment in favor of the Defendants and against the Plaintiffs.

An appropriate order follows.

---

claim because the insured has received what he was due under the policy and therefore has no damages." *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 629 (W.D. Pa. 2014). In this case, the Plaintiffs have failed to prove that the Defendants did anything other than pay what was due under the Policy. Therefore, the Court finds that the Plaintiffs have failed to succeed on their breach of contract claim, even if the Defendants misclassified the approximately $116,000 payment for the unattached commercial kitchen equipment.

Finally, the Court notes that the Plaintiffs reference the fact that, in the Defendants' Final Building Repair Estimate, they referred to "labor minimums[.]" (ECF No. 107 at 4). Simply put, the Plaintiffs have failed to show that the Defendants breached the Policy by referring to (or utilizing) "labor minimums" in that estimate.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUBOIS COUNTRY CLUB, LTD and | ) | Case No. 3:19-cv-190 |
| JUNIATA LAKE PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| DEPOSITORS INSURANCE COMPANY, | ) | |
| ALLIED PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY, and | ) | |
| NATIONWIDE MUTUAL INSURANCE | ) | |
| COMPANY & AFFILIATED COMPANIES, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, this ___10th___ day of October, 2023, the Court having conducted a bench trial

on the issue of Plaintiffs Dubois Country Club, LTD and Juniata Lake Properties, LLC's Breach

of Contract claim, and upon consideration of the parties' Proposed Findings of Fact and

Conclusions of Law and other relevant filings on the record before the Court, (ECF Nos. 96–98,

103, 104, 107, 109), and for the reasons set forth in the accompanying Memorandum Opinion, **IT**

**IS HEREBY ORDERED** that Plaintiffs Dubois Country Club, LTD and Juniata Lake Properties,

LLC's claims for relief are **DENIED**.

The Court will enter Judgment in favor of Defendants Depositors Insurance Company, Allied Property and Casualty Insurance Company, and Nationwide Mutual Insurance Company and Affiliated Companies and against Plaintiffs Dubois Country Club, LTD and Juniata Lake Properties, LLC.

BY THE COURT:

_____

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**